UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

TODD PHILLIPS, ET AL                      CIVIL ACTION NO. 17-cv-1524

VERSUS                                    JUDGE DOUGHTY

JULIAN C. WHITTINGTON, ET AL              MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

**Introduction**

Residents of north Bossier Parish experienced a rash of vandalism and property crimes that began in 2010 and continued for several years. Local law enforcement authorities were under pressure to arrest someone for the crimes that affected dozens of victims. The sheriff eventually charged local resident Todd Phillips with criminal property damage, a misdemeanor. Two years later, the Bossier Parish District Attorney amended the charge to a felony offense of simple arson.

With the trial date on the felony charge approaching, Mr. Phillips filed this federal action and asked for (1) an injunction to halt the state court trial and (2) an award of damages. A few weeks later, sheriff's deputies executed a search warrant at the home of Gary Wilson, a man who had claimed to be among the victims, fed information to investigators, publicly accused Phillips of the crimes, and testified as a state witness at a pretrial hearing. The search of Wilson's home revealed evidence that connected Wilson to arson and other crimes, and Wilson was arrested. The DA later dismissed all charges against Mr. Phillips.

Mr. Phillips, his wife, and two daughters present their claims in a third amended complaint. Doc. 35. Phillips dropped his claim for injunctive relief after the DA dismissed the criminal charge, but the family still seeks damages from Sheriff Julian Whittington, two deputies, DA Schuyler Marvin, ADA Hugo Holland, Gary Wilson, and Coty Wilson (Gary's son). Before the court is a Motion to Dismiss (Doc. 39) filed by DA Marvin and ADA Holland. For the reasons that follow, it is recommended that the Motion to Dismiss (Doc. 39) be granted in part and denied in part.

**Relevant Allegations**

The DA and ADA defendants have challenged the third amended complaint by filing a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 127 S.Ct. 2197, 2200 (2007). Accordingly, the facts set forth below are taken from the Phillips family's third amended complaint and accepted as true for purposes of this motion. Of course, this is only the Phillips' side of the story, and evidence could later demonstrate a different set of facts.

Beginning in 2010, residents began to report property crimes near the Old Plain Dealing Road area in north Bossier Parish. The third amended complaint describes more than 40 incidents between 2010 and 2015 where residents reported flat tires on a truck or ATV, or even personal injury, caused by homemade spikes that had been placed in roads or trails near hunting areas. There were also reports of theft of a hunting camera, vandalism of deer stands and hunting camps, and arson that destroyed multiple hunting camps.

Anonymous letters, phone calls, and other clues appeared to cast suspicion on certain persons.  One resident who found two spikes on an access road also found a plaid men's shirt on the ground nearby.  Inside the shirt was a small walkie talkie with "L. Burns" written on it in black marker.  The name was thought to identify Landon Burns, but the shirt was too small to fit him.  Detectives concluded that the real perpetrator(s) intentionally placed the shirt and walkie talkie to mislead investigators.  Third Amended Complaint, ¶¶ 11-12.

Tammy Brunson received an anonymous phone call from a female caller in 2011.  The caller said she needed to "clear her conscience" and was looking for a man to tell him that his green camp house on Highway 160 had been destroyed.  Mrs. Brunson advised that the only green camp house in that area belonged to her and her husband.  The caller said that she was with Gregory Bickham when he vandalized the camp, and Bickham hid stolen items under his trailer.  Deputies accompanied the Brunsons to their camp, where they found it in disarray and vandalized with threatening messages carved into the front door.  Deputies learned that the anonymous call came from a pay phone in the area.  A search of Mr. Bickham's residence did not find any evidence of his involvement, and his cell phone records confirmed that he was in Texas at the time of the burglaries.  Detectives concluded that the real perpetrator(s) named Bickham in an effort to mislead them.  ¶¶ 17-20.

Stephen Adams reported to deputies that he found a cellphone box suspended 10-12 feet in the air on his hunting lease.  Inside the box was a plastic baby doll with, "cry baby," "kiss my ass," and "Mark 13:35" written on it.  ¶ 22.  Another resident received a

threatening letter that read: "Keep that bitch off my lease I can get to your cows just as easy. Keep the bitch off my lease." ¶ 23.

Sheriff Whittington took office in July 2012, after the property crimes had been occurring for over a year. He received multiple complaints from residents and was under pressure to make an arrest. ¶ 84. He appointed Lt. Bruce Bletz as the lead investigator and instructed him to identify and arrest a suspect. ¶ 85. Todd Phillips, in August 2012, was promoted to Vice President/General Manager of Frymaster Corporation. The company services food-chains across the world and requires that Phillips travel across the United States and to foreign countries on a regular basis. ¶¶ 97-98.

Mr. Phillips' name became associated with the events after his name was found written on an item near a crime scene. A resident reported that his deer stand had been burned down, and a game camera and metal box were missing. Deputies located the camera and box on the property, and they also located a small green Coleman fuel bottle with the name "Todd Phillips" written on it in black marker. ¶ 26.

In November 2012, deputies were investigating another complaint of a deer stand and game camera being burned when they found a GPS device. The GPS had been taken from a deer stand and placed in the bed of another man's truck. Detectives also found a rigged incendiary device in a deer stand that was made from items including a Powerade bottle, diesel fuel, and a Bute syringe that had been prescribed for a horse that belonged to the Phillips family. Next to the device was a trash bag that contained a Styrofoam cup with the name "Karen" written on it with a pen. ¶ 27.

Detectives obtained a search warrant to search the Phillips' property and outside buildings.  They searched the residence and two barns on the property, but they found nothing to connect any members of the Phillips family to the crimes.  Daughter Abby Phillips told the deputies that the syringe was used for her horse and had been discarded after use.  Mr. and Mrs. Phillips told deputies that they recognized the "Karen" cup as one used by their friend, Karen Sherratt, who had visited the week before.  The cup and syringe had been placed in the trash at the end of their driveway, which is about .3 miles from the home and cannot be seen from the home in the heavily wooded area.  The Phillips family voluntarily submitted fingerprints, and Todd Phillips gave a DNA sample and a handwriting exemplar.  None of that information linked the Phillips family to any of the crimes.  ¶¶ 28-31.

About a month after the search of the Phillips property, Crime Stoppers received an anonymous call that identified Blake Barton as the person responsible for the crimes.  The caller told investigators to look for a hole near a pine tree behind Barton's residence. Detectives found the hole, inside of which was a camouflage fanny pack with tire spikes, a torch, part of a blue flashlight, and a black trash bag with household trash that included a magazine with a subscription label for Mrs. Phillips.  ¶¶ 32-33.  Barton denied any knowledge about the items found on his property, and detectives concluded that the items were intentionally placed there in an effort to mislead them.  ¶ 35.

Blake Barton's father received a call from an unknown man who warned that Blake better sell his trailer or it would be burned down.  The caller said that Blake was trying to set up Todd Phillips.  The call was traced to a pay phone in the area.  ¶ 37.

Some of the crime scene messages made reference to Lt. Bletz, the lead investigator for the sheriff.  One man found a toilet bowl in his driveway with writing on it: "2 John 1:12" and "Bletz career." ¶ 39.[1]  Deputies found graffiti that was red paint in the shape of a body with "Bletz Gossip" written at the feet.  ¶ 40.  A resident received a letter that identified a location.  When detectives arrived, they found a toilet tank top at the edge of a dirt grave with "Bletz a/k/a Inspector Clouseau Wearried Himself to Death" and a black dancing monkey drawn on the toilet.  ¶ 48.  Another resident found a plastic bottle near one of the metal spikes.  Inside the bottle was a message: "Call Detective Clouseau ***-****." ¶ 54.

An area resident received a letter that stated: "We know your son is helping Phillips and you know it two chief no hair will not get off his ass to do anything so I will I have always hated you anyway you and your son are going to hell and I'm going to send y'all there." ¶ 56.  A Shreveport policeman who lived in the area reported finding spikes in his driveway.  The spikes were made from crushed beer cans with nails and tacks driven through them, and the cans had "talk talk talk" written on them in black marker.  ¶ 65.

Doctor and Mrs. Bobby Hewlett lived on Old Plain Dealing Road.  They were awakened in December 2015 when an explosive device went off beneath the main bedroom of their pier-and-beam home.  Douglas Holley, who lived on their horse farm in a separate residence, was arrested several days later and charged with the bombing.  Despite the proximity of the Hewlett farm to the other property crimes and the use of an explosive

---

[1] The referenced Bible verse reads: "Having many things to write unto you, I would not write with paper and ink: but I trust to come unto you, and speak face to face, that our joy may be full."

device, Bossier detectives, after consultation with ADA Holland, refused to investigate whether Douglas Holley was responsible for or connected to the other property crimes. ¶ 77-78.

Gary Wilson, who was ultimately charged with the crimes, made victim reports or provided information to law enforcement on several occasions. He reported that he suffered flat tires on an ATV or his truck on at least three occasions. ¶¶ 36, 41, and 66. He reported that his deer camp had been burned down, and he reported a few weeks later that a deer stand and game camera had been burned. ¶¶ 25, 27. Wilson gave deputies a Propel Zero drink bottle and part of a blue flashlight that he reported finding in a tree next to his deer lease. ¶ 34. Those items were similar to items found at crime scenes. Gary Wilson contacted Lt. Bletz and reported finding (1) metal spikes and (2) a clear plastic bottle hanging from a nearby tree with a paper inside with writing: "Never Say I Can't Go On Any Longer!" ¶ 44.

Gary Wilson later reported that his home had been vandalized while he was out of town. Detectives saw that his walls had been broken through with an axe, and his furniture and other personal belongings destroyed. ¶ 76. About a year later, Wilson reported that his secondary residence had been burned down. ¶ 79.

Lt. Bletz was aware that the perpetrator had made multiple attempts to mislead and taunt detectives by attempting to direct them toward certain persons. ¶ 86. The search of the Phillips home did not reveal any incriminating information, and no witness ever identified any member of the Phillips family at the scene of any of the crimes. The only items that connected the Phillips family were the syringe, magazine, and cup that had been

placed in the trash, and the small propane bottle with "Todd Phillips" written on it. Such bottles can be purchased at any hardware or sporting goods store and are commonly used by hunters and outdoorsmen. ¶¶ 87-96.[2]

Despite the lack of evidence against the Phillips family, Lt. Bletz and other investigators began reporting to members of the community that Todd Phillips was a suspect. Gary Wilson developed a close relationship with Lt. Bletz and repeated to members of the community that Bletz said that Phillips was guilty, which encouraged public outrage. ¶ 99.

ADA Holland, Lt. Bletz, and others disregarded the evidence placed at various scenes that identified suspects other than Mr. Phillips. ADA Holland advised Bletz and other detectives that any exculpatory evidence in Mr. Phillips' favor should be disregarded or considered planted by Mr. Phillips. The investigators intentionally misrepresented facts and evidence in their offense reports in an effort to bolster their case against Phillips. ¶¶ 101-03.

Three signs appeared near the Phillips home in March 2013. The signs featured the same type of writing used on the messages sent to members of the community, and each referenced a different Bible verse. One sign was placed directly across the highway from the Phillips' driveway, and the other two were placed along Old Plain Dealing Highway so that the family would see the signs on their way home.

---

[2] Most such bottles cost just a few dollars, hold only enough propane to power an item for a few hours, and are not refillable. It would be unusual for someone to write his name on such a disposable item.

Todd Phillips was in China on behalf of Frymaster when the signs went up. Mrs. Phillips and one of her daughters saw the signs while coming home from a rodeo on a Friday evening. They were afraid because the signs appeared to be connected to the several crimes in the area. They called a friend who came to their home and called the sheriff's office. Deputies arrived, but they did not tell Mrs. Phillips that Lt. Bletz and other deputies, after consultation with and pursuant to the advice of ADA Holland and Sheriff Whittington, were the ones who placed the signs. Mrs. Phillips and her daughter spent the night with a friend and did not return until it was daylight and their home was checked for danger. ¶¶ 104-105.

Lt. Bletz later testified in court and admitted that he and other deputies placed the signs with the knowledge and advice of the sheriff and ADA Holland. He said the signs were placed in an effort to "communicate" with Mr. Phillips, whom he believed to be responsible for the crimes. This attempt at communication was made despite knowing that Mr. Phillips had retained counsel and had twice given voluntary statements at the request of Lt. Bletz. ¶ 107.

Sheriff Whittington, Lt. Bletz, and other deputies failed to investigate and made repeated, disparaging remarks about Mr. Phillips, which incited angst and outrage by other members of the community. The Phillips family was forced to move from their home in Benton, Louisiana to Marshall, Texas. One of their daughters had to travel back and forth from Marshall to Benton to complete her senior year of high school. ¶ 111.

The sheriff's office issued a citation to Todd Phillips in June 2015 for the misdemeanor offense of criminal property damage. Phillips alleges that the citation was

issued "without probable cause" and "after consultation with and pursuant to the instructions of ADA Holland and other prosecutors in the Bossier Parish DA's office, despite their knowledge that there was no evidence connecting Mr. Phillips to the misdemeanor offense." ¶ 112.

ADA Holland, acting as a special prosecutor, filed a bill of information that charged Mr. Phillips with one count of simple criminal damage to property. The bill alleged that "during March of 2014" Phillips intentionally damaged ATV tires of Gary Wilson and Jimmy Hope by means of hidden fabricated metal tire spikes. The damage was described as less than $500, which made it a misdemeanor count. This prosecution was initiated "without probable cause," and there was "no evidence connecting Mr. Phillips to the misdemeanor offense." ¶¶ 113-114.

ADA Holland filed a Rule 404(B) notice that identified approximately 60 other crimes that the State sought to introduce as evidence at the misdemeanor trial. Phillips moved to exclude the evidence of these other crimes. ADA Holland proposed a plea agreement whereby Mr. Phillips would plead guilty to one misdemeanor count and pay restitution of approximately $60,000. Holland threatened that if Phillips rejected the plea offer he would bring additional charges and keep Phillips tied up in litigation for years. ¶¶ 115-116.

KTBS 3 television news aired a story about the case that included a statement by ADA Holland: "Not a single person is gonna tie Todd Phillips to the property damage." Holland also stated his intent to file more charges against Phillips if he did not accept the plea offer. ¶ 118. During that and other news segments, Holland made false

representations to the media and the public that Mr. Phillips was responsible for all of the acts of property damage and for sending threatening letters to witnesses and others. ¶ 119.

The state court held a Rule 404(B) hearing that lasted four and one-half days. Lt. Bletz testified, "We have no witnesses whatsoever who saw Todd Phillips at or near any of these properties at or near any of the times we think these spikes got put down." ¶ 120. Gary Wilson and Coty Wilson testified for the State at the hearing. Gary testified that he had been a victim of multiple acts of vandalism and had received multiple writings from the perpetrator. ¶ 121. The trial judge ruled that five of the alleged "other crimes" were admissible at the misdemeanor trial. ¶ 123.

Sheriff Whittington, ADA Holland, Lt. Bletz, and other deputies then "conspired together to cause Mr. Phillips to again be falsely arrested and to continue their malicious prosecution …" ADA Holland prepared and signed an affidavit seeking an arrest warrant for Phillips for the felony offense of simple arson with damage over $500. "Upon information and belief, ADA Holland intentionally omitted from the affidavit exculpatory information pertaining to Mr. Phillips and/or intentionally or with reckless disregard for the truth made false statements to cause the arrest warrant to issue." ¶ 124.

The DA's office filed an amended bill of information in August 2017 that dismissed the misdemeanor charge and formally charged Mr. Phillips with the felony count. Phillips was required to turn himself in. He was booked, posted bail, and pleaded not guilty. He alleges that his arrest was "not supported by probable cause and is an intentional and malicious act" by ADA Holland and the others to continue to cause him embarrassment and humiliation and force him to pay restitution to the victims. ¶¶ 125-128.

The Bossier investigators continued to investigate the crimes even after Phillips was charged with the felony. DA Marvin and ADA Holland, along with the others, "withheld the fact that their investigation remained ongoing and that additional suspects were being investigated." ¶ 129. Deputies executed a search warrant for the home of Gary Wilson in February 2018 and found evidence connecting Wilson to the arsons and other property damage crimes. ¶ 130.

Gary Wilson was arrested and charged with two counts of communication of false information of planned arson, and investigators released a statement that Wilson was also being investigated for his possible involvement in the vandalism of the deer camps and the spiking incidents. ¶ 131. Counsel for Mr. Phillips sent a letter to ADA Holland and DA Marvin in February 2018 and requested that the charges against Phillips be dismissed. They refused to do so despite their public admissions of evidence connecting Wilson to the crimes. ¶ 133.

Gary Wilson soon faced additional charges of obstruction of justice and injuring a public record. Coty Wilson, his son, was arrested in March 2018 and charged with two counts of obstruction of justice. "On March 13, 2018 DA Marvin acknowledged Mr. Phillips' innocence and sent a letter to the Bossier Parish Clerk of Court requesting that the charges against Mr. Phillips be nolle prossed." ¶ 139.

Soon after Mr. Phillips filed his third amended complaint, it was widely reported that Coty Wilson and his mother died after they jumped from a bridge into the Red River. The two left goodbye notes, and their bodies were found tied together. The coroner ruled that the deaths were apparently suicides. It was also reported that Gary Wilson is suspected

of mailing GPS coordinates that lured deputies to the site of a mock grave for the DA. A few feet in front of the grave was an abandoned well concealed with chicken wire and leaves.  Fortunately, no one was injured before the well was discovered.  Gary Wilson remains in jail facing charges that include attempted murder, insurance fraud, and falsely reporting an arson.

**Rule 12(b)(6)**

DA Marvin and ADA Holland challenge the complaint with a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  "To survive a  Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'"  Cuvillier v. Taylor, 503 F.3d 397, 401 (5th Cir. 2007), quoting Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964-65 (2007).

The facts alleged, taken as true, must state a claim that is plausible on its face. Amacker v. Renaissance Asset Mgmt. LLC, 657 F.3d 252, 254 (5th Cir. 2011).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009).  A complaint is not sufficient if it offers only "labels and conclusions," or "a formulaic recitation of the elements of a cause of action." Id. (quoting Twombly, 127 S.Ct. at 1965).

**Prosecutorial Immunity**

Section 1983 creates a right of action to vindicate violations of rights secured by the Constitution. 42 U.S.C. § 1983. Despite the broad reach of the statute enacted by Congress, the Supreme Court has long recognized that the statute is subject to a number of immunities that have been extended to legislators, judges, witnesses, and prosecutors for certain actions taken by them. Loupe v. O'Bannon, 824 F.3d 534, 537-38 (5th Cir. 2016).

The absolute immunity of prosecutors was addressed in Imbler v. Pachtman, 96 S.Ct. 984 (1976), which held that a former prisoner whose conviction had been set aside could not maintain a Section 1983 action against the prosecutor who had litigated the charges against him. The Court stated that "a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution" was not subject to suit under Section 1983. Id. 96 S.Ct. at 985.

The holding in Imbler has been applied in a number of settings to determine whether absolute immunity was or was not available to a prosecutor. The determination relies on a "functional approach" and is not grounded in any special esteem for those who perform the functions. In determining immunity, the court examines "the nature of the function performed, not the identity of the actor who performed it." Forrester v. White, 108 S.Ct. 538, 545 (1988). As an example, Forrester held that a judge did not have judicial immunity for actions taken in an administrative capacity when he demoted and fired a probation officer. The mere fact that a person holds the title judge or prosecutor does not afford him immunity for all actions taken in connection with his job.

It has developed that a prosecutor is absolutely immune for initiating and pursuing a criminal prosecution, for actions taken in his role as "advocate for the state" in the courts, or when his conduct is intimately associated with the judicial phase of the criminal process. Loupe, 824 F.3d at 539. On the other hand, a prosecutor is afforded only qualified immunity for acts performed in the course of administrative duties and investigatory functions that do not relate to his preparation for the initiation of a prosecution or for judicial proceedings. Id.

ADA Holland's motion and immunity arguments focus solely on absolute prosecutorial immunity. His motion does not argue for qualified immunity; the word "qualified" does not appear in the motion or reply memorandum. Accordingly, that potential defense is not at issue in this report and recommendation. DA Marvin is sued only in his official capacity and relies on Eleventh Amendment immunity, which will be addressed separately.

**Claim by Claim Approach**

The Phillips family's complaint sets forth several paragraphs of factual allegations, followed by six federal "claims" or counts and eight state-law claims/counts. The DA defendants' Rule 12(b)(6) and absolute immunity defenses are directed only at the federal claims. They ask that, with respect to the state-law claims, the court decline to exercise supplemental jurisdiction over them if all federal claims are dismissed.

When a prosecutor raises absolute immunity, the court should review each of the various claims asserted by the plaintiff and assess the nature of the conduct on which the claim is based. Cousin v. Small, 325 F.3d 627, 632 (5th Cir. 2003). Accordingly, the court

will review each federal claim separately and apply the functional approach to determine whether absolute immunity shields the prosecutors from liability for the actions alleged in each particular claim.

**Claim I: False Arrest**

### A. Absolute Immunity

Claim I is for false arrest.  Mr. Phillips directs that claim at the sheriff, two of his deputies, and ADA Holland.  He refers to the earlier allegations of fact and contends that they establish violations of his rights under the Fourth and Fourteenth Amendment to be free from unreasonable and unlawful seizures of his person.  Mr. Phillips alleges that he suffered injuries, including emotional distress, in connection with being falsely arrested by the defendants.  ¶¶ 140-46.

There are only two incidents described in the complaint that might support a false arrest claim.  The first is that the sheriff's office issued Mr. Phillips a misdemeanor citation on June 21, 2015.  Plaintiffs allege that the citation was issued after consultation with and pursuant to the instructions of ADA Holland, despite his knowledge that there was no evidence connecting Mr. Phillips to the misdemeanor offense.  ¶ 112.

That 2015 event occurred more than one year before this civil action was filed in November 2017.  Movants have not raised a limitations defense, but a claim for false arrest based on this event would appear to be untimely given that a false arrest claim under Section 1983 accrues as soon as the allegedly wrongful arrest occurs.  Wallace v. Kato, 127 S.Ct. 1091 (2007); Spikes v. Williams, 644 Fed. Appx. 334 (5th Cir. 2016).  The court will not raise the timeliness defense for a defendant, but perhaps the potential untimeliness

explains why Plaintiffs do not make any argument in their memorandum that a false arrest claim against the DA defendants can be based on the 2015 misdemeanor citation.

The other event on which a false arrest claim might be based is the allegation that ADA Holland and the sheriff defendants conspired together to cause Mr. Phillips to be falsely arrested for felony arson. The complaint alleges that "ADA Holland prepared and signed an affidavit seeking an arrest warrant from Mr. Phillips for the felony offense of simple arson …" It adds that Holland intentionally omitted from the affidavit exculpatory information and intentionally or with reckless disregard for the truth made false statements in support of the warrant application. ¶ 124.

Holland argues that he is entitled to absolute immunity in connection with the warrant application. Under the facts alleged, he is not. A prosecutor who appears in court in support of an application for a search warrant and presents supporting evidence is protected by absolute immunity. Burns v. Reed, 111 S.Ct. 1934 (1991). A prosecutor is also entitled to absolute immunity in connection with the preparation of an application for an arrest warrant and the filing of the application, but such immunity does not apply to the act of personally attesting to the truth of the evidence presented to a judicial officer. If the prosecutor is fulfilling the function of a witness by executing an affidavit regarding the facts in support of an arrest warrant, he is not entitled to absolute immunity for claims in connection with that function. Kalina v. Fletcher, 118 S.Ct. 502 (1997); Spivey v. Robertson, 197 F.3d 772 (5th Cir. 1999).

Plaintiffs allege that ADA Holland "prepared and signed an affidavit seeking an arrest warrant" for arson, so he is not entitled to prosecutorial immunity for a false arrest

or other Section 1983 claim based on that action.  If Holland contends that he did not personally execute the affidavit of facts in support of the warrant application, then that is an attack on the facts alleged, and it will have to be presented by motion for summary judgment or at trial.  The facts alleged by Mr. Phillips must be accepted as true at this point.[3]

### B. Failure to State a Claim

The DA defendants also attack the false arrest claim under Rule 12(b)(6).  Their original memorandum set forth two short paragraphs that contended the fact that the arrest was accomplished by legal process, apparently referencing the warrant, defeated the claim.  That is not necessarily the case.

Sheriff's deputies and other defendants argued in a recent case that the issuance of an arrest warrant insulated them from liability on the arrested man's Fourth Amendment claim.  McLin, 866 F.3d at 689.  The Fifth Circuit explained that when the facts supporting an arrest are placed before an independent intermediary such as a judge, the intermediary's decision to issue a warrant breaks the chain of causation for false arrest and insulates the initiating party.  But the initiating party may be liable for false arrest if the plaintiff shows that the deliberations of the intermediary were in some way tainted by the actions of the defendant.  The plaintiff must show that the defendant's "malicious motive led the official

---

[3] The Fifth Circuit recently afforded qualified immunity to officers who were involved in the plaintiff's voluntary surrender to an arrest warrant because it was not clearly established in 2012 that such a surrender constituted a Fourth Amendment seizure.  The court held on August 8, 2017 that such a surrender was a seizure, thus clearly establishing the law for future cases.  McLin v. Ard, 866 F.3d 682, 696 (5th Cir. 2017).  Mr. Phillips turned himself in on the felony charge on August 31, 2017.  ¶ 126.

to withhold relevant information or otherwise misdirect the independent intermediary by omission or commission." <u>McLin</u>, 866 F.3d at 689.

      <u>McLin</u> addressed the "taint exception" in the context of a motion to dismiss. The plaintiff had alleged that the defendants did not possess any information that would be sufficient to swear out affidavits that made out a statutory violation, and that the arrest was based in whole or in part on material representations, omissions, and other inaccuracies. The complaint did not specify the particular omissions or errors; it merely alleged that there were such matters. The Court stated that, viewing those allegations in the light most favorable to the plaintiff, "the complaint pleads facts supporting the taint exception sufficient to survive a motion to dismiss." <u>McLin</u>, 866 F.3d at 690.

      Mr. Phillips pleaded similar facts that also pass Rule 12(b)(6) review. He alleged that ADA Holland intentionally omitted exculpatory information from his affidavit and made false statements to cause the arrest warrant to issue. That is sufficient under <u>McLin</u> to survive the motion to dismiss. If the DA defendants wish to test the facts alleged or attack particular elements of the claim, they will have to do so by motion for summary judgment or at trial.

## Claim II: Failure to Intervene

      The motion to dismiss generally raises absolute immunity to all federal claims, but the false arrest claim is the only one to which individual attention is devoted. Claim II begins, as do all the federal claims, with a general allegation that ADA Holland and the sheriff defendants were acting under color of law, pursuant to their office policies, and deprived Mr. Phillips of rights secured by the Constitution. ¶¶ 148-149. Claim II then

alleges that "unknown BPSO deputies" had knowledge throughout the investigation that the real perpetrator(s) were intentionally trying to mislead investigators, knew that the items connected to Mr. Phillips and his family were placed in a misleading manner, and that the prosecution of Mr. Phillips was not supported by probable cause. Mr. Phillips alleges that these unknown deputies had an opportunity to intervene and prevent the deprivation of his rights but failed to do so.

This claim mentions ADA Holland at the outset and, at the end, prays for an award of damages against him and the other defendants as a result. The substance of the claim, however, does not direct any allegations against Holland that would constitute a constitutional violation. This claim is limited to the unknown deputies. Accordingly, all claims against ADA Holland under Claim II (Failure to Intervene) should be dismissed.

**Claim III: Due Process and Excessive Pre-Accusation Delay**

Claim III alleges that the defendants, including ADA Holland, intentionally delayed filing a bill of information against Mr. Phillips on the felony offense. Phillips alleges that this action was not taken in good faith and, because of excessive delay, prejudiced him in his ability to defend against the felony offense. ¶¶ 157-158.

To prevail on a claim of pre-indictment delay to violate due process, the accused must show not only "substantial actual prejudice" but also that the delay was intentionally undertaken for the purpose of gaining some tactical advantage over him in the contemplated prosecution, and he must show an actual loss of evidence that would have aided the defense and cannot be obtained from other sources. Quinn v. Roach, 326 Fed.

Appx. 280, 291 (5th Cir. 2009). The dismissal of the charges against Phillips would make such a showing of actual prejudice difficult if not impossible.

In any event, ADA Holland is entitled to absolute immunity from this claim. The district attorney defendants in Quinn were accused of waiting 15 months after arrest to seek an indictment. The Fifth Circuit stated that the alleged wrongful act "concerns the decision of when and whether to file criminal charges, which clearly falls within the scope of the District Attorney Defendants' prosecutorial duties," meaning claims based on those allegations were barred by absolute prosecutorial immunity. Id. at 292. The same result should apply with respect to this claim. All claims against ADA Holland under Claim III (Due Process and Excessive Pre-Accusation Delay) should be dismissed.

**Claim IV: Due Process and Equal Protection**

This claim alleges that ADA Holland and the other defendants denied Mr. Phillips equal protection of the laws by failing to treat him "equally as all other citizens and/or 'suspects' identified throughout the course of their investigation." ¶ 164. Defendants have not directly challenged this claim under Rule 12(b)(6). It is subject only to the general assertion of absolute immunity.

This claim appears to be focused on the investigation and not any aspect of the actual prosecution or other judicial function. A prosecutor is not entitled to absolute immunity for giving legal advice to police, including advice as to whether there is probable cause to arrest. He is also not entitled to absolute immunity when he performs the investigative functions normally performed by a detective or police officer. Loupe, 824 F.3d at 538-40, citing Burns, 111 S.Ct. 1934 and Hoog-Watson v. Guadalupe, 591 F.3d 431, 438 (5th Cir.

2009).  Accordingly, ADA Holland is not entitled to absolute immunity with respect to investigation-related conduct alleged in Claim IV.

**Claims V and VI: Policy and Custom**

The doctrine of respondeat superior does not apply to Section 1983 claims. Accordingly, a sheriff or district attorney may not be held liable under the statute based merely on the actions of his subordinates.  Such officials may, however, be liable if their official policy or custom was the moving force behind the constitutional violation committed by the subordinate.  Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001).

Claim V alleges that Sheriff Whittington had unconstitutional customs and policies that his deputies carried out during the course of this matter.  That claim is not directed at ADA Holland, so any claims against Holland under Claim V should be dismissed.  Claim VI sets forth similar allegations with regard to the policies of the District Attorney's Office. That claim is directed at attempting to establish liability of DA Marvin in his official capacity.  It does not assert any claims against ADA Holland in his individual capacity, so all claims against Holland under Claim VI should also be dismissed.

**DA Marvin**

The Supreme Court explained the difference between individual capacity and official capacity actions in Kentucky v. Graham, 105 S.Ct. 3099 (1985).  It noted that an official sued in his individual or personal capacity may be able to assert personal immunity defenses such as prosecutorial immunity under Imbler v. Pachtman.  "In an official capacity action, these defenses are unavailable."  Graham, 105 S.Ct. at 3105-06.  That is because an

official capacity action is merely another means of pleading a claim against the entity itself, such as the institutional office of the district attorney.

The DA defendants' motion to dismiss asserted absolute immunity on behalf of both DA Marvin and ADA Holland.  Plaintiffs responded that "DA Marvin is sued only in his official capacity and, therefore, he is not entitled to absolute immunity."  Plaintiffs are correct that the third amended complaint names Marvin as a defendant only in his official capacity.  ¶ 5(E).

DA Marvin apparently acknowledges in his reply memorandum that he is not entitled to raise absolute immunity.  But he points out that Graham allows that sovereign immunity defenses, such as under the Eleventh Amendment, may be raised in defense of an official capacity claim for damages.  Id. at 3106.  DA Marvin then argues that the Eleventh Amendment bars the Phillips' federal-court damages action against him in his official capacity.

Only the state or an arm of the state is entitled to raise the Eleventh Amendment defense.  The Fifth Circuit has explored whether a Louisiana district attorney is an arm of the state and held that "a parish district attorney is not entitled to Eleventh Amendment immunity."  Spikes v. Phelps, 131 Fed. Appx. 47, 49 (5th Cir. 2005), citing Hudson v. City of New Orleans, 174 F.3d 677 (5th Cir. 1999).  A Louisiana district attorney is akin to a municipality, which is not considered an arm of the state and not entitled to assert Eleventh Amendment immunity.

**State Law Claims**

The DA defendants have not attacked the merits of any state law claims.  They argue only that the court should decline to exercise jurisdiction over the state law claims if all federal claims have been dismissed.  The court does have such discretion in those circumstances.  28 U.S.C. § 1367(c)(3).  It is recommended, however, that some federal claims survive the motion to dismiss, so there is no need to consider whether such a discretionary dismissal of the state law claims is appropriate.

Accordingly,

**IT IS RECOMMENDED** that the Motion to Dismiss by DA Marvin and ADA Holland (Doc. 39) be granted in part by dismissing with prejudice the claims against ADA Hugo Holland under Claim II (Failure to Intervene), Claim III (Due Process and Excessive Pre-Accusation Delay), and Claims V and VI (Policy and Custom).

**IT IS FURTHER RECOMMENDED** that the motion be denied in all other respects.

**Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. <u>See Douglass v. U.S.A.A.</u>, 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 16th day of May, 2018.

Mark L. Hornsby
U.S. Magistrate Judge