Confidential
SHERIFF JULIAN WHITTINGTON - CONFIDENTIAL                07/25/2019

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION


| | |
|---|---|
| TODD PHILLIPS, et al. | : CIVIL ACTION NO: |
| | : 5:17-cv-01524 |
| VERSUS | : |
| | : |
| JULIAN WHITTINGTON, | : DISTRICT JUDGE JAMES |
| individually and in his | : |
| official capacity as | : |
| SHERIFF OF BOSSIER PARISH, | : |
| et al. | : MAGISTRATE JUDGE HORNSBY |


- C O N F I D E N T I A L -

VIDEO DEPOSITION OF SHERIFF JULIAN WHITTINGTON
July 25, 2019


Reported by:
Karen Tyler, CCR(LA), CSR(TX), TCRR, CRR, CRC
Registered Diplomate Reporter
Notary Public

318.424.1707          KAREN TYLER REPORTING, LLC          318.424.1744 - Fax
3000 Fairfield Avenue, Suite A - Shreveport, LA 71104

1    Q.   Okay.  And then you said you served as Chief

2  of Corrections?

3    A.   Correct.

4    Q.   Okay.  How long did you serve as Chief of

5  Corrections?

6    A.   About a year and a half.

7    Q.   And what were your duties as Chief of

8  Corrections?

9    A.   Ensure that corrections was being operated

10  properly, that they had what they needed to do their

11  job.  Overseeing the supervisors.

12    Q.   And was this -- were you in charge of the --

13  I guess it's the maximum, medium?

14    A.   Right.  All of our prisons are under the

15  corrections.

16    Q.   Did you have to go -- undergo -- or did you

17  undergo any additional training for corrections?

18    A.   No.

19    Q.   And you said you were elected Sheriff

20  in 2011?

21    A.   Correct.

22    Q.   When did you take office?

23    A.   July 1 of '12.

24    Q.   Did you undergo any additional training once

25  you were elected Sheriff?

1              MR. LANGLEY:  Thank you.

2         Q.  (By Ms. Buckle)  Sheriff, I was going to ask

3    you about the chain of command when you were elected

4    but before taking office.

5              (Mr. Hays exits the room.)

6         A.  Okay.

7         Q.  (By Ms. Buckle)  And am I correct in that

8    detectives would report, I believe it was to Captain

9    Joey Cleveland and then Chief Tom Myrick and then

10   Deputy Chief Don Rittenberry to Sheriff Larry Deen.

11   Was that the correct chain of command?

12        A.  I actually resigned in order to run, and so I

13   was not there in all the months leading up to my

14   taking office.  I came back to the sheriff's office

15   probably a couple of months before the July 1st

16   swearing in.  Those names sound familiar, but I

17   couldn't tell you with absolute certainty that

18   that's -- I don't think you mentioned, I think -- I'm

19   not sure what his title was.  Doyle Dempsey was in the

20   mix there during this.  So, I guess, if you add his

21   name to it, those would be the same players, yes.

22        Q.  Okay.  And would it be correct that once you

23   took office you assigned new people to fill the roles

24   of Captain in the detectives division, as well as

25   Chief of criminal division and Deputy Chief?  Would

SHERIFF JULIAN WHITTINGTON - CONFIDENTIAL

28

1  that be correct?

2      A.   That's correct.  We eliminated Deputy Chief

3  and made some changes, yes.

4      Q.   Okay.  And you selected Deputy Chief Charlie

5  Owens, Chief Tony Staton and Captain Sean Phillips; is

6  that correct?

7      A.   And selected -- well, obviously the Chief

8  Deputy was Chief Owens, and Tony Staton and Captain

9  Phillips, yes.

10     Q.   Was there anyone else that was in the chain

11 of command for the criminal investigation in the

12 detectives division?

13     A.   I'm sure we had some lieutenants and other --

14 other people beyond ones you just listed.  I don't

15 know.

16     Q.   Other than just the detectives, though, as

17 far as who they reported or how information was passed

18 to you, was there anyone else involved in that chain

19 of command, or has there been anyone else involved in

20 that chain of command?

21     A.   Those were the key players.

22     Q.   Okay.

23     A.   Yeah.

24     Q.   Why did you select Charlie Owens?

25     A.   He was the right man for the job.

1       A.   Yes.

2       Q.   Okay.

3       A.   And even --

4       Q.   Before?

5       A.   -- before.

6       Q.   Sheriff, I also advised your counsel that I

7    was going to ask you about policies, procedures,

8    practices, and customs of the Bossier Parish Sheriff's

9    Office concerning Brady material, specifically any

10   changes implemented by you after July 1st, 2012.

11            And your counsel replied in the July 24th,

12   2019, correspondence --

13            MR. LANGLEY:   You have a copy before you.

14   It's number 8 -- excuse me.   It's number 5 on the

15   second page of this responding to --

16            MS. BUCKLE:   Number 6.

17            MR. LANGLEY:   Excuse me.   Number 6.

18      A.   Policy and procedure, Brady.   Okay.

19   Number 6.

20      Q.   (By Ms. Buckle)  And your counsel responded

21   on your behalf:  The Sheriff has no personal knowledge

22   or personal involvement regarding the policies,

23   procedures, practices, and customs of the Bossier

24   Parish Sheriff's Office concerning Brady material or

25   of any changes implemented by him after

1    July 1st, 2012.

2         Is that a correct statement?

3         A.  Yes.  We go by the law.

4         Q.  Okay.  What is your understanding as to what

5    is required by the law for disclosure of Brady

6    material?

7         A.  Well, exculpatory evidence, things are

8    developed, the DA is required to inform the defendant

9    of new information basically.

10        Q.  Okay.  You indicated that the DA is to

11   provide the defendant with information.  Do you know

12   if the Bossier Parish Sheriff's Office has a policy

13   concerning whether deputies employed by the Sheriff's

14   Office have an obligation to disclose exculpatory

15   evidence?

16        A.  I couldn't recite the policy to you.  I know

17   we go by the law.

18        Q.  So if there is a written policy -- and I've

19   requested that from your counsel -- that would have

20   been provided; correct?

21        A.  What now?

22        Q.  If your -- if there is a written policy --

23        A.  Uh-huh.  Uh-huh.

24        Q.  -- concerning the disclosure of Brady

25   material --

1  going on since well before I took office.  Two or

2  three, four years before I ever assumed office.  So

3  while I was there, they were occurring, and so, yes, I

4  knew about them.

5      Q.  Okay.  How did you hear about these incidents

6  that occurred prior to becoming Sheriff?

7      A.  Prior to becoming -- like I said, I was

8  working there when some of them were going on and

9  heard the discussions around.  Members of the public.

10  Everywhere I went, especially after I was elected, it

11  was a topic of conversation.  Members of the public.

12      Q.  What members of the public do you recall

13  discussing the case?

14      A.  It would be easier to say which ones didn't.

15  Just mostly victims, but just other people that

16  weren't victims, but just had -- had an idea who was

17  doing it and what we needed to do.

18      Q.  Who were the victims that you spoke to?

19      A.  Oh, there were some -- I don't know who.  You

20  said while ago there were 60-some-odd victims or

21  something.  Most of them.  I don't know.

22      Q.  Did these victims reach out to you

23  personally?

24      A.  Yes.

25      Q.  Okay.  How would they contact you?

1      A.  Well, this occurred five miles from my house.

2  I mean, this is where I go to church, and hardware

3  store and restaurant and everywhere else.  Grocery

4  store.  So just bumping into people mainly.

5      Q.  Who were the people that you would bump into

6  and have these conversations?

7      A.  Most of the -- just various members of the

8  public.  You know, I don't remember over nine years

9  who or where I saw them, but.

10      Q.  Did you have any discussion with members of

11  the public during your campaign while you were running

12  for Sheriff?

13          MR. LANGLEY:  About these incidents?

14      Q.  (By Ms. Buckle)  Yes.

15      A.  I'm -- yeah.  I think some people probably

16  asked me about it, yeah.

17      Q.  Okay.  Either during the election or after --

18  or after the election, did you -- do you recall making

19  any promises or assurances to the victims of the

20  public?

21      A.  Yeah.  I said we're going to find who's doing

22  this and arrest him.

23      Q.  When you took office on July 1st, 2012, what

24  was your understanding of the status of the

25  investigation?

SHERIFF JULIAN WHITTINGTON - CONFIDENTIAL

50

1    Q.  Okay.  Was this considered a high-profile

2    case?

3    A.  Yes.

4    Q.  Why was it high profile?

5    A.  As I mentioned earlier, it was 60-some-odd

6    members -- 60-some-odd victims.  It was in my

7    backyard, where I travel every day.  And everybody I

8    came across almost on a daily basis, it was on their

9    mind, you know.  And so, yes.  I don't remember a

10   crime with 60 victims in my whole years there.

11   Q.  Did you request to be updated concerning this

12   investigation?

13   A.  Yes.  There was not a daily or weekly or any

14   set meetings to discuss it, but, yes, that's an

15   accurate statement.  I had instructed them to keep me

16   in the loop, I think, probably would be the term I'd

17   use.

18   Q.  How did you receive updates?

19   A.  They would tell me about it.  Conversations.

20   Q.  Was this in person?

21   A.  Uh-huh.

22   Q.  Did you ever receive emails about the case?

23   A.  No.

24   Q.  Did you ever have any -- exchange any text

25   messages with detectives about the case?

Confidential
07/25/2019

52

1   look through it to see if it looks like -- if you
2   recall ever reviewing or reading this report.  It was
3   prepared by Lieutenant Bletz.
4       A.  I may have seen it.  I don't know.
5       Q.  Okay.
6       A.  It's -- looks, obviously, like one of our
7   reports, but I don't recall particularly reviewing
8   or -- no, ma'am.
9       Q.  Okay.  Sheriff, with respect to the 60-plus
10  incidents that occurred, the spikings and arsons and
11  vandalisms --
12      A.  Uh-huh.
13      Q.  -- did you ever formally interview any
14  witnesses?
15      A.  No.
16      Q.  Okay.  Did you ever visit any scenes of the
17  crimes?
18      A.  Strictly dealing with Phillips; correct?  No.
19      Q.  Did you ever write any reports?
20      A.  No.
21      Q.  In October of 2012, there was an incident
22  where an incendiary device was found at or near a deer
23  stand that belonged to Gary Wilson.  Do you recall if
24  you ever spoke to Gary Wilson about his deer stand or
25  deer camp being burned?

1    Q.  And what else?

2    A.  That's it.  That's all I can remember.

3    Q.  Okay.  Do you recall if you were ever advised

4 that the Phillips had placed that horse medication in

5 the trash?

6    A.  I did hear that.  I did.

7    Q.  Do you recall hearing that from your

8 detectives?

9    A.  It was -- yes.

10    Q.  Okay.  Prior to the citation being issued?

11    A.  Yes.

12    Q.  Did you ever have a meeting with Sonny

13 Bickham to discuss these vandalisms?

14    A.  No.

15    Q.  Did you ever have a meeting with Sonny

16 Bickham to discuss Todd Phillips?

17    A.  No.

18    Q.  Okay.  What -- Mr. Sonny Bickham and

19 Mr. Breck Bickham have testified that they attended a

20 meeting with you at the Sheriff's Office.  Do you

21 recall that meeting?

22    A.  They did come down.  I'm certain they did.  I

23 don't remember in particular -- I mean, that was on

24 their mind, but I don't remember what we talked about

25 as far as specifics or particulars or whatever.  I

1    think -- I don't know if that was before or after we

2    had written a citation.  What year was that?  Or -- I

3    don't -- they did come down, and were concerned, the

4    safety and everything going on.  That did happen.

5    Yes, it did.

6         Q.  Okay.

7         A.  Sure did.

8         Q.  They were concerned about their safety?

9         A.  Just the Burn -- yeah.  Everybody's safety.

10        Q.  Where did this meeting take place?

11        A.  It was at the courthouse.  Conference room.

12        Q.  Is there a conference room?

13        A.  Yes.

14        Q.  Who else was present?

15        A.  I don't know, ma'am.

16        Q.  Was this a meeting that you scheduled?

17        A.  No.  No.

18        Q.  Do you recall if you or members of the

19   criminal investigations team discussed the evidence

20   against Mr. Phillips?

21        A.  I don't even know who was there besides the

22   Bickhams.

23             MS. BUCKLE:  Okay.  If we can take a quick

24   break.  I'm told we need to change the video.

25             VIDEOGRAPHER:  All right.  The time is

Confidential
07/25/2019

75

1          Do you recall that?

2      A.   No.   I remember one being done, talked about,

3  but I don't recall issuing the -- it was my idea to do

4  it.

5      Q.   Okay.   Do you recall what the results of that

6  voice stress analysis were?

7      A.   No.

8      Q.   Okay.   Do you know why a voice stress

9  analysis was not done for Todd Phillips?

10     A.   No.

11     Q.   Okay.

12          (Ms. Parks enters the room.)

13     Q.   (By Ms. Buckle)  Were you ever advised that

14  Todd Phillips and his counsel, Marty Stroud, had

15  requested a meeting with you personally to discuss the

16  investigation?

17     A.   No.

18     Q.   If that request was made to a member of your

19  criminal investigations team should that message have

20  been submitted to you?

21     A.   I would hope so.

22     Q.   During the investigation of the spikings and

23  the arsons, did you personally consult with District

24  Attorney Schuyler Marvin?

25     A.   Yes.  Over the course of many years, we

1   or -- I don't know.  I don't know who I heard it from.

2       Q.   Okay.  And you said you were not involved

3   with the decision to charge Mr. Phillips with a felony

4   offense.

5       A.   Correct.

6       Q.   Do you know who made the decision?

7       A.   I -- no.

8       Q.   Did anyone from the District Attorney's

9   office consult with you prior to charging him with a

10  felony?

11      A.   With me?  No.

12      Q.   How long have you known Gary Wilson?

13      A.   Too long.  30 -- 30 years.

14      Q.   How do you know him?

15      A.   He's just a resident of the area.

16      Q.   Did you go to school with him?

17      A.   No, I did not.

18      Q.   Have you ever attended church with him?

19      A.   No.

20      Q.   Has he done -- ever done any work for you?

21      A.   His son did.  His son did.  Uh-huh.

22      Q.   What did his son do?

23      A.   He was a trapper, and he trapped some coyotes

24  down on my place.

25      Q.   When was that?

1    A.   I don't.

2    Q.   Okay.  Sheriff, we know through the course of

3   discovery in this case that there was a task force

4   created in January 2017.

5    A.   Uh-huh.  That's not the correct date.

6    Q.   I'm going to talk about two task forces.

7    A.   Okay.

8    Q.   And correct me on the date if it's wrong, but

9   my understanding is that there was a task force

10   created after, I guess what we can refer to as, the

11   grave was located.

12    A.   Uh-huh.

13    Q.   When was that task force formed?

14    A.   That was when Chief Huddleston was put in

15   charge.  That was in October of '17.

16    Q.   Was there a task force created prior to that

17   time?

18    A.   There was.

19    Q.   And what was that task force created for?

20    A.   We were continuing to have crimes being

21   committed.

22    Q.   Then this is after Mr. Phillips had been --

23    A.   That's true.

24    Q.   -- issued a citation; correct?

25    A.   That's true.

SHERIFF JULIAN WHITTINGTON - CONFIDENTIAL

Confidential
07/25/2019

88

1    Q.  Did you -- did you instruct that this task
2  force be formed?
3    A.  I was involved and aware and --
4       MR. LANGLEY:  Just answer the question.
5    A.  Yes.
6    Q.  (By Ms. Buckle)  Did you select the members
7  of the task force?
8    A.  Along with Chief Owens, I believe we did.
9    Q.  And do you recall who was selected?
10   A.  I know Shannon Mack was one, and I don't
11  recall who else.
12   Q.  Okay.  Do you recall if Lieutenant Bletz was
13  part of this task force?
14   A.  No, I don't.
15   Q.  No, you don't recall?
16   A.  I don't recall.
17   Q.  Where did this task force operate?
18   A.  Viking Drive.
19   Q.  All right.  What instructions were they
20  given?
21   A.  To find out why these were still happening
22  and who's doing it.
23   Q.  At this point, when this task force was
24  formed, was there some doubt that Todd Phillips was
25  responsible?

Confidential
07/25/2019

89

1  A. Didn't know who was responsible.

2  Q. If you believed Todd Phillips was

3 responsible, would there have been a reason to form

4 this task force?

5  A. Yeah.  If he's committing more crimes we can

6 charge him with more -- more charges.  More crimes --

7  Q. Okay.

8  A. -- that he's doing.

9  Q. Your testimony is you didn't know who was

10 committing them; correct?

11  A. No.

12  Q. And you told -- the instructions to the task

13 force members were to find out why these are still

14 going on and who's committing them?

15  A. Yes, ma'am.

16  Q. Did they find out why these crimes were still

17 going on and who was committing them?

18  A. No.

19  Q. Why not?

20  A. It was concluded that -- we were reassured

21 that the District Attorney's office, that there was

22 ample, solid case, and they didn't need any more

23 evidence.  They had a good case.

24    MR. LANGLEY:  Object to any communication the

25 witness discloses communication from the District

Confidential
07/25/2019

92

1      A.  I don't recall.  Not that I remember.  I
2  don't remember.  I don't recall.
3      Q.  If other members of the Sheriff's office have
4  testified that those instructions came from you, do
5  you have any reason to dispute that?
6      A.  I was aware of it -- but I don't recall who
7  said -- say your statement again?
8      Q.  If other members of the Bossier Parish
9  Sheriff's Office have testified that the instructions
10  to discontinue the investigation of the task force,
11  that instruction came from you --
12      A.  It's possible.
13      Q.  -- do you have any reason to dispute that?
14      A.  No, I don't.
15      Q.  When was the second task force created?
16      A.  It was October of '17.
17      Q.  Okay.  Were there only two task forces?
18      A.  Correct.
19      Q.  All right.  Why was the October 2017 task
20  force created?
21      A.  Crimes were still being committed, even
22  wilder and more bizarre.  Letters, a grave that one of
23  my deputies very possibly likely would have died had
24  he stepped in it.  Things were just ratcheting up.
25          (Mr. Stroud enters the room.)

Confidential
07/25/2019

93

1     Q.  (By Ms. Buckle)  Sheriff, if the grave was
2  found in January of 2017, does that refresh your
3  memory at all as to the -- why that first task force
4  was created?
5     A.  January of '17 is what you're saying?  I'll
6  have to stipulate that.  I don't recall when it was
7  found.  I know it was one of the reasons that we
8  formed it in October.
9     Q.  Could it have also been part of the
10  investigation from the first task force?
11         MR. LANGLEY:  I don't understand the
12  question.
13     A.  I don't understand.
14     Q.  (By Ms. Buckle)  Other detectives have
15  testified in this proceeding that the first task force
16  was created in January 2017 after the grave was found.
17     A.  No.  The first task force in January --
18  well -- I thought it was earlier than that, but
19  it's -- that's possible.  It's possible.  That's
20  possible.  Yes, ma'am.  It is possible.  Yes.  It
21  surely is.  I'm absolute on the date of the second one
22  was October '17.  But that's possible.  It's possible.
23  Yes.  Correct.
24     Q.  Okay.  Well, let me just go back just
25  briefly.  Was it believed that the grave was related

Confidential
07/25/2019

94

1  to the other spikings and arsons and vandalisms?

2      A.  It was similar in nature to some of the

3  others, yes.  Yes.

4      Q.  Okay.  Do you know if the task force

5  identified any suspects?

6          MR. LANGLEY:  The second task force, Counsel?

7          MS. BUCKLE:  First.

8      A.  The first?  I think I said no.  No.

9      Q.  (By Ms. Buckle)  Do you know if Todd Phillips

10  was considered not to be a suspect of the grave

11  incident?

12      A.  Everybody was a suspect.

13      Q.  Do you know if any -- well, do you know if

14  any member -- strike that.

15          In October 2017 the second task force was

16  created.  And you were saying events were still

17  occurring?

18      A.  Correct.

19      Q.  What was the purpose of this task force?

20      A.  Find out who was doing it.

21      Q.  Okay.  What events were occurring that led to

22  this task force?

23      A.  I just remember that the letters were getting

24  more bizarre and wilder and somewhat threatening in

25  nature.  Letters were sent out all around the town of

1    A.   I don't know about it.

2    Q.   Okay.  So this is --

3    A.   I don't remember that one.

4    Q.   This is 17-2918, and you don't remember that

5    one?

6    A.   No, ma'am, I don't.

7    Q.   Okay.  But the first two you do recall?

8    A.   Are very familiar.  Yes, ma'am.

9    Q.   Those were some of the letters that were

10   being sent out prior to the October 2017 investigation

11   being formed?

12   A.   That's correct.

13   Q.   And these letters, Sheriff, did you consider

14   them to be personally directed toward you or your

15   family members in any way?

16   A.   Yes.  Specifically my daughter.  Someone that

17   that's infatuated or concerned and included her name

18   in those types of letters certainly made me concerned

19   for her personal safety.  Yes, ma'am, it did.

20   Q.   Did you believe these letters to be related

21   to the previous acts of spikings and arsons?

22   A.   Yes.

23   Q.   Did you believe Todd Phillips was sending

24   these letters?

25   A.   I didn't know who was sending them.

1    A.   Find out who's doing this.

2    Q.   Okay.  Did those instructions come from you?

3    A.   They certainly did.

4    Q.   Where were they working from?

5    A.   They worked out of the old Plain Dealing

6  Academy school that the Sheriff's Office owns.

7    Q.   Why were they working from there?

8    A.   Because of the sensitivity, all the victims

9  right there in the coffee shops and the hamburger

10  joints and proximity, we moved them up there for

11  privacy.

12    Q.   Were you also trying to keep this

13  investigation confidential from other members of the

14  Sheriff's Office?

15    A.   Trying to keep it confidential from

16  everybody.

17    Q.   Did you have any discussions with members of

18  this task force about whether Todd Phillips was

19  responsible for any of the criminal acts?

20    A.   We talked about any and everybody that could

21  be responsible.  I'm sure he was probably named.  I

22  don't specifically have any conversations about him in

23  particular, but he was certainly on the list, yes.

24    Q.   Do you recall when you were first informed

25  that Gary Wilson was a suspect?

1       A.   Uh-huh.

2       Q.   -- did you visit in his house concerning the

3    investigation of a crime against Gary Wilson?

4       A.   Say that again.

5            MR. LANGLEY:   Against?

6       Q.   (By Mr. Hays )  Against Gary Wilson,

7            MR. LANGLEY:   A crime against Gary Wilson?

8       A.   Against him?

9       Q.   (By Mr. Hays)  Against -- when Gary Wilson's

10   house was vandalized in November of 2015, did you go

11   to his house?

12      A.   I did.

13      Q.   Okay.  How did you go there?

14      A.   He called -- his uncle called me.

15      Q.   Who -- that would be Jimmy Hope?

16      A.   Yes, sir.

17      Q.   Okay.  And what -- what transpired then?

18      A.   He told me he was at Gary's -- he was at

19   Gary's; Gary was upset.  His house had been

20   burglarized, and Gary wanted me to come up there.

21      Q.   And did you do so?

22      A.   I did.

23      Q.   Did you -- were you accompanied by any other

24   deputies?

25      A.   I was the only one there for a short time and

Confidential
07/25/2019

111

1  then I notified our detectives in crime scene to

2  respond.

3      Q.  And they came to investigate the crime, the

4  vandalism, the burglary at his house?

5      A.  Correct.

6      Q.  All right.  Did you have any discussions with

7  Mr. Wilson?

8      A.  Yes, sir.  We stood there and talked for an

9  hour or two or so.

10     Q.  Did you have -- what did you discuss?

11     A.  I mean, he was upset about his home being

12  burglarized.  And I don't remember what we talked

13  about.

14     Q.  Do you recall having any discussions

15  concerning the signs that had been placed at Todd --

16  near Todd Phillips' home?

17     A.  No, sir, I don't.

18     Q.  Don't remember that.  Okay.  Now, in your

19  education and training as a law enforcement officer,

20  I'm assuming that you have been trained to

21  determine -- in committing -- to finding out a

22  suspect, would motive be one of the elements of the

23  crime that would lead you to the arrest of someone?

24     A.  Yes.

25     Q.  I mean, why someone may have done it.