UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

TODD PHILLIPS, ET AL.                    CIVIL ACTION NO. 17-cv-1524

VERSUS                                   JUDGE TERRY A. DOUGHTY

JULIAN C WHITTINGTON, ET AL.             MAG. JUDGE MARK L. HORNSBY

RULING

The case arises from a series of property crimes in Bossier Parish, Louisiana.  Plaintiff

Todd Phillips ("Mr. Phillips") was investigated and eventually charged with one of these crimes,

but the charges were later dropped.  Mr. Phillips; his wife, Jodi Phillips ("Mrs. Phillips"); and his

daughters, Brooke Phillips Lottinger ("Brooke") and Abby Phillips ("Abby"), brought suit

against Defendants Julian Whittington ("Sheriff Whittington"), the Sheriff of Bossier Parish, in

his individual and official capacities; Lieutenant Bruce Bletz ("Lt. Bletz"), in his individual

capacity; Captain Shawn Phillips ("Capt. Phillips"), the supervisor of the investigation division,

in his individual capacity; former Chief Deputy Charlie Owens ("Chief Deputy Owens"),

supervisor of day-to-day operations and adviser to Sheriff Whittington, in his individual

capacity; unknown Bossier Parish Sheriff's Office employees (collectively "BSO Defendants");

J. Schuyler Marvin ("DA Marvin"), individually and in his official capacity as District Attorney

for the 26th Judicial District, and Hugo Holland ("ADA Holland"), individually and in his official

capacity as an Assistant District Attorney/Special Prosecutor (collectively "DA Defendants");

Gary Wilson, the alleged perpetrator of the crimes; and Carrie Lee Winford, Administratrix of

the Estate of Coty Wilson, Gary Wilson's son and an additional alleged perpetrator of the crimes.[1]  [Doc. No. 81, Fourth Amended and Supplemental Complaint"].

Pending before the Court is a Motion for Summary Judgment [Doc. No. 142] filed by the BSO Defendants.  Plaintiffs oppose the motion.

For the following reasons, the Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

## I.      FACTS AND PROCEDURAL HISTORY

The Phillips family moved to Benton, Bossier Parish, Louisiana, in 2004 when Mr. Phillips accepted a position as Vice-President of Finance for Frymaster, a worldwide supplier of commercial fryers and other equipment.   Mr. Phillips continues to be employed by Frymaster, after having later been promoted to Chief Executive Officer.

The Phillips purchased 28 acres on Old Plain Dealing Road, which were heavily wooded and had a barn and pasture area for their horses.  Their daughters, Brooke and Abby, were involved in barrel racing, and the family regularly attended rodeo events.  Mr. Phillips also traveled frequently, both in and out of the country, for his job.  As a result, the Phillips, who are not from Louisiana originally, did not know many people in Benton, other than their closest neighbors and persons they met through their daughters' activities.

Around 2010, approximately six years after the Phillips moved to the area, there were a series of property crimes along Old Plain Dealing Road and Cottage Grove Road in Benton, particularly involving hunting leases.  A number of items were stolen, and homemade metal spikes were placed on roads and trails to and from the leases, causing flat tires to trucks and

---

[1]While out on bond, Coty Wilson and his mother, Jennifer Wilson, drove to a bridge and purportedly jumped into the Red River, where their bodies were later found.  *See* https://www.ktbs.com/news/3investigates/lawyer-coty-wilson-under-pressure-to-testify-against-father-when-he-disappeared/article_dbe732a0-336a-11e8-98a9-db8d9a79e51c.html (last visited 08/31/2020).

ATV's.  The crime escalated to vandalisms, arsons, and damage to property by gun fire.  A number of strange letters were mailed to individuals in the area, as well as to law enforcement.

Between 2010 and 2017, there were over sixty (60) documented crimes that occurred.  However, there were no witnesses who observed the perpetrators in the acts, and there were no fingerprints or DNA obtained from the scenes.  From 2010 to 2012, the actual perpetrator also planted evidence at the crime scenes to mislead detectives and implicate other persons.  *See* [Doc. No. 155-4, Exh. 1; Doc. No. 155-45, Exh. 43,  BSO Report No. 10-4483; Doc. No. 155-46, Exh. 44, BSO Report No. 10-5374; Doc. No. 155-47, Exh. 45, BSO Report No. 11-2586; Doc. No. 155-53, Exh. 51, BSO Report No. 12-5816].

On October 2, 2010, Nicholas Osentoski ("Mr. Osentoski") reported to the BSO that several items were stolen from his deer lease on Cottage Grove Road.  Mr. Osentoski found a hammer on his property with the initials "LC" written on the handle, and he believed the hammer might belong to Larry Coker, although no evidence was ever developed placing that person at or near the property.

On October 18, 2010, Jimmy Hope [2] ("Mr. Hope") reported finding a welded spike on a private gravel roadway and that it was believed to have caused flat tires.

On November 26, 2010, homemade metal spikes were found in the dirt driveway leading into the Burnt Pine Hunting Club. The spikes caused flat tires to three vehicles.

A few weeks later, on December 18, 2010, BSO deputies were again dispatched to the Burnt Pine Hunting Club when Kathy Naron reported finding two more homemade spikes.  A red plaid men's shirt was found lying on the ground beside the access road approximately five feet from where the spikes were located, and deputies discovered a small walkie-talkie

---

[2]Plaintiffs identify Mr. Hope as the father-in-law of Gary Wilson at times and as his uncle at others. Regardless, there appears to be some familial relationship between Mr. Hope and Gary Wilson.

radio inside the pocket of the shirt.  The name "L. Burns" was written in black marker on the radio, and Landon Burns, who lived in the area and hunted a nearby lease, was identified as a suspect.  However, it was determined that the shirt was way too small for him, and no DNA evidence was found on the radio.

On June 3, 2011, Tammy Brunson ("Mrs. Brunson") reported to BSO that she received an anonymous telephone call from a female who stated that she needed to "clear her conscience" and that she was with Gregory Bickham when he vandalized the Brunsons' camp house on Highway 160.  The caller also stated that Gregory Bickham was responsible for all the recent thefts at the camp and that he hides the property under his mobile home until a friend picks up the property or he is able to pawn the property.   Mrs. Brunson's husband, Johnnie, reported that they had repeated run-ins with Gregory Bickham and believed he was responsible for placing spikes on his hunting lease.  BSO deputies followed the Brunsons to Highway 160 where they discovered their camp house in disarray.  Items were removed from the camp and thrown along the roadway, the A/C unit was pulled from the house, threatening messages were carved into the front door, threatening messages were written on the television and other places inside the home, Bible verses were written on a chip bag and a piece of paper, and a bottle of lighter fluid was left upside down on a roll of toilet paper in a manner believed to  be an  attempt  to burn down the camp house, although no form of ignition was found nearby.

A search warrant was obtained and executed at Gregory Bickham's residence based on the anonymous call.  However, no stolen items were located at his residence, nor was there any evidence that the items had ever been located there.  BSO deputies then spoke with Gregory Bickham who advised that he had been in East Texas for the last couple of weeks working, and

cell phone records subpoenaed from AT&T confirmed his statement.  As a result, he was cleared as a suspect, and the case was marked inactive on July 15, 2011.

In July 2011, Sheriff Whittington was elected to serve his first term as sheriff of Bossier Parish.

On September 11, 2011, Stephan Adams ("Mr. Adams") reported that he was at the "Four-N's" Hunting Club where he found a cell phone box suspended approximately 10-12 feet in the air.  Mr. Adams opened the box and discovered a plastic baby-doll with the words "cry baby" and "kiss my ass" written on it.  "Mark 13:35"[3] was written on the box.  Records from AT&T identified the cell phone box with an account registered to Billy Joe Fletcher.  The Fletchers were contacted, and Leslie Fletcher, Billy Joe's wife, reported that their middle daughter, Kendra, had the same type of cell phone as shown on the box.  Kendra was interviewed by Deputy Brandon Masters, but no suspects were identified.

In  September 2011, Lt. Bletz was appointed as the lead investigator in connection with the various property crimes.  He began reviewing reports of prior offenses and concluded that the real perpetrator had intentionally placed false information or evidence at various crime scenes to mislead investigators.  He also determined that the real culprit appeared to know or have knowledge of Gregory Bickham and Landon Burns and that they had been named by victims as potential suspects.  In connection with his investigation, Lt. Bletz spoke to some of the prior victims, particularly Defendant Gary Wilson.  Mr. Wilson claimed that he was a victim of multiple property crimes.  Lt. Bletz began using Gary Wilson as an informant; as a result, they developed a friendly relationship and began to communicate regularly.  [Doc. No. 155-10,  Exh.

---

[3] "Therefore keep watch because you do not know when the owner of the house will come back— whether in the evening, or at midnight, or when the rooster crows, or at dawn."  *Mark* 13:35 (New International Version).

7, Deposition of Lt. Bruce Bletz ("Bletz Depo."), pp. 16-17; Doc. No. 155-27, Exh. 25,

Deposition of Gary Wilson ("Wilson Depo.), pp. 16, 20; Doc. No. 155-, Exhs. 73 & 74].

During this time, Mr. Phillips was traveling significant distances fairly often for work.  In

late summer and fall 2012, he traveled to Tampa, Florida, on August 24-29, to Seoul, South

Korea, on October 6-11, and to Chicago, Illinois, on October 16-18.[4]

In the middle of October 2012, Gary Wilson's deer camp burned down.

On October 24, 2012, Chad Johnson ("Mr. Johnson") reported two of his deer stands

were burned down.  A small Coleman fuel bottle with the name "Todd Phillips" written on the

side was located at the scene.  The offense occurred in the Highway 3 and Highway 160 area of

Benton, which is near the home of Gary Wilson and several miles from the Phillips' home on

Old Plain Dealing Road.

On November 12, 2012, BSO received a report of an arson at a deer stand owned by Matt

Caston ("Mr. Caston").  Mr. Caston reported that his GPS device had also been stolen.  In a

nearby deer stand owned by Otis Smalley, deputies located an alleged "delayed action incendiary

device" made from a grape Powerade Zero bottle, which had been filled halfway with red diesel

fuel, and a veterinary bute syringe that had been placed into a cardboard toilet paper roll and

attached to the top of the Powerade bottle.  The name "Phillips" was written on the label of the

bute syringe.  That deer stand had not burned, and officers theorized that rain had gotten into the

deer stand and extinguished the incendiary device.  A blue plastic bag filled with trash was also

found next to the bottle inside the deer stand.  It contained several soda cans and a styrofoam cup

---

[4]Mr. Phillips avers that copies of expense reports and work calendars confirming these dates were provided to the DA's Office and were introduced at the 404(b) hearing discussed *infra*.  He does not state when the documentation was first provided to the DA's Office or if it was provided to the BSO. [Doc. No. 155-29, Todd Phillips Affidavit, ¶ 2].

with the name "Karen" written on it.  The syringe was traced to a local veterinarian who reported to BSO that it had been sold to Todd and Jodi Phillips.

State Court Judge Parker Self issued a search warrant for the Phillips' home.  The search warrant was executed on the evening of November 15, 2012.  When deputies arrived, Mr. Phillips was still in his office in Shreveport.  Lt. Bletz, in the presence of Capt. Phillips, interviewed Mrs. Phillips for approximately one hour until Mr. Phillips arrived home.  He then interviewed Mr. Phillips and the Phillips' daughters, Abby and Brooke.  BSO Detectives informed Mr. Phillips that the syringe and propane bottle implicating him had been found at crime scenes.  The Phillips told Lt. Bletz that the syringe had been used for Abby's horse, and Abby believed that it had been thrown in the trash at the rodeo the previous weekend, but she really could not remember.  The Phillips also reported that the cup with the name "Karen" written on it had been used by a family friend who was visiting and had been thrown away.  The trash was placed for pick up along Old Plain Dealing Road, approximately 0.3 miles from their house.  Although approximately eight (8) deputies were present for the search, they found nothing of evidentiary value at the house.

The following day, Friday, November 16, 2012, the entire Phillips family voluntarily provided fingerprints to the BSO.  Mr. Phillips also provided DNA and a handwriting exemplar.

A few days later, according to Mrs. Phillips, a neighbor, Dale Russell ("Mr. Russell"), flagged her down as she pulled into her driveway.  He had found a device in the bed of his truck which was parked along the fence line of the Phillips' property.  He thought the device had fallen out of the Phillips' truck and then had been picked up and thrown in his truck by kids.  Mrs. Phillips, who believed the device to be a walkie talkie, told Mr. Russell about the search warrant executed at her home.  Mr. Russell allegedly did not want to contact BSO deputies because he

had previously had legal trouble, so Mrs. Phillips offered to contact the BSO.  She then pulled up to her house, and Mr. Phillips and their neighbor, Sonny Bickham, were in the carport.  Sonny Bickham said that it appeared to be a GPS tracker for a dog.  Mrs. Phillips called the BSO, but no one returned her call.

On December 14, 2012, an anonymous call was made from a pay phone in Bossier City to a crime stoppers hotline.  The following day, BSO received information that the caller accused local resident Blake Barton ("Mr. Barton") of the crimes, claimed that he had been framing a neighbor, and reported that evidence could be found under a tree behind his home.  The caller also reported that the hole was covered by leaves, and that inside the hole were spikes used to blow out tires.  Mr. Barton lived near the Phillips and Defendant Gary Wilson.

Later the same day, Mr. Hope reported to the BSO that he had run over spikes which caused a flat tire.  BSO retrieved the spikes from the scene, along with other items of evidence.

Lt. Bletz and Capt. Shawn Phillips contacted Mr. Barton, who consented to a search of his home.  Upon searching under the tree as indicated in the crime stoppers tip, they located a bag  containing tire spikes and a trash bag containing trash, including a magazine with a subscription label for "Jodi Phillips."  Mr. Barton  denied  any involvement in the ongoing crimes, and no other evidence was discovered at his residence.

On December 24, 2012, another call was made from the same pay phone in Bossier City to Charles Everett, Mr. Barton's step-father, stating that Mr. Barton needed to leave town immediately or his trailer would be burned down.

 On or about December 27, 2012, Lt. Bletz learned from Gary Wilson that Mr. Russell had located a GPS tracker in his truck and given it to Mrs. Phillips.[5]  Lt. Bletz contacted her and

---

[5]It is unclear how Gary Wilson obtained this information.

then picked up the tracker from the Phillips residence.  The tracker was later determined to be the device stolen from Mr. Caston's deer stand on or about November 12, 2012.

In January 2013, Lt. Bletz obtained a warrant allowing for the placement of a GPS tracker on Mr. Phillips' vehicle.  The GPS tracker was placed on his vehicle on January 14, 2013, and remained there until April 19, 2013, but the device never showed him to be at or near any of the deer camps or other areas where the property crimes were occurring.  Lt. Bletz also subpoenaed the AT&T records for the cellular devices registered to Todd and Jodi Phillips for the dates of December 14 and 24, 2012.  Those records did not show Todd Phillips to be in Bossier City at or near the time the phone calls were made from the pay phone, but they did show that Jodi Phillips (or the cell phone used by her) was in the general area on December 24, 2012.  The general area where the pay phone is located and within the range shown includes a local mall and shopping areas.  Jodi Phillips has stated that she was shopping on Christmas Eve.

Additionally, although it is unclear exactly when, BSO deputies also conducted nighttime surveillance of the Phillips home on at least two occasions.  [Doc. No. 155-13, Exh. 11, Deposition of Lt. Shannon Mack ("Mack Depo."), pp. 34-38].  No report was prepared.

Lt. Bletz continued to suspect Mr. Phillips was responsible for the crimes, despite having found no further evidence.  So in March 2013, on a Friday evening, Lt. Bletz, with the assistance of Capt. Phillips and the approval of Sheriff Whittington, placed three white posters with writings in black marker along Old Plain Dealing Road, one of which was placed across from the Phillips' residence.  Bible verses were written on the posters in dot-style lettering like the writings of the perpetrator of the property crimes being investigated.

Mrs. Phillips and Abby saw the posters on their way home from a local rodeo.  They assert that they were fearful because they were aware that Bible verses had been found written at

the deer camps.  Mr. Phillips was in China on business, so Mrs. Phillips called their friend, John

Greer, who came over and called the BSO.  Although a deputy was dispatched, he did not admit

that the signs had been placed by the BSO,[6] nor did he pick up the signs or search the property.

Jodi and Abby Phillips spent the night with John and Lisa Greer, so that Mr. Greer could search

the property during the daylight.

When he returned home, Mr. Phillips went to see Lt. Bletz, stating multiple times,

according to Lt. Bletz's report, that the situation was becoming dangerous.  Lt. Bletz still did not

admit that the BSO had placed the signs.  Lt. Bletz's notes indicate that he perceived Mr.

Phillips' statements as a threat.

In  June  2013,  Lt. Bletz met with DA Marvin, Lt. Shannon Mack ("Lt. Mack"), Capt.

Phillips, and perhaps others.  While DA Marvin has testified he did not advise Lt. Bletz on

whether to proceed, he admits that he did not believe there was "proof beyond all reasonable

doubt to formally charge Todd Phillips" at that time.  [Doc. No. 155-25, Exh. 23, Deposition of

J. Schuyler Marvin ("Marvin Depo."), pp.  30-34, 48-49].

Meanwhile, crimes in the area continued.  During 2013 and continuing into 2014 and

2015, threatening letters with dot-style lettering were sent in the mail, with some referring to Lt.

Bletz as "Detective Clouseau"[7]; dogs were shot and killed;  truck windows and houses were shot

up; spikes continued to cause vehicle damage; plastic bottles with salt and flagging tape were left

in people's yards; a toilet was used as a makeshift headstone for Lt. Bletz; and beer cans with

---

[6]It is unclear whether the deputy was aware BSO had placed the posters.

[7]Inspector Clouseau is a fictional character in *The Pink Panther* movie series.   "Clouseau is an inept and incompetent police detective in the French Sûreté, whose investigations quickly turn to chaos. His absent-mindedness almost always leads to destruction of property . . . " https://en.wikipedia.org/wiki/Inspector_Clouseau (last visited 08/17/2020).

nails were left in the driveway of a Shreveport policeman who lived across the street from the Phillips.  Thefts, vandalisms, and other incidents occurred on a regular basis.

On July 15, 2014, Sonny Bickham, the Phillips' neighbor and friend, received a threatening letter in the mail which purportedly read:  "We know your son is helping Phillips and you know it[,] two[sic][;] chief no hair will not get off his ass to do anything[,] so I will[.] I have always hated you anyway[.]   [Y]ou and son are going to hell[,] and I am going to send yall there." [Doc. No. 155-59] (all caps deleted). [8]

According to the Phillips, members of  the community had been reporting to them that the BSO suspected Mr. Phillips of the crimes and his arrest was imminent.  The family asserts that they became increasingly concerned for their safety and feared that they would not receive any protection from the BSO.  In September 2014, even though it was Abby's senior year in high school, the Phillips purchased a new home in Marshal, Texas, approximately sixty (60) miles away, and moved in the middle of the night.  Yet the crimes continued.

In March and June of 2015, BSO Detective Mike Lombardino was assigned to investigate two cases involving the vandalism of a skid loader and the burglary of a tractor trailer on Cottage Grove Road.  Detective Lombardino identified Gary Wilson as the primary suspect in both cases and advised Lt. Bletz of his suspicions.  [Doc. No. 155-19, Exh. 17, Deposition of Michael D. Lombardino, Jr., ("Lombardino Depo."), pp. 8, 11-14, 19-24].  Lt. Bletz was not personally involved in the investigations of these two cases,  but he was Detective Lombardino's supervisor. He advised Detective Lombardino that "Gary Wilson was a weird guy but he had cleared him." *Id.* at p. 15.  Lt. Bletz  instructed Detective Lombardino to "inactivate" the cases.  *Id.* at p. 18. Detective Lombardino disagreed with that decision.  *Id.*  Detective Lombardino also advised

---

[8] The statement was provided in a police report in all caps with no punctuation.  For ease of reading, the Court has deleted the capitalization and added punctuation in brackets.

Capt. Phillips that he believed Gary Wilson was a suspect and expressed his concerns that the investigation had been marked inactive.  *Id.* at pp. 17, 30-31.  These offenses were never disclosed by Lt. Bletz or anyone else with the BSO to the DA's office.  Nor were Mr. Phillips and his attorney notified of  these crimes or the fact that evidence had been developed identifying another potential suspect.

Between Friday, March 13, and Saturday, March 21, 2015, Mr. and Mrs. Phillips were in Illinois visiting family.  [Doc. No. 155-29, Phillips Aff., ¶ 4].

In the spring of 2015, Lt. Bletz learned that he would be promoted and transferred to lead the Internal Affairs division of the BSO.  Prior to his transfer, Lt. Bletz and Capt. Phillips consulted with ADA Holland, a special prosecutor brought into the case at the request of Sheriff Whittington.

From Monday, June 8, 2015, through Sunday, June 14, 2015, Mr. and Mrs. Phillips and Abby were in Abilene, Texas, for the Texas state rodeo finals.  [Doc. No. 155-29, Phillips Aff., ¶ 5].

Even after his promotion in July 2015, Lt. Bletz was responsible for preparing the narrative supplement accusing Mr. Phillips of committing the offense for which a misdemeanor summons later issued.  He continued to include in his narrative report offenses which occurred after July 2015, and his primary narrative supplement was not entered until December 9, 2015.

After July of 2015, Gary Wilson continued to contact Lt. Bletz via phone, email, and text messages regarding the crimes that were occurring in the area.  Lt. Bletz would obtain the information from Gary Wilson and convey the information to the detectives working in the Detectives division.  Lt. Bletz's responses to these messages indicate that he believed Mr. Phillips to be the perpetrator of any new crime, although he was no longer the investigator, and

the detectives who were assigned to the case had not yet had a chance to conduct their own investigation.

On August 3, 2015, ADA Holland sent a plea offer to Mr. Phillips' attorney requesting that he plead guilty to simple damage to property and pay restitution in the sum of $59,578.00. Mr. Phillips rejected that offer.

On September 14, 2015, Mr. Phillips appeared at the BSO detectives' office pursuant to arrangements made between ADA Holland and Mr. Phillips' attorney, Marty Stroud ("Mr. Stroud").  At that time, Capt. Shawn Phillips formally served him with a summons for the misdemeanor charge of simple criminal property damage under LA. REV. STAT. § 14:56.  A formal Bill of Information followed, charging Mr. Phillips with simple criminal damage to property in connection with a single spiking incident in March 2014.

ADA Holland filed a 404(b) Notice of the State's intent to introduce evidence of more than sixty (60) other crimes, and a 404(b) hearing was scheduled to begin on November 28, 2016, in the 26th Judicial District Court, Bossier Parish, Louisiana.

In the fall of 2016, just prior to the hearing, Mr. Stroud received an envelope at his office. On the back of the envelope was written "U R asking 2 many ?" and inside was flagging tape which read "We R Untouchable Better Make Phillips C The Light" and "Elephant Foot on a Mouse Tail."  [Doc. No. 155-71].

On November 28, 2016, the hearing was conducted under Louisiana Code of Evidence article 404(b) to determine if evidence of other crimes could be used in Mr. Phillips' misdemeanor criminal trial on the charge of simple criminal damage to property. [9]  A five-day

---

[9]Louisiana Code of Evidence article 404(b) provides, in pertinent part:

B.  Other crimes, wrongs, or acts. Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he

hearing was held.  Lt. Bletz testified as one of the witnesses, but, according to Plaintiffs, he mischaracterized witness statements and evidence and testified falsely.  Additionally, Plaintiffs contend that they were not provided with exculpatory evidence and, thus, had no opportunity to cross-examine or call witnesses to testify as to those facts, nor was the exculpatory evidence disclosed to the state court.

In January 2017, approximately one month after the 404(b) hearing concluded and well prior to the state court ruling, BSO deputies were directed to a fake "grave site" of DA Marvin where a booby trap was set.  BSO deputies were tasked with determining whether this incident was connected to the arsons and spikes and identified a suspect, John Greer, based on information provided by Gary Wilson to Lt. Bletz.  [Doc. No. 155-13, Exh. 11, Mack Depo., pp. 44-46].  Lt. Mack reported their suspicions that John Greer was the culprit to Deputy Chief Owens.  *Id.* at p. 49.  However, the task force was disbanded.  *Id.* at p. 48.  Neither Plaintiffs nor their counsel was informed of this offense, that the task force was formed to investigate, that a suspect other than Mr. Phillips was identified, or that the task force was then disbanded. Likewise, this information was not furnished to the state court judge.

In May 2017, Lt. Bletz  continued to exchange texts and calls with Gary Wilson regarding additional criminal activity in the area. [Doc. No. 155-75, p. 44].

Also in May 2017, Judge Jeff R. Thompson issued an Opinion [Doc. No. 142-4]  that  the state  had  proven by clear and convincing evidence that Mr. Phillips was responsible for five of the related camp vandalism and arson cases.

---

acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. . .

In August 2017, ADA Holland prepared a Bill of Information and a Motion and Order for Issuance of Warrant for the arrest of Mr. Phillips for felony arson.  No affidavit accompanied the motion.  Instead, ADA Holland incorporated by reference "the entirety of the evidence adduced at the previous 404([b]) hearing."  [Doc. No. 155-87, Exh. 85].  Judge Thompson issued the warrant without requesting or considering additional information.  After the charges against Mr. Phillips were amended to a felony, his jury trial was set for January 22, 2018 (although it was later continued to May 29, 2018).

In October 2017, Chief Deputy Owens assigned Deputy Duane Huddleston to go back and look at the harassing letters that had been sent to individuals and businesses in the area over several years with "a fresh set of eyes."  [Doc. No. 155-15, Exh. 13, Duane Huddleston Deposition ("Huddleston Depo."), pp. 29-32, 40-42; Doc. No. 142-7, Affidavit of Duane Huddleston ("Huddleston Aff.")].  Lt. Mack, Lt. Dave Falk, Sergeant Tim Wynn, and Detective Tab Cahn[10] were also part of this task force.  [Doc. No. 155-13, Exh. 11, Mack Depo., p. 56; Doc. No. 155-15, Exh. 13, Huddleston Depo., p. 42].  Once Deputy Huddleston began investigating, he and other members of the task force focused on Gary Wilson as the person who was sending the letters.  [Doc. No. 155-15, Huddleston Depo., pp. 52-53].  Deputy Huddleston stated in his later report that it "seems the recent letters are connected to a series of spikes, vandalisms, arsons, property damage by gunfire and strange letters that have been occurring in a small area south of Hwy 160 and between Old Plain Dealing Road and Hwy 3."  [Doc. No. 155-54, Exh. 52, BSO Report No.  12-5866].

On November 20, 2017, Plaintiffs filed their original Complaint [Doc. No. 1].  The Complaint was amended prior to the filing of answers or motions by Defendants.  [Doc. No. 3].

---

[10]In the Mack deposition, "Cahn" is spelled "Kahn," and "Wynn" is spelled "Nguyen."

In December 2017, a handwriting analysis of the letters was performed that revealed that Gary Wilson could have been the one who wrote the letters.  [Doc. No. 142-7, Huddleston Aff.].

On December 27, 2017, the DA Defendants filed a Motion to Dismiss [Doc. No. 10]. Defendants Sheriff Whittington, Lt. Bletz, and the BSO Jane & John Does also filed a Motion to Dismiss [Doc. No. 12].  While those motions were pending, Plaintiffs obtained leave of Court to file a Second Amended Complaint [Doc. No. 23] and, later, a Third Amended Complaint [Doc. No. 35].  The Third Amended Complaint asserted claims against Gary Wilson and Coty Wilson, in addition to the other Defendants.

In  February 2018, Gary Wilson was arrested and charged with crimes, including the one which Mr.  Phillips had been accused of and those crimes which the State sought to introduce as "other crimes" evidence at the 404(b) hearing.  The June 2011 burglaries of the Brunson residence and Naron residence,  the March 2012 arsons of the hunting camps of Johnnie Brunson,  Stephen  Adams,  Morris  Naron, and Curtis Southern, the October 2012 arson of Chad Johnson's deer camp and theft of his deer camera,  the  October/November 2012  arson of Matthew Caston's deer stand, the December 2012 threats to Charles Everett, the August 2013 theft of Dustin Williams'  deer  stand, and the September 2013 theft of a hunting camera are all included in the Amended Bill of  Information filed against Gary Wilson.

On March 13, 2018, DA Marvin nolle prossed[11] the charges against Mr. Phillips.

---

[11]"Nolle pros" is an abbreviation of the Latin term, "nolle prosequi," which is defined as follows:

an entry on the record of a legal action denoting that the prosecutor or plaintiff will proceed no further in an action or suit either as a whole or as to some count or as to one or more of several defendants.

https://www.merriam-webster.com/dictionary/nolle%20prosequi (last visited 08/19/2020).   In essence, the prosecutor drops the charges.  *See id.*

Based on Plaintiffs' amendments to their Complaint, on March 26, 2018, the Court denied the BSO Defendants' Motion to Dismiss as moot.  [Doc. No. 38].

On March 29, 2018, the DA Defendants filed a Second Motion to Dismiss [Doc. No. 39]. After conferring with counsel, Magistrate Judge Hornsby denied the DA Defendants' first Motion to Dismiss as moot.  [Doc. No. 41].

On May 16, 2018, Magistrate Judge Hornsby issued a Report and Recommendation [Doc. No. 47] recommending that the Court grant in part and deny in part the DA Defendants' Second Motion to Dismiss.  After the objection period passed, on May 31, 2018, the Court adopted the Report and Recommendation of  Magistrate Judge Hornsby and granted the motion to dismiss the claims against ADA Holland under Claim II (Failure to Intervene), Claim III (Due Process and Excessive Pre-Accusation Delay), and Claims V and VI (Policy and Custom). Those claims were dismissed with prejudice.  The motion was otherwise denied.

On March 11, 2019, Magistrate Judge Hornsby held a status conference [Doc. No. 80] in which he granted Plaintiffs leave of Court to file a Fourth Amended Complaint.  He cautioned, however, that no further amendments would be permitted.  *Id.*  The Fourth Amended Complaint [Doc. No. 81] was filed, and it amended and supplanted any previous filings.

After discovery and motion practice, on April 10, 2020, the BSO Defendants filed the instant motion.  On May 6, 2020, Plaintiffs filed a Memorandum in Opposition to the Motion for Summary Judgment [Doc. No. 155].  On May 20, 2020, the BSO Defendants filed a Reply Memorandum [Doc. No. 166].

The motion is fully briefed, and the Court is prepared to rule.[12]

---

[12] The DA Defendants also filed a Motion to Dismiss [Doc. No. 139] and Motion for Partial Summary Judgment [Doc. No. 141].  Those motions are also fully briefed and pending before the Court.  The Court will issue a separate ruling on the DA Defendants' motions.

## II.     LAW AND ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate when the evidence before a court shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party.  *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247).  "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim."  *Stahl v. Novartis Pharm. Corp.,* 283 F.3d 254, 263 (5th Cir. 2002).  Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate. *Id.*  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

In evaluating a motion for summary judgment, courts "may not make credibility determinations or weigh the evidence" and "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party."  *Total E & P USA Inc. v. Kerr–McGee Oil and Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013) (citations omitted).  While courts will

18

"resolve factual controversies in favor of the nonmoving party," an actual controversy exists only

"when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.,*

37 F.3d 1069, 1075 (5th Cir. 1994). To rebut a properly supported motion for summary

judgment, the opposing party must show, with "significant probative evidence," that a genuine

issue of material fact exists. *Hamilton v. Segue Software, Inc*., 232 F.3d 473, 477 (5th Cir. 2000)

(emphasis added). "'If the evidence is merely colorable, or is not significantly probative,'

summary judgment is appropriate." *Cutting Underwater Tech. USA, Inc. v. Eni U.S. Operating*

*Co*., 671 F.3d 512, 517 (5th Cir. 2012) (quoting *Anderson,* 477 U.S. at 248).

Relatedly, there can be no genuine dispute as to a material fact when a party fails "to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322-

23. This is true "since a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 323.

### B.  Section 1983 Claims and Qualified Immunity

Plaintiffs assert several claims of constitutional violations under 42 U.S.C. § 1983.

Section 1983 provides individuals with a civil remedy for a violation of constitutional rights. To

establish a § 1983 violation, the plaintiff must show that a person has deprived him of a federal

constitutional or statutory right acting under color of state law. *Gomez v. Toledo*, 446 U.S. 635,

640 (1980).

Even if a plaintiff proves that his constitutional rights have been violated, a police officer

or other public employee sued in his individual capacity may be entitled to application of the

defense of qualified immunity. "Qualified immunity . . . 'is an immunity from suit rather than a

mere defense to liability; and like an absolute immunity, it is effectively lost if a case is

erroneously permitted to go to trial.'" *Sorey v. Kellett*, 849 F.2d 960, 961 (5th Cir. 1988) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 2816 (1985)).  When an officer argues that he is entitled to qualified immunity from suit, we first view the evidence "in the light most favorable to the party asserting the injury" and decide if "the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If that view reveals no constitutional violation, there is no claim. "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* This second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* For immunity to apply, the "actions of the officer must be objectively reasonable under the circumstances, such that a reasonably competent officer would not have known his actions violated then-existing clearly established law." *Evett v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 330 F.3d 681, 688 (5th Cir. 2003).

An officer need only plead his good faith, which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the officer's allegedly wrongful conduct violated clearly established law.  *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005); *see also Atteberry v. Nocona General Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005) ("When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense."), abrogated on other grounds, *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002)).

### 1.  False Arrest in Violation of the Fourth and Fourteenth Amendments (Claim I)

First, the BSO Defendants move for summary judgment on Plaintiffs' claims that Mr.

Phillips was subjected to false arrest in violation of the Fourth and Fourteenth Amendments.  The BSO Defendants argue that they had probable cause to issue the citation against Mr. Phillips. Alternatively, they contend that they had qualified immunity for their actions.  Plaintiffs dispute those assertions.

"By virtue of its 'incorporation' into the Fourteenth Amendment, the Fourth Amendment requires the States to provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty. "  *Baker v. McCollan*, 443 U.S. 137, 142–43 (1979) (citing *Gerstein v. Pugh*, 420 U.S. 103 (1975)).  "The initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection—the Fourth Amendment if the accused is seized and arrested, for example, or other constitutionally secured rights if a case is further pursued. Such claims of lost constitutional rights are for violation of rights locatable in constitutional text, and some such claims may be made under 42 U.S.C. § 1983."  *Castellano v. Fragozo*, 352 F.3d 939, 953–54 (5th Cir. 2003); *see also Blackwell v. Barton*, 34 F.3d 298, 302 (5th Cir. 1994) ("We hold that Blackwell's section 1983 claim against Barton for illegal arrest and detention is properly considered under the Fourth Amendment, the more specific constitutional right implicated by her allegations."); *Estep v. Dallas County, Te*x. 310 F.3d 353, 358 (5th Cir. 2002) (Fourth Amendment guarantees citizens the right to be free from illegal searches and seizures).

To prevail on a Fourth Amendment claim of false arrest, a plaintiff must show that he was arrested without probable cause. U.S. CONST. AMEND. IV; *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir.), *cert. denied*, 122 S.Ct. 46 (2001).   The determination of probable cause is an objective inquiry and requires an examination of the facts honestly and reasonably believed by an officer at the time criminal proceedings were instituted.  *Gordy v. Burns*, 294 F.3d 722, 728

(5th Cir. 2002).  An officer must rely on the totality of facts available to him, but "'may not

disregard facts tending to dissipate probable cause.'"  *Evett*, 330 F.3d at 688 (quoting *Bigford v.*

*Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988)).

> In general, "[i]t is well settled that if facts supporting an arrest are placed before
> an independent intermediary such as a magistrate or grand jury, the intermediary's
> decision breaks the chain of causation for false arrest, insulating the initiating
> party." [*McLin v. Ard*, 866 F.3d 682, 689 (5th Cir. 2017)]. There is a qualification:
> the initiating party may still be liable for false arrest "if the plaintiff shows that
> the 'deliberations of the intermediary were in some way tainted by the actions of
> the defendant.'" [*Id.* (quoting *Deville v. Marcantel*, 567 F.3d 156, 170 (5th Cir.
> 2009)].  Chiefly relevant here, thirty-five years before Gabbert obtained his
> warrant, *Franks v. Delaware* established that even if an independent magistrate
> approves a warrant application, "a defendant's Fourth Amendment rights are
> violated if (1) the affiant, in support of the warrant, includes 'a false statement
> knowingly and intentionally, or with reckless disregard for the truth,' and (2) the
> allegedly false statement is necessary to the finding of probable cause." *Winfrey v.*
> *Rogers*, 901 F.3d 483, 494 (5th Cir. 2018), *on petition for rehearing* (quoting
> *Franks v. Delaware*, 438 U.S. 154, 155–56, 165, 98 S.Ct. 2674, 57 L.Ed.2d 667
> (1978); *see Hale v. Fish,* 899 F.2d 390, 400–02 (5th Cir. 1990) (applying *Franks*
> to a § 1983 claim for arrest without probable cause)].

*Arizmendi v. Gabbert*, 919 F.3d 891, 897 (5th Cir.), *cert. denied*, 140 S. Ct. 220, 205 (2019); *see*

*also Davis v. Strain*, 676 Fed. App'x 285, 287 (5th Cir. 2017) (A Fourth Amendment violation

occurs, even if the arrest and prosecution were achieved through legal process, if "a false

statement [is] made knowingly and intentionally, or with reckless disregard for the truth.").

Likewise, an officer may not omit "exculpatory information from the warrant affidavit, thereby

precluding review by a neutral magistrate of all the facts material to the existence of probable

cause."  *Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006); *see also Burrell v. Adkins*, Civil

Action No. 01-2679-M, 2007 WL 4699166 at *10 (W.D. La. Oct. 22, 2007) (citing cases),

adopted as modified by *Burrell v. Adkins*, Civil Action No. 01-2679-M, 2008 WL 130789 (W.D.

La. Jan. 10, 2008).

The BSO Defendants contend that probable cause clearly existed to issue the misdemeanor criminal property damage summons to Mr. Phillips on September 14, 2015. It is undisputed that evidence implicating Mr. Phillips was found at various crime scenes where arsons and vandalism targeting deer hunters had occurred, including a green Coleman fuel bottle with his name on it, an incendiary device was constructed using a syringe that was traced back to the Phillips, and trash from the Phillips home that appeared to be planted to mislead detectives. Therefore, they argue that it was a reasonable conclusion for BSO to believe that Mr. Phillips had planted the evidence to make it look like someone was stealing his trash to frame him.  They contend that there was a basis for an officer to believe to a "fair probability" that a violation occurred.

Additionally, they argue that, at the 404(b) hearing, a court reviewed all of the evidence available to BSO, with Mr. Phillips having the opportunity to cross-examine the state's witnesses and present his own witnesses, evidence, and argument.  The state court concluded that the evidence met an even higher standard of evidence.

Even if the BSO Defendants had not been able to meet the probable cause threshold, they contend that they are each entitled to qualified immunity. In order for qualified immunity to be lost, there must not have even arguably been probable cause for the arrest (or citation). The evidence available to Defendants clearly exceeds this threshold, and BSO Defendants are entitled to qualified immunity as to Plaintiffs' false arrest claims.

Finally, to the extent Plaintiffs are asserting a claim for false arrest against the BSO Defendants for the amended charge of felony arson, they are entitled to dismissal as to this claim as well, as a judge, as learned intermediary, evaluated the facts and determined there was

23

probable cause before issuing the arrest warrant for this charge, and the finding of probable cause by an independent intermediary breaks the chain of causation.

Plaintiffs respond that a Fourth Amendment violation occurred in this case, even though the arrest was achieved through legal process, because Lt. Bletz made false statements at the 404(b) hearing and in evidentiary submissions, failed to provide exculpatory evidence, and operated with a confirmation bias that precluded Judge Thompson's fair review of the requested warrant.

Plaintiffs "acknowledge that a claim for false arrest on the 2015 citation for simple criminal damage to property would be untimely,"[13] but contend there was an absence of probable cause as to both the 2015 citation and the 2017 arrest.  [Doc. No. 155, p. 19 n. 108 (citing *Murray v. Town of Mansura*, 940 So.2d 832, 839 (La. App. 3 Cir. 2006))].  In support of their arguments, Plaintiffs rely on the alleged false testimony of Lt. Bletz at the 404(b) hearing, the BSO Defendants' failure to disclose exculpatory evidence, and the BSO Defendants' confirmation bias.  Finally, they respond further that the BSO Defendants are not entitled to application of qualified immunity under the circumstances of this case.

### a.  Probable Cause

Plaintiffs have conceded that any claim  based on the 2015 misdemeanor citation is  untimely, but pursue a claim based on Mr. Phillips' 2017 arrest.  Thus, the Court must determine whether Mr. Phillips' 2017 arrest constituted false arrest in violation of the Fourth Amendment, and, if so,  whether Defendants are entitled to the protection for qualified immunity.

Plaintiffs contend that they have raised a genuine issue of material fact for trial because the BSO Defendants obtained an arrest warrant based on false statements, withheld exculpatory

---

[13]The Court does not address the timeliness of this claim as the parties concede that the 2017 arrest is the alleged false arrest at issue.

evidence, and applied confirmation bias.  The Court must consider each of these allegations in turn, the BSO Defendants' response, and the alleged misconduct in its totality.

### (1) Alleged False Testimony

### (a) Statements About the Powerade Bottle

First, Plaintiffs point to evidence that Lt. Bletz testified falsely at the 404(b) hearing with regard to the November 2012 arson of deer stands.  He testified that "Mr. Phillips was the only one in the world that recognized this device and bottle filled with red diesel fuel as being a purple Powerade bottle" and that "the label is completely whited out and devoid of color as a –as a result of the intense heat and the fire."  [Doc. No. 4-1, 404(b) Hearing Transcript,  Vol. I, p. 138].  However, photographs of the purported incendiary device show the bottle to be in good enough condition that the front label is visible, identifying it as a Powerade, and the back part of the label is a deep purple color.  [Doc. No. 155-52, Exh. 50(a) (Photographs)].  Although Lt. Bletz stated in his report narrative from a November 17, 2012 interview that Mr. Phillips admitted that detectives would find that his DNA and fingerprints on the Powerade bottle to make the incendiary device because he "purchased that exact 'purple Powerade Zero' bottle" from the corner store the previous Friday, the interview was recorded, and the exchange was as follows:

> Mr. Phillips:   . . . You know,  when  I  was  looking  at that  stupid Powerade bottle.  You know, the more I thought about it, you know, one of the girls says, you don't drink Powerade, that Powerade Zero.  Well, you're right.  Normally, I don't –normally, it's Gatorade G2, right?
>
> * * *
>
> . . .But I do pick it up at that convenience store once in a while, and you  know, last  weekend,  I  had  two  of those  bottles.   But  that  was  last  weekend;  right? . . .
>
> * * *

. . . So we're mixing and matching things a little bit, but I did have two of those Powerade grapes that I had last weekend.  But I don't know when that showed up. . .

* * *

Lieutenant Bletz:  Would you have –would it have come back with you or would it have been in the trailer or what do you –

Mr. Phillips:  I could have brought one back with me, because I had –I bought two of them.  Because you buy two of them for 2.22 or something like that at the convenience store.

Lieutenant Bletz:  Okay.

Mr. Phillips:  And I grabbed two of them, and it was with our friends from  Iowa. We drove separately.   Met the girls.   And it was Saturday in Cotton Valley, and yeah.  There's a chance that I would have finished one and there's a chance that I could have brought it back, and you know, I don't leave anything around so it could be in the vehicle, and I could have grabbed it and thrown it in the trash.

* * *

Lieutenant Bletz:  You remember what flavor?

Mr. Phillips: It was grape.

Lieutenant Bletz:  Grape?

Mr. Phillips:  That's the only thing I drink.

[Doc. No. 155-41, Exh. 39, Transcript of Nov. 17, 2012 Interview of Todd Phillips,  pp. 69-73].

The BSO Defendants respond that Lt. Bletz explained in his deposition that the photo that he had when interviewing Mr. Phillips did not reveal that the product was purple or grape, and that he had not seen the actual bottle which had been taken for analysis by crime scene investigation and taken into evidence.  [Doc. No. 166-5, Exh. 5, Bletz Depo., pp. 58-60].  He admitted that it can be seen in later photographs and from examining the bottle itself that the Powerade was purple or grape, but not in the photograph he had at the time he interviewed Mr.

Phillips.  Regardless, they argue that Lt. Bletz's mistake was inconsequential and did not result in "false evidence" against Mr. Phillips because Mr. Phillips' defense was always that the bottle was removed from his trash.

### (b) Mr. Phillips' Alleged Motivation/Attitude

Additionally, Plaintiffs contend that Lt. Bletz falsely testified at the hearing that Mr. Phillips made comments during his interview that indicated a motivation for someone to commit the crimes.  Lt. Bletz testified that he said during the interview ". . .Todd, you know what, you're right, maybe I'm the only one that seems to think that . . .you're involved  in  these  crimes, everybody  else  is probably right, everybody else seems to think this is a bunch of,  you know, nitwit, inbred, idiotic kids running around with nothing better to do."  [Doc. No. 4-1, Exh. 2, 404(b) Hearing Transcript,  Vol. I, p. 176].  Lt. Bletz then testified that "Mr. Phillips took . . . exception to that and . . . reiterated his belief which was that . . . he believed this was obviously a highly intelligent, motivated adult with a. . . deep-seeded  hatred  for hunters and the ability to hide it well." *Id.*  Lt. Bletz's report contained similar statements, indicating Mr. Phillips "appeared irritated when [Lt. Bletz] suggested that these crimes were possibly being committed by a group of dumb, young kids." [Doc. No. 155-4, Exh. 1, p. 13].

However, the recorded interview differs:

Lieutenant Bletz: Someone's been very, very careful, and you know, again, I think just like you said, the time that somebody's putting into this to me demonstrates I don't think it's a kid.  There hasn't been any talk about it.

Mr. Phillips: No, it doesn't sound like a kid.

Lieutenant Bletz: Someone has been very disciplined, but someone, in my opinion, that is intelligent and has –you know, they're thinking about what they're doing.  It's not like a spur of the moment, a bunch of kids pissed off  because they  got  ran  over  for –ran  off  for  riding  four-wheelers  on  somebody's property, and, you know, just go back and burn some stuff down.  In fact, even in talking about the not liking deer hunters thing, I don't know if that's exactly what

it is, but I feel like it's some kind of a tie with, you know, anti-deer hunting,
something like that, because it –all of the fires –they're always set when it's
raining, you know.  So seems to me like they're wanting  to  destroy  this  stuff
but  they're  making  a  concerted  effort  to preserve, you know, the woods . . .

[Doc. No. 155-41, Exh. 39, Transcript of Nov. 17, 2012 Interview of Todd Phillips, pp. 16-18].

Plaintiffs suggest that Lt. Bletz insinuated to the state court that Mr. Phillips was personally

offended by the idea that BSO believed "dumb, young kids" were committing the offenses,

implying his guilt, when, in fact, Mr. Phillips merely agreed with Lt. Bletz's stated theory.

The BSO Defendants respond that it would have been clear to Judge Thompson at the

404(b) hearing that these were Lt. Bletz's personal observations, and he would have assigned

those opinions the appropriate weight.

### (c)  Extinguishment of Alleged Incendiary Device

In connection with the November 2012 offense, Plaintiffs also contend that Lt. Bletz

falsely testified "that there  was  a  small  crack  in  the  roof  of  this  deer  stand  and  enough

rain  was  able  to  drip through that after the device was lit . . . to extinguish it while the other

two went off and completely burned the structures to the ground." [Doc. No. 155-5, Exh. 2,

404(b) Hearing Transcript, Vol. I, p. 70].  In his report, Lt. Bletz wrote:  "After a thorough

examination it was determined that the device did not explode because the roof of the deer stand

it was placed inside of has a large hole in it, this subsequently allowed the rain to get in and

extinguish the use/wick." [Doc. No. 155-4, Exh. 1, p. 11].  This false testimony supported Lt.

Bletz's alleged theory that the device "obviously was not intended to be found." [Doc. No. 155-

6, Exh. 3, 404(b) Hearing Transcript, Vol. II, p. 257].  However, Matthew Caston, who

personally sat in that same deer stand on multiple occasions, testified that the deer stand never

had a roof on it.  [Doc. No. 155-8, Exh. 5, 404(b) Hearing Transcript, Vol. IV, p. 755].  Lt. Bletz

admitted in his deposition that he had gone to this crime scene and examined it himself.  [Doc. No. 4-1, 404(b) Hearing Transcript, Vol. I, pp. 69-72].

The BSO Defendants respond that Plaintiffs have failed to show that Lt. Bletz was intentionally deceptive, rather than simply mistaken, or that Lt. Bletz and Mr. Caston were even talking about the same deer stand.  Regardless, the BSO Defendants contend that Lt. Bletz's conclusion that the deer stand was intended to be burned is not unreasonable when there was an incendiary device in the stand, and the deer stand next to it did, in fact, burn.

### (d) Signs Along Old Plain Dealing Road

Plaintiffs next contend that Lt. Bletz testified falsely about the signs that were placed along Old Plain Dealing Road in March 2013.  Lt. Bletz testified the idea of the posters was formed with the approval of  Sheriff  Whittington [Doc. No. 155-6, Exh. 3, 404(b) Hearing Transcript, Vol. II, p. 244]  "after discussing several different methods with the District Attorney's Office as well as a court forensic criminal psychologist." [Doc. No. 155-5, Exh. 2, 404(b) Hearing Transcript, Vol. I, p. 167].  He testified further that he spoke with the D.A. and Dr. Seiden,[14] the psychologist,  and "developed a couple of different possible strategies one of which was to place some signs with Bible verses on them."  [Doc. No. 4-1, 404(b) Hearing Transcript, Vol. I, p. 168].

However, DA Marvin and Dr. Seiden were not brought  in to consult on the case until nearly three months after Lt. Bletz created the signs and placed them along Old Plain Dealing Road across from the Phillips' residence.  DA Marvin testified that he first met with BSO deputies in June 2013, and he called Dr. Seiden in.  He was "certain" no one from BSO had previously consulted with Dr. Seiden on the case prior to a June 21, 2013 meeting, and any

---

[14]Dr. Seiden is now deceased.

29

testimony of Lt. Bletz to the contrary would be "incorrect."  [Doc. No. 155-26, Exh. 23, Marvin Depo., pp. 30-33, 41-44].

The BSO Defendants respond that the signs were not written in a threatening manner, no other residents complained about the signs, and Plaintiffs' own expert agreed that there was a legitimate law enforcement reason to place the signs along the area where the crimes were committed in an attempt to communicate with the person committing the crimes to incite the perpetrator to act and provide officers with evidence.  [Doc. No. 166-7, Exh. 7, p. 113; Doc. No. 155-69].  There is no evidence to suggest that the BSO Defendants knew Mr. Phillips was in China at the time, or that the patrol deputy who was called to the scene or his supervisor were aware that the signs were placed by BSO.

Additionally, there is no dispute that the signs were discussed with Dr. Seiden and DA Marvin at the June meeting. The only discrepancy between Marvin's testimony and Lt. Bletz's is the order in which these meetings occurred regarding when the signs were placed. There is no evidence that Lt. Bletz lied rather than simply was mistaken regarding the order of events that had occurred so close to each other and both over three and a half years prior to his testimony. Therefore, this discrepancy between the testimony of different parties is not evidence that Lt. Bletz intentionally lied, as opposed to making a mistake, or as opposed to DA Marvin having made a mistake. Although Plaintiffs claim that "this particular lie told by Lt. Bletz is that his testimony created the inference that Dr. Seiden predicted that, if Mr. Phillips was the real culprit, he could be prompted to respond or act in a particular manner to the signs." [Doc. No. 155, p. 37 ].  However, the BSO Defendants argue that information showing that Mr. Phillips acted in accordance with Dr. Seiden's predictions was not presented at the 404(b) hearing as evidence against him and was not relied upon by the State Court in issuing the ruling.

30

### (e)  Alleged Mischaracterization of Statements During Interviews of Phillips Family and Others

In his report and during the 404(b) hearing, Lt. Bletz also allegedly mischaracterized and fabricated statements to support his contention that Mr. Phillips was responsible for these crimes, particularly statements by Mrs. Phillips, Brooke, and Abby.

Lt. Bletz's narrative describes the interviews:

We then entered the residence and sat at the kitchen table with Jodi Phillips and began explaining the circumstances surrounding our visit.  During the ensuing conversation, Jodi Phillips stated that she and Todd didn't "hate" deer hunters; however they fundamentally disagreed with hunting and would never do it themselves.  Jodi Phillips further stated that Todd Phillips gets extremely annoyed with the local hunters because the high-powered rifle fire often scares their horses and has caused them to jump the fences in the past.

[Doc. No. 155-4, Exh. 1, pp. 11-12 (all caps deleted].

Lt. Bletz continued his description of the interview with the following paragraph:

Approximately one hour later Todd Phillips arrived at the residence and joined the conversation at the kitchen table.  Todd and Jodi Phillips were informed that a veterinary grade syringe of "bute paste" belonging to them had recently found [sic] at the scene of arson approximately a mile or two from their residence.  Todd and Jodi Phillips both agreed that their youngest daughter was the last to administer a dose of medicine to their horse from this particular tube of "bute paste."  Todd and Jodi Phillips both confirmed that the empty syringe was then placed in a garbage can in the horse barn approximately a week ago and was still in there as far as they knew.  Todd and Jodi Phillips were then asked if they knew of anyone who could have come onto their property and taken said syringe from their trash;  however, Todd and Jodi Phillips both stated that it is absolutely impossible for someone to get onto their property without them knowing.  They further explained that they have two large guard dogs that always stay outside during the night.  Furthermore, Jodi Phillips stated that she is a stay at home wife/mother and is always home.  Todd and Jodi Phillips stated their [sic] has never been an incident where something was found to be out of place, missing and or stolen in the past.  The Phillips further stated that they have not seen anything strange or out of the ordinary around their property and have never had any incidents where they felt someone could have been on their property.

[Doc. No. 155-4, Exh. 1, p. 12 (all caps deleted)].  Lt. Bletz continued by stating that

> ...Fifteen year old Abby Phillips and nineteen year old Brooke Phillips were also present at the kitchen table for part of this conversation and reiterated the fact that it was impossible for someone to get onto their property without them knowing, because of their guard dogs and the fact that Jodi Phillips is always  home. Brooke and Abby Phillips stated that they have not seen anyone on or near their property and nothing has ever been out of place or missing that they are aware of. Abby Phillips further stated that she is the one who administered the last dose of medicine from the syringe of "bute paste" in question and distinctly remembers putting it into the barn trash and seeing it there a few days ago.

*Id.* at p. 13.   Lt. Blez testified at the 404(b) hearing consistent with his report that he specifically asked all four of the family members whether it was possible for someone to sneak onto their property and steal garbage bags and he was told "it was beyond the realm of possibility." [Doc. No. 155-5, 404(b) Hearing Transcript, Vol I., pp. 83, 124].   He testified "there was at least one dog outside and that there was no way for somebody to get on [their] residence without . . . the dogs going after them." *Id.* at p. 84.  Lt. Bletz further testified, and, again, consistent with his report, that the Phillips "both confirmed that the empty syringe was then placed in a garbage can in the horse barn approximately one week prior and was still in there as far as they knew." [Doc. No. 155-5, Exh. 3, Vol. II, p. 344].

Plaintiffs also contend that Lt. Bletz mischaracterized their interview regarding the Coleman bottle.  His report states:

> Todd and Jodi Phillips were then informed that a green Coleman fuel bottle with the name Todd Phillips written on it had been found at a separate arson scene  in the same area, approximately four weeks earlier.   This detective showed Todd Phillips a picture of the Coleman fuel bottle in question and Todd Phillips subsequently identified said bottle as being his.  Todd Phillips stated  that  the Coleman fuel bottle would have been in a shed on their property and believed that he had actually written his own name on this bottle.  Todd Phillips was then asked if it was possible that someone else wrote his name on the Coleman fuel bottle in an effort to set him up and or mislead Sheriff's department investigators.  Todd Phillips stated that he was positive about writing his name on this bottle and could not think of anyone who  would  try  to  set  him  up.   Todd Phillips stated that he  gets  up  every morning at 0430 to go to the gym before work and doesn't get home until late in the evening and therefore doesn't have any type of outside activities or interactions with people outside of home and work.

[Doc. No. 155-4, Exh. 1, p. 12].  At the 404(b) hearing, Lt. Bletz similarly testified that Mr. Phillips "said that it was in fact his [bottle] and that  . . . he was in fact the one that wrote his name on that bottle."  [Doc. No. 4-1, 404(b) Hearing Transcript, Vol. I, p. 122].

In connection with the cell phone box found hanging from the tree,  Lt. Bletz interviewed Leslie Fletcher and wrote that she:  "admitted to being friends with Todd and Jodi Phillips and stated that they have been to one another's residence in the past." Doc. No. 155-4, Exh. 1, p. 7].  This statement was included in his report as part of the September 2011 event, though there is no indication as to when Lt. Bletz spoke to Mrs. Fletcher.  [Doc. No. 155-49, Exh. 46, BSO Report No. 11-4229].  At the hearing, Lt. Bletz also testified that "some of the Fletcher girls were –were somewhat friends of acquaintances" of the Phillips' girls and that Mrs. Fletcher had "somewhat of a friendly relationship with the Phillips and [had] been to their residence before and vice versa." [Doc. No. 155-5, Exh. 2, 404(b) Hearing Transcript, pp.113-114].  Lt. Bletz testify falsely that the Phillips were the only persons out of all the suspects he had previously looked at in the case with a connection to the Fletchers. *Id.* at 115.

The Phillips contend that Lt. Blezt has mischaracterized and fabricated their statements and those of Leslie Fletcher.  First, they deny that they have any disagreement with hunting, deny that they were annoyed by high-power rifle shots, deny that they ever had a horse jump the fence for any reason, and, finally, deny that they ever made such representations to Lt. Bletz or other BSO deputies.  To the contrary, Mrs. Phillips contends that she explained that she is from a hunting family, showed Lt. Bletz hunting pictures on her phone from family members and friends, and pointed to Brooke who was wearing a shirt that read "Silly Boys, Hunting is for Girls" and had a bruise between her

33

eyes from learning to shoot a rifle. [Doc. No. 155-9, Exh. 6, 404(b) Hearing Transcript,

Vol. V, pp. 996-997; Doc. No. 155-31, Exh. 28, Deposition of Jodie Phillips ("Mrs.

Phillips Depo."), pp. 81-85, 96].  Brooke was dating her now-husband, Dillon, whose

"only hobby is hunting," and the Phillips allowed and even encouraged both Brooke and

Abby to go hunting with him.  [Doc. No. 155-8, Exh. 5, 404(b) Hearing Transcript,  Vol.

IV, pp. 861-862].

       The family further denies the truth of Lt. Bletz's testimony about the bute syringe and the

ability for someone to gain access to trash on their property.  They assert that no one could

remember where the bute syringe was last placed and could not have possibly "confirmed" an

exact location.  Abby told Lt. Bletz that she thought she put the syringe in the trash at the rodeo

because that was when she used the last dose, but she did not know for sure where it was placed,

and she never advised deputies that she specifically recalled placing it in the barn trash.  [Doc.

No. 155-8, Exh. 5, 404(b) Hearing Transcript, pp. 846-47; Doc. No. 155-31, Exh. 28, Mrs.

Phillips Depo., p. 86; Doc. No. 155-33, Exh. 30, Deposition of Abby Phillips ("Abby Phillips

Depo."), pp. 14-15].  The next day at the detective's office, Lt. Bletz stated only that Mrs.

Phillips, Brooke, and Abby "felt they were pretty sure that  it was in the trash in the barn,"  and

Mr. Phillips questioned that statement, explaining the syringe "could have been in the barn or up

front" and that he gathers all the trash and takes it to the end of their driveway on Sunday

evenings.  [Doc. No. 155-42, Exh. 39, Transcript of Nov. 17, 2012 Interview of Todd Phillips,

pp. 4-5].

       The Phillips also deny telling Lt. Bletz that it would be impossible to get on their

property.  [Doc. No. 155-9, Exh. 6, 404(b) Hearing Transcript, Vol. V, pp. 998-999].  Lt. Bletz

testified that the Phillips have two "Doberman Pinchers that are outside dogs that . . .are there for

34

security." [Doc. No. 155-5, Exh. 2, 404(b) Hearing Transcript, Vol. I, p. 83].  However, they were house dogs that slept with Abby and Brooke every night [Doc. No. 155-8, Exh. 5, 404(b) Hearing Transcript, Vol. IV, pp. 842-843, 867].  Sonny Bickham testified that he and his son went onto the Phillips property to look around without their knowledge, and Dale Russell also testified that the dogs "never seemed aggressive," never barked, and that the dogs would run away if you just "holler at them." [Doc. No. 155-8, Exh. 5, 404(b) Hearing Transcript, Vol. IV, p. 907; Doc. No. 155-37, Exh. 35, Deposition of Walter D. Russell, Jr. ("Russell Depo."), pp. 35-38].

With regard to the  Coleman bottle, Mr. Phillips never confirmed that the writing on the bottle was his.  Mr. Phillips told Lt. Bletz there were similarities to his writing, but he did not know whether the writing was his, and the next day Mr. Phillips specifically told Lt. Bletz that he had no recollection of ever writing on one of his Coleman fuel bottles.  [Doc. No. 155-9, Exh. 6, 404(b) Hearing Transcript, Vol. V, pp. 1059-1060.  The two Coleman fuel bottles owned by Mr. Phillips were later found in his shed (without writing on them).  *Id.* at p. 1060.

Finally, Leslie Fletcher testified at the hearing that she did not know Todd or Jodi Phillips and that her daughter had thrown the cell phone box away at the home of Brittany Bickham, the daughter of a previously identified potential suspect, Gregory Bickham.  [Doc. No. 155-7, Exh. 4, 404 (b) Hearing Transcript, Vol. III, p. 484; Doc. No. 155-66, Exh. 33, Deposition of Gregory Bickham ("Gregory Bickham Depo."), pp. 27-28].

The BSO Defendants respond, first, that Plaintiffs have an incentive to dispute facts in order to survive summary judge.  At any rate, they argue that the alleged differences are not material to their claims. Judge Thompson heard all the evidence,

including testimony from the entire Phillips family, who had the opportunity to dispute

Lt. Bletz's testimony and report.

Specifically with respect to Mrs. Fletcher's testimony, the BSO Defendants cite the Court

to the following testimony:

Q.    You remember telling the sheriff's office a couple of years ago that the Phillips'

        family had visited your residence?

A.    Yes, I believe yes, I did say that.

  . . .

Q.    Now, okay, so just so I'm clear, a couple of years ago you told the sheriff's office

        you knew the Phillips' family, they'd been to your residence and the last place

        you thought the box was in a closet in your house?

A.    Yes.

[Doc. No. 166-3, Exh. 3, 404(b) Hearing Transcript, Vol. III, pp. 483-85].  Thus, the BSO

Defendants contend that Lt. Bletz's testimony was not false, but was based on the information

previously provided by Mrs. Fletcher.  Mrs. Fletcher informed ADA Holland on the morning of

her testimony that she had remembered that the cell phone box was taken to Brittany Bickham's

house and thrown away in her trash.  *Id.* p. 485.  As Mrs. Fletcher testified two days *after* Lt.

Bletz, he could not have known this information.  *Cf.* [Doc. No. 166-3] to [Doc. No. 166-4].

### (f)  Alleged Misrepresentations Regarding Expert Testimony

Plaintiffs also allege that Lt.  Bletz falsely testified with regard to the handwriting expert

and cellular records.  Lt.  Bletz testified that the State's handwriting expert, Robert Foley, noted

a "very obvious anomaly in Mr. Phillips' handwriting exemplar which was the fact that in his

professional opinion there was a very obvious attempt to deceive throughout Mr. Phillips'

handwriting exemplar meaning he intentionally attempted to deceive and change his ordinary handwriting." [Doc. No. 155-5, Exh. 2, 404(b) Hearing Transcript, Vol. I, p. 139].  Yet, Mr. Foley actually opined that it appeared as though Mr. Phillips had put forth his best effort in the exemplars and that the attempt to deceive was only noted in the writings found at the various crime scenes.  [Doc. No. 155-6, Exh. 3, 404(b) Hearing Transcript, Vol. II, p. 305; Doc. No. 155-75, Exh. 72, Foley Report].

The BSO Defendants explain that Lt. Bletz testified on November 28, 2016, one day prior to Mr. Foley.  [Docs. No. 166-4 & 166-6].  According to them, Lt. Bletz mistakenly interpreted the report because Mr. Foley referred to the writings in his analysis by number rather than name.  They point out that the transcript indicates that ADA Holland may have also made the same mistake in interpreting Foley's report.  [Doc. No. 166-6, 404(b) Hearing Transcript, Vol. II, p. 305].  Regardless,  prior to his ruling, Judge Thompson was aware of Mr. Foley's clarified opinion and testimony.

Lt. Bletz also stated in his narrative that cell phone records placed "Todd Phillips' cellular device at the Circle K gas station on the same date/time" the threatening phone calls were made in December 2012.  [Doc. No. 155-4, Exh. 1, p. 177].  At the 404(b) hearing, he testified that the cell phone records showed "Mr. Phillips leave his residence . . . , drive straight to the location of the Circle K, . . . and then turn around and drive straight home," claiming the records "placed him at that payphone."  [Doc. No. 155-7, Exh. 2, 404(b) Hearing Transcript, vol. I, pp. 144, 154; Doc. No. 155-6, Exh. 3, 404(b) Hearing Transcript, Vol. II, p. 259].  However, the cell phone records were for the phone used by Jodi Phillips, not Todd, and there was no evidence that Mr. Phillips ever used his wife's phone.  [Doc. No. 155-10, Exh. 7, Bletz Depo., p. 79].  Furthermore, the State's expert, Lt. Mack, testified that the records only demonstrated Mrs.

Phillips' cell phone was in the same "pie shape" area as the Circle K and that the exact location

of the cell phone could not be determined.  [Doc. No. 155-8, Exh. 5, 404(b) Hearing Transcript,

Vol. IV, pp. 681, 687; Doc. No. 155-9, Exh. 6, 404(b) Hearing Transcript, Vol. V, pp. 1081,

1083].

(2) <strong>Exculpatory Evidence</strong>

Plaintiffs also point to exculpatory evidence that was not provided to their counsel or the

state court.  Approximately one month after the 404(b) hearing concluded and well prior to Judge

Thompson's ruling, BSO deputies were directed to a fake "grave site" of DA Marvin where a

booby trap was set.  It was immediately assumed that the letter directing deputies to the site "was

related to the cases involving spikes and arsons in the Hwy 160 and Cottage Grove Road area."

[Doc. No. 155-67, Exh. 64, BSO Report No. 17-126, p. 5; Doc. No. 155-17, Exh. 15, Deposition

of David L. Faulk ("Faulk Depo."), p. 24]; *see also* [Doc. No. 155-26, Exh. 23, Marvin Depo.,

p.62 (testifying that there was evidence found at the "grave" site that linked it to the other

incidents)].  Sheriff Whittington assigned four (4) detectives to a task force to investigate that

incident.  The task force identified John Greer as a suspect based on information provided to Lt.

Bletz by Gary Wilson.  [Doc. No. 155-8, Exh. 5, 404(b) Hearing Transcript, Vol. IV, p. 795;

Doc. No. 155-67, Exh. 64, BSO Report No. 17-126; Doc. No. 155-14, Exh. 11, Mack Depo., pp.

45-46].  Sheriff Whittington testified that he was advised by the DA's Office that there was an

"ample, solid case" against Mr. Phillips.  [Doc. No. 156, Deposition of Julian Whittington

("Whittington Depo."), p. 89 ("It was concluded that –we were reassured that the District

Attorney's office, that there was an ample, solid case, and they didn't need more evidence.  They

38

had a good case.").[15]  He then disbanded the task force.  [Doc. No. 155-13, Exh. 11, Mack Depo., pp. 47-51].

However, the fact that the offense occurred, that a task force was assigned to investigate this incident along with the spikings and vandalisms, and the fact that a suspect other than Todd Phillips had been identified was never disclosed to Mr. Phillips and his defense counsel or to Judge Thompson prior to the issuance of his 404(b) opinion or the subsequent felony arrest warrant based on the evidence adduced at the hearing.  [Doc. No. 155-94; Exh. 91, Marty Stroud Aff.; Doc. No. 141-1 Hugo Holland Aff.(referring only to the 404(b) hearing as basis for warrant)].

Additionally, Plaintiffs contend that Lt. Bletz prepared an offense report and presented it to the DA's Office in connection with the prosecution of Mr. Phillips which contained a lengthy narrative supplement of all the incidents that Mr. Phillips was suspected of committing, but failed to disclose all of the vandalisms and acts of property damage which were reasonably believed to be related.  Specifically, he failed to disclose the following events that were either patently exculpatory of Mr. Phillips or could have led to exculpatory information:

1) On or about October 6, 2010, Nicholas Osentoski had two deer cameras and a deer stand stolen from his deer lease off Cottage Grove Road.  He found the handle of a hammer with the initials "LC" and believed it might be Larry Coker;

2) On or about September 19, 2011, Joseph Allen reported a trail camera stolen from his lease at 194 H. White Road.  Someone recently started a fire on the property, burning several acres of trees.

---

[15]Plaintiffs also contend that Chief Deputy Owens testified that Sheriff Whittington received a request to delay this investigation.  That may be true, but they cite the Court to Owens' deposition at pp. 40-43, and those pages are not attached.  See [Doc. No. 155-12, Exh. 9, Deposition of Charles R. Owens.].  Thus, the Court cannot review that testimony.

3) On or about July 18, 2012, Shelton Stiles reported a burglary of his residence at 270 Cottage Grove Road.  The door was pried open, a thermostat was stolen off the wall, and a message written in mud in the shower: "wite trashf*** you", and "white man" written on two mirrors. The A/C unit, pump and tank from the water well, and pump and motor from the sewer system were removed.  2 x 4's were found stuffed down the well, and the water, sewer, and electric lines under the house had been cut.

4) On or about September 1, 2012, Shelton Stiles reported that someone shot and killed one of his dogs and the other dog was missing.

5) On or about April 12, 2013, Ashley Jordon found her dog dead in their front yard at 260 Cottage Grove Road and found two Springfield 30-06 casings next to the dog.

6) On or about April 23, 2013, Ashley Jordan showed an Amazon package was delivered to her on April 19, but she did not receive it.  On April 23, the box was in her mailbox but had been opened and retaped, and inside was a bag of dog food.

7) On or about June 1, 2013, Cody Jordan reported sitting inside his home at approximately 11:15 p.m. when he heard two shots.  The next morning, he found two bullet holes in the driver's side rear quarter panel of his truck.

8) On or about September  23, 2013, Johnny Vinson reported someone cut his fence and stole his fence posts and the fence gate at 260 Cottage Grove Road (the same residence where the Jordans previously resided).

9) On or about December 27, 2013, Johnny Vinson's truck was shot up while parked on Cottage Grove Road.  Deputies interviewed Gary Wilson who said he was in his backyard before dark shooting his pistol, but he did not hear any other shots.

10) On or about December 5, 2014, Terence Vinson reported someone shot at him just north of the oil tanks on Cottage Grove Road.  He had been hunting earlier.  As he was leaving around 5:45 pm., someone shot through his back window, and the bullet hit his rearview mirror.  Deputies interviewed Shelton Stiles as a possible suspect but confirmed Mr. Stiles was driving an 18-wheeler to Utah when the   incident occurred.

11) On or about March 20, 2015, Lenardo Kingsby reported someone shot his skid loader in the 100 block of Cottage Grove Road between 4:30 p.m. on March 19 and 9:30 a.m. on March 20.  Deputies found tire tracks leading from the skidder to the end of Cottage Grove Road and learned from Police Jury records that someone who lived  at the end of Cottage Grove Road named Wilson had  made several complaints about a skid loader damaging the road.

12) On or about June 10, 2015, A&A Trucking reported a tractor/trailer burglary in the 200 block of Cottage Grove Road.   Miscellaneous supplies were stolen,  and 2 perimeter lights were shot out.

13) On or about  June 11, 2015, Andrew Odom reported stolen equipment from the A&A logging site on Cottage Grove Road.  Someone stole 12 volt batteries from 2 skidders, a CB radio and antenna, $8.00 in change and a fire extinguisher,  and perimeter lights were shot out.

14) On or about June 13, 2015, Colton Stanley reported finding several items in the woods behind his house, and the items were identified as the supplies stolen from A&A Trucking on June 10.

15) On or about March 9, 2016, Austin Hesson reported someone shot up his house at 260 Cottage Grove Road.  A total of 14 rounds entered the house.

Deputy Huddleston later found that the "series of spikes, vandalisms, arsons, property damage by gunfire and strange letters that have been occurring in a small area south of Hwy 160 and between Old Plain Dealing Road and Hwy 3" were connected.  [Doc. No. 155-54, Exh. 52, BSO Report No.  12-5866].  Every incident except the September 2011 incident occurred on Cottage Grove Road, the same road Gary Wilson lived on.  [Doc. No. 155-73, Exh. 71, aerial view of Gary Wilson's residence].

Lt. Bletz offered an explanation of why he did not believe the vandalism at Shelton Stile's residence was related to the other incidents (because it did contain "religious writings, arsons, and/or spikes or combinations thereof."  [Doc. No. 155-10, Exh. 7, Bletz  Depo.,  pp.123-124].  However, Plaintiffs note that Lt. Bletz accused Mr. Phillips of the alleged "burglary" at Gary Wilson's residence in November 2015, which occurred less than one-half mile from Mr. Stiles' residence, and there were no religious writings, arson, or spikes.  [Doc. No. 155-6, Exh. 3, 404(b) Hearing Transcript,  Vol. II, pp. 235-236 (no Bible verses were written or left at the Wilson residence).  His explanation also does not address the remaining acts which were not disclosed.

Plaintiffs contend that these incidents are significant because Mr. Phillips could not have been involved.  On April  12,  2013, when Ashley Jordan's dog was shot, BSO had a tracking device on Mr. Phillips' vehicle and was able to identify his location at all times.  [Doc. No. 155-4, Exh. 1, p. 18 (tracker removed on April 19, 2013)].  When Terence Vinson was shot at on December 5,  2014,  Mr. Phillips boarded a flight in Dallas, Texas, which was scheduled to depart at 5:05 p.m. and fly to Shreveport.  [Doc. No. 155-29, Exh. 27, Todd Phillips Aff. & 27(b) (calendars)].  He would have had to fly from Dallas to Shreveport, drive to Plain Dealing, and shoot at Mr. Vinson within a forty-minute time span.  Even if Lt. Bletz denies awareness of this

42

information, he was aware that Detective Mike Lombardino was assigned to investigate the March and June 2015 cases and developed circumstantial evidence that Gary Wilson was responsible. Lt. Bletz stated that he had "cleared" Gary Wilson and instructed Detective Lombardino to inactive the cases where Gary Wilson had been developed as a suspect. [Doc. No. 155-61, Exh. 59, BSO Report No. 15-1149; Doc. No. 155-19, Exh. 17, Lombardino Depo., pp. 12-19, 21-24, 29-32; Doc. No. 155-10, Exh. 7, Bletz Depo., pp. 134-35]. The fact that Gary Wilson had been identified as a potential suspect was patently exculpatory because Mr. Phillips was out of town during the commission of both offenses and could not have been responsible; he and his wife were visiting family in Illinois at the time of the March 2015 offense, and Mr. and Mrs. Phillips and Abby were in Abilene, Texas for Abby's state rodeo finals at the time of the June 2015 offense. [Doc. No. 155-29, Exh. 27, Todd Phillips' Aff. & calendars].[16]

The BSO Defendants respond that the *Brady* decision does not apply to the 404(b) hearing or to the disclosure of evidence prior to a plea agreement. Thus, they contend that there was no violation for their failure to provide alleged exculpatory evidence prior to that hearing or the State's plea offer to Mr. Phillips. The concern under *Brady* is that a defendant receive a fair trial, and, in this case, the charges never went to trial.

Additionally, they contend that Lombardino admitted that he did not know why Lt. Bletz wanted him to inactivate the cases where Gary Wilson had been developed as a suspect, but that Lt. Bletz might have wanted to investigate the cases himself. [Doc. No. 166-12, Lombardino Depo., p. 26].

---

[16] Plaintiffs notes that, with regard to the March 9, 2016 incident, the victim, Mr. Hesson, named Gary Wilson as a possible suspect and notified BSO that he would constantly fire assault type weapons and the gunfire grew closer to his home over a period of time. [Doc. No. 155-65, Exh. 63, BSO Report No. 16-1109, pp. 8-9]. Mr. Hesson did call Mr. Wilson "crazy," but the other information was provided after Mr. Hesson saw that Gary Wilson "had been arrested." [Doc. No. 155-65, Exh. 63, p. 9]. Thus, it is not clear that such information was available to officers prior to Gary Wilson's arrest.

### (3) Confirmation Bias

Finally, Plaintiffs contend that the BSO Defendants are not entitled to summary judgment because they improperly disregarded facts tending to dissipate probable cause in favor of the theory Lt. Bletz had developed that Mr. Phillips was guilty of the crime.  They argue that this so-called confirmation bias negates probable cause.

Plaintiffs point out that  a consistent theme throughout the investigation was the real perpetrator's efforts to intentionally mislead detectives and plant false evidence implicating innocent third persons.  The BSO Defendants  recognized this issue early on, and other potential suspects that had been identified, namely Landon Burns, Gregory Bickham, and Blake Barton, were cleared, but  Lt. Bletz failed to view the evidence against Mr. Phillips "through the same lens."  [Doc. No. 155, p. 45].  For Lt. Bletz's theory of the case against Mr. Phillips to be correct, Mr. Phillips would have had to have known, in 2010 and 2011, who Gregory Bickham and Landon Burns were and that they had been identified by "several victims,"  but there was no such evidence.  [Doc. No. 155-10, Exh. 7, Bletz Depo., p. 34 (Lt. Bletz has "no idea" whether Todd Phillips knew Gregory Bickham in 2011 and doesn't "know anything about that"); *see also* [Doc. No. 155-6, Exh. 3, 404(b) Hearing Transcript,  Vol. II,  pp. 452, 470 (Landon  Burns and Morris Naron testified they did not know Todd Phillips); Doc. No. 155-7, Exh. 4, 404(b) Hearing Transcript,  Vol. III, pp. 514, 521 (Daniel Burns and Blake Barto testified that they did not know Todd Phillips); [Doc. No. 155-7, Exh. 5, 404(b) Hearing Transcript,  Vol. IV, p.802 (Lt. Bletz testified none of the witnesses ever had a conflict with Mr. Phillips); [Doc. No. 155-35, Exh. 33, Gregory Bickham Depo., pp.17-18 (testified he didn't really know the Phillips, "[n]ever had no dealing[s]", and "[n]ever did nothing with them"); [Doc. No. 155-38, Exh. 36, Deposition of Johnnie D. Brunson ("Brunson Depo."), p.13 (testified that he did not personally

know Todd Phillips); Doc. No. 155-36, Exh. 34, Deposition of Matthew S. Caston ("Caston Depo."), p.11-12 (testified that he did not know the Phillips); Doc. No. 155-39, Exh. 37, Deposition of Jimmy R. Hope ("Hope Depo."), pp.10-11 (testified that he never met Mr. Phillips)].  To support his theory, Plaintiffs argue that Lt. Bletz ignored the pattern of staged evidence and formed the idea that Mr. Phillips, a man who is neither a hunter nor a woodsman, took trash from his kitchen, traveled to the deer stand on foot, set a deer stand on fire which then burned to the ground, and placed the trash in another deer stand which was intended to be burned, but which never caught fire.

Landon  Burns, Gregory Bickham, and Blake Barton were all cleared because no fingerprints were found, no DNA was found, cell phone records proved they were not in the area at the time certain crimes were committed, and nothing of evidentiary value was found during the  execution  of  search  warrants  at  their  residences. However, Lt. Bletz did not clear Mr. Phillips under these same facts, instead proceeding "to manipulate the evidence and statements of witnesses, grossly misrepresent the opinion of [handwriting expert] Mr. Foley, exaggerate the opinion of Lt. Mack to falsely report that Todd Phillips, rather than Jodi, was in the area when calls were made from the Circle K, and fabricate statements by Plaintiffs, all in order to support his belief that Mr. Phillips was responsible for the series of criminal acts occurring in north Bossier Parish." [Doc. No. 155, p. 48].  They argue that the BSO Defendants cannot show that there was probable cause for Mr. Phillips' arrest because  he was never considered a suspect once the October 2017 task force looked at all the facts in an objective light.

### (4) Analysis

Plaintiffs have apparently abandoned any claim based on the 2015 citation,

therefore, the BSO Defendants' Motion for Summary Judgment as it relates to the 2015 citation is GRANTED.

The Court must still address Mr. Phillips' 2017 arrest on the felony charge.  It is undisputed that Judge Thompson's issuance of a warrant for Mr. Phillips' arrest on that charge was based solely on the evidence presented prior to and at the 404(b) hearing while the misdemeanor charge against Mr. Phillips was pending.  The BSO Defendants argue that this Court is bound by Judge Thompson's decision to issue the warrant to find that there was probable cause for Mr. Phillips' arrest.  They argue that all of the issues raised by Plaintiffs were either part of the evidence considered by Judge Thompson or red herrings that fail to raise a genuine issue of material fact for trial.  They assert that there was no duty to disclose exculpatory evidence to Mr. Phillips or his counsel prior to a trial which, in this case, never took place.  Thus, based on those arguments and given Judge Thompson's findings under a much higher standard, the BSO Defendants argues that the Court must find that there was probable cause for Mr. Phillips' arrest and dismiss Plaintiffs' false arrests claim under § 1983 against the BSO Defendants.

Plaintiffs oppose the motion, arguing that the evidence which the Court has detailed above, is sufficient to raise a genuine issue of material fact for trial whether probable cause existed for his arrest when Lt. Bletz either recklessly disregarded the truth or actively lied to Judge Thompson, the BSO Defendants failed to disclose the exculpatory evidence to them or Judge Thompson, and Lt. Bletz's confirmation bias served to taint the investigation and the presentation of evidence to Judge Thompson.

First, for the reasons discussed more fully, *infra.* the Court finds that the BSO Defendants' failure to disclose exculpatory evidence prior to or at the 404(b) hearing does not

violate *Brady v. Maryland*, 373 U.S. 83 (1963).  However, that argument is separate and apart from the considerations raised by Plaintiffs with regard to the alleged false arrest of Mr. Phillips.

While Judge Thompson's review of evidence would normally serve to insulate the BSO Defendants from liability for false arrest, a judge's issuance of a warrant does not break the chain of causation when the actions of law enforcement taint the process.  As the BSO Defendants contend, Plaintiffs did have the opportunity to challenge some of the evidence at the hearing through their own testimony, evidence, and cross-examination of the State's witnesses.  For example, they offered their own testimony about the family's lack of malice towards hunting.  However, after a review of the totality of the evidence presented through Lt. Bletz's testimony and in reliance thereon, the Court finds that there is a genuine issue of material fact for trial whether Lt. Bletz either intentionally lied or recklessly disregarded the truth in his testimony and reports and other evidence presented to the state court at the 404(b) hearing.  Further, even though the BSO Defendants did not have a duty to provide exculpatory evidence to Mr. Phillips under *Brady*, Plaintiffs have also raised a genuine issue of material fact for trial that Lt. Bletz failed to disclose exculpatory evidence to Judge Thompson for his consideration prior to issuance of the felony warrant.  Instead, the evidence presented creates a picture of Lt. Bletz doggedly pursing charges against Mr. Phillips, even after he was no longer an investigator on the case and had been assigned to Internal Affairs.  He actively interjected himself into the case against Mr. Phillips and interfered in the investigation of other related incidents.  His actions, along with the false and misleading testimony and the failure to disclose exculpatory information to Judge Thompson, create a fact issue as to whether probable cause existed for Mr. Phillips' arrest which cannot be resolved on summary judgment.

This is not a case where Lt. Bletz or another BSO deputy provided an affidavit with easily reviewable "facts."  Rather, by relying on the 404(b) hearing, the BSO Defendants placed at issue all of the evidence and testimony presented over five (5) days.  Further, at a hearing, unlike the review of statements on the face of a cold affidavit, Judge Thompson was required to judge and assess the credibility and demeanor of every witness before him.  As Plaintiffs have raised a genuine issue of material fact for trial whether Lt. Bletz, the primary State witness, either intentionally lied or recklessly disregarded the truth, there is sufficient evidence to reserve for trial whether Mr. Phillips was subjected to a Fourth Amendment violation on the basis of his felony arrest.

However, the question remains as to whom this alleged violation is properly attributable.  Plaintiffs have asserted their false arrest claim under § 1983 against Sheriff Whittington, Chief Deputy Owens, Capt. Phillips, Lt. Bletz, and "unknown BSO Deputies."  The Court finds that the evidence presented properly states a claim against Lt. Bletz, individually, but not against the remaining Defendants.  Plaintiffs have had three opportunities to amend their Complaint, and the parties have engaged in extensive discovery over the three years this case has been pending.  Therefore, no claims should remain against "unknown BSO Deputies."  Even if theoretically such placeholders could remain in the case, Plaintiffs have presented no arguments or evidence to support a false arrest claim against someone who has not been named as a Defendant.  Further, all arguments and evidence address the actions and inaction of Lt. Bletz with regard to this claim.  Accordingly, to the extent that the BSO Defendants move for summary judgment on the claims against Defendants other than Lt. Bletz, the motion is GRANTED.

### b.  Qualified Immunity

Even if there is a genuine issue of material fact for trial on whether there was

probable cause to arrest Mr. Phillips, the BSO Defendants contend that Lt. Bletz is entitled to

summary judgment based on qualified immunity.

The Fifth Circuit has explained the boundaries of qualified immunity in the context of a

false arrest claim:

> Here, the clearly established constitutional right asserted  . . . is to be free from
> police arrest without a good faith showing of probable cause. Since *Franks v.
> Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), it has been
> clearly established that a defendant's Fourth Amendment rights are violated if (1)
> the affiant, in support of the warrant, includes "a false statement knowingly and
> intentionally, or with reckless disregard for the truth" and (2) "the allegedly false
> statement is necessary to the finding of probable cause." *Id.* at 155–56, 98 S.Ct.
> 2674. In *Franks*, the Supreme Court observed that the warrant requirement is
> meant "to allow the magistrate to make an independent evaluation of the matter."
> Id. at 165, 98 S.Ct. 2674. It requires affiants to "set forth particular facts and
> circumstances underlying the existence of probable cause," including those that
> concern the reliability of the information and the credibility of the source to avoid
> "deliberately or reckless false statement[s]." *Id.*
>
> Still, "negligence alone will not defeat qualified immunity." *Brewer [v. Hayne*,
> 860 F.3d 819, 825 (5th Cir. 2017)]. "[A] proven misstatement can vitiate an
> affidavit only if it is established that the misstatement was the product 'of
> deliberate falsehood or of reckless disregard for the truth.' " *United States v.
> Martin*, 615 F.2d 318, 329 (5th Cir. 1980) (quoting *Frank*s, 438 U.S. at 171, 98
> S.Ct. 2674). Recklessness requires proof that the defendant " 'in fact entertained
> serious doubts as to the truth' of the statement." *Hart v. O'Brien*, 127 F.3d 424,
> 449 (5th Cir. 1997) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct.
> 1323, 20 L.Ed.2d 262 (1968) ), abrogation on other grounds recognized by *Spivey
> v. Robertson*, 197 F.3d 772, 775 (5th Cir. 1999).

*Winfrey*, 901 F.3d 483, 494 (5th Cir. 2018), *cert. denied sub nom. Johnson v. Winfrey*, 139 S. Ct.

1549, 203 L. Ed. 2d 712 (2019).  In this regard, the Court must consider the state court's

issuance of a warrant "as if those errors and omissions were removed."  *Id.* at 494-95.  The

warrant is thus valid only if probable cause existed to support Mr. Phillips' arrest based on the

corrected information.

As the Court has indicated, by relying on the entirety of the 404(b) hearing, Lt. Bletz

cannot point to the redaction of one or two statements from an affidavit and then argue that

49

Judge Thompson would have found probable cause anyway.  Based on the fact issues in the record presented, the Court cannot conclude as a matter of law that Judge Thompson had an adequate basis for finding probable cause for issuance of a felony warrant if Lt. Bletz's alleged falsehoods and misleading testimony are removed and if the exculpatory evidence had been provided to him.  Thus, Lt. Bletz is not entitled to qualified immunity from trial on the claim against him, and the BSO Defendants' Motion for Summary Judgment is DENIED in this regard.

### 2. Failure to Intervene in Violation of the Fourth and Fourteenth Amendments (Claim II)

The BSO Defendants next move for summary judgment on Plaintiffs' Claim II, failure to intervene in violation of the Fourth and Fourteenth Amendments.  Plaintiffs oppose this motion.

An officer's liability under §1983 "may be established where an officer '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.'"   *Kitchen v. Dallas Cty., Tex.*, 759 F.3d 468, 480 (5th Cir. 2014) (quoting *Whitley v. Hanna*, 726 F.3d 631, 646–47 (5th Cir. 2013), *cert denied*, —– U.S. ——, 134 S.Ct. 1935, 188 L.Ed.2d 960 (2014)).  These so-called bystander liability or failure to intervene cases usually involve the alleged use of excessive force.  *See, e.g., id.*; *Davis v. Cannon*, 91 Fed. App'x. 327, 329 (5th Cir. 2004); *Hale v. Townley*, 45 F.3d 914, 991 (5th Cir. 1995) ("The district court correctly held that an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983.") (citations omitted); *Adams v. City of Shreveport*, 269 F.Supp.3d 743, 748 (W.D. La. 2017) ("Several federal circuit courts, including the Fifth Circuit, have concluded that an officer may be liable under § 1983 when he is present at the scene of a constitutional violation by another officer and 'does not take reasonable measures to protect' a person from the other officer's violation of the person's constitutional rights.") (citing *Whitley*,

726 F.3d at 646 (other citations omitted)).   However, they can also apply to other constitutional

violations, such as false arrest.  *See Rakun v. Kendall Cty., Tex.*, No. SA-06-CA-1044-XR, 2007

WL 9710426, at *5 (W.D. Tex. Aug. 13, 2007) (asserting cause of action against Corporal Motz

for failing to supervise Deputy Salsedo and failing to intervene to prevent a constitutional

violation of false arrest); *see generally Williams v. City of McComb*, Civil Action No.

3:13CV452 LRA, 2015 WL 5712758 at *2 (S.D. Miss. Sept. 29, 2015) (booking officer entitled

to qualified immunity for failure to intervene in a false arrest when he was "responsible for

performing administrative tasks, including the intake of arrestees," and there was "no evidence

that [the officer's] failure to intervene violated a clearly established right of which a reasonable

police officer would have known.").  Regardless, a constitutional violation by another officer is a

necessary element of the failure to intervene claim. *See Lytle v. Bexar Cnty., Tex*., 560 F.3d 404,

410 (5th Cir.2009) ("If we determine that the alleged conduct did not violate a constitutional

right, our inquiry ceases because there is no constitutional violation for which the government

official would need qualified immunity.").

In this case, the BSO Defendants argue that no false arrest occurred, so there is no

constitutional violation.  Even if a constitutional violation were established, they assert that this

claim must be dismissed because BSO Defendants are entitled to qualified immunity.  According

to the BSO Defendants, it was, at the least, arguable that probable cause existed for the charges

against Mr. Phillips, and Plaintiffs cannot show otherwise.  Finally, even if Plaintiffs could

overcome qualified immunity, the BSO Defendants argue that Plaintiffs cannot meet the burden

of presenting evidence to support the remaining essential elements of this cause of action.[17]

---

[17]The BSO Defendants list as one of the elements that the defendant be "present at the scene" of the
constitutional violation in order to be held liable for a failure to intervene claim.  [Doc. No. 142-9, p. 15  (quoting
*Adams v. City of Shreveport*, 269 F. Supp.3d 743, 758 (W.D.  La.  2017) (citing *Whitley  v.  Hanna,*  726 F.3d  631,
646  (5th  Cir.  2013)).  While the *Whitley* Court used this language, it was not  listed as an element.  Such a

Plaintiffs respond that Capt. Phillips and Chief Deputy Owens both knew that Lt. Bletz was violating Mr. Phillips' constitutional rights, had a reasonable opportunity to act, and failed to do so.  Specifically, as to Capt. Phillips, Plaintiffs contend that he was Lt. Bletz's immediate supervisor and was involved in the investigation of the vandalisms and spikings.  He participated in the interviews of the Phillips during the execution of the search warrant and the interview of John Greer, was involved in the decision to make the posters placed along Old  Plain Dealing Road, attended meetings with victims, and attended multiple meetings with Lt. Bletz, Chief Tony Staton, Chief Deputy Owens, Sheriff Whittington, ADA Holland, and DA Marvin during the investigative phase of the case.  [Doc. No. 155-10, Exh. 7, Bletz Depo., pp.47-48, 146-147; Doc. No. 155-11, Exh. 8, Deposition of Shawn C. Phillips ("Capt. Phillips Depo."), pp. 31, 49, 51-53; [Doc. No. 155-25, Exh. 23, Marvin Depo., p.31].

Additionally, BSO Detective Mike Lombardino testified in his deposition that he began to look at the crimes around Old Plain Dealing Road in 2015, he briefed Capt. Phillips on his investigations and the evidence he had developed against Gary Wilson, and informed Capt. Phillips that he had been instructed by Lt. Bletz to inactivate the cases.  [Doc. No. 155-15, Exh. 17, Lombardino Depo., pp.16-17, 30-31].

With regard to Chief Deputy Owens, Plaintiffs contend that he knew that BSO had an open investigation in January 2017 concerning the grave incident which was believed to be related to the spikings and arsons, and he knew that the task force had identified a suspect other than Todd Phillips.  [Doc. No. 155-13, Exh. 11, Mack Depo., p.49 (Lt. Mack reported her

requirement makes sense in the typical excessive force case, where it would naturally arise as part of the "reasonable opportunity" to intervene.  But there is no such requirement for a probable cause case, nor should there be when the "reasonable opportunity" may not be at a "scene," but, for example, in the BSO's administrative offices.

suspicions to Chief Owens)].  However, he took no action when he learned that Sheriff

Whittington instructed the task force shut down and return to their regular duties.

 First, the Court addresses the claims against Capt. Phillips.  It is undisputed that Capt.

Phillips was involved early in the case when the search warrant was executed at the Phillips'

home and that he participated in meetings about the case.  However, this evidence is insufficient

to hold Capt. Phillips accountable for a failure to intervene.

The evidence involving Detective Lombardino is more troubling.  Detective Lombardino

has clearly testified that he conveyed his suspicions that Gary Wilson was a suspect in the two

crimes he investigated and that he conveyed those concerns to Capt. Phillips after Lt. Bletz told

him to stop his investigation because Gary Wilson had been "cleared."  However,  Plaintiffs

must produce sufficient evidence to raise a genuine issue of material fact for trial that Capt.

Phillips knew, at that time, that Lt. Bletz was violating Mr. Phillips' constitutional rights.  All of

the evidence upon which Plaintiffs rely occurred early in the investigation in 2015, and the Court

cannot say that this evidence is sufficient to prove all the required elements of a failure to

intervene claim.

The Court has determined that there is a genuine issue of material fact for trial as to

whether probable cause was lacking for Mr. Phillips' arrest and that Lt. Bletz is not entitled to

qualified immunity.  With regard to Capt. Phillips, however, at best, Plaintiffs have shown that

he was negligent in failing to intervene,  not that he knew, at that time (in 2015), that Lt. Bletz

was violating Mr. Phillips' constitutional rights, or that his failure to intervene violated a clearly

established right of which a reasonable police officer would have known.  Therefore, the Court

finds that Capt. Phillips is entitled to summary judgment on the failure to intervene claim in two

ways:  because Plaintiffs have failed to raise a genuine issue of material fact for trial on the

essential element that Capt. Phillips knew Lt. Bletz was violating Mr. Phillips' constitutional rights and because they have failed to overcome his qualified immunity by showing that he knew his failure to intervene violated clearly established constitutional rights which a reasonable officer would have known.

Second, with regard to Chief Deputy Owens, the Court finds that his involvement in the case was more attenuated.  The fact that he was aware that Sheriff Whittington ended the investigation of the January 2017 grave incident is insufficient, standing alone, to overcome qualified immunity.  Again, Plaintiffs have failed to raise a genuine issue of material fact for trial that Chief Deputy Owens knew Lt. Bletz was violating Mr. Phillips' constitutional rights and that he knew his failure to intervene violated clearly established constitutional rights which a reasonable officer would have known.  In fact, the timeline and undisputed facts show that it was Chief Deputy Owens who brought Deputy Huddleston in, after Mr. Phillips' arrest, to investigate all the Old Plain Dealing Road incidents with "fresh eyes," so BSO could determine whether the cases were related and who was ultimately responsible.

The BSO Defendants' Motion for Summary Judgment is GRANTED as to Plaintiffs' Claim II, the failure to intervene, and this claim is DISMISSED WITH PREJUDICE.

### 3.  Due Process and Excessive Pre-Accusation Delay in Violation of the Fifth and Fourteenth Amendments (Claim III)

The BSO next move for summary judgment on Plaintiffs' Claim III that Mr. Phillips was subjected to due process and excessive pre-accusation delay in violation of the Fifth and Fourteenth Amendments.  "Plaintiffs concede there is no evidence in the record at this time to prove an actual loss of evidence that would have aided Mr. Phillips and his counsel in the criminal proceeding as required by Fifth Circuit precedent."  [Doc. No. 155, p. 19 (citing *Quinn v. Roach,* 326 Fed. App'x. 280, 291 (5th Cir. 2009))].

The BSO Defendants' Motion for Summary Judgment is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### 4. Due Process and Equal Protection in Violation of the Fourteenth Amendment (Claim IV)

The BSO next move for summary judgment on Plaintiffs' Claim IV that Mr. Phillips was subjected to due process and equal protection violations of the Fourteenth Amendments. "Plaintiffs concede that, in this particular case based on the facts and circumstances, this claim is duplicative of other claims asserted herein for violations of the Fourth Amendment."  [Doc. No. 155, p. 19].

The BSO Defendants' Motion for Summary Judgment is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### 5. Policy and Custom in Violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments (Claim V)[18]

The BSO Defendants next move for summary judgment on Plaintiffs' claims that the BSO, through Sheriff Whittington, maintained unconstitutional  customs,  practices  or  policies; that the BSO, through Sheriff Whittington, Chief Deputy Owens, and "other policymakers" had actual or constructive notice of the policies, but ratified them; and that those policies were the moving force behind the deprivation of Mr. Phillips' constitutional rights.

An official capacity suit is the equivalent of a suit against the entity of which the officer is an agent. *Kentucky v. Graham*, 473 U.S. 159, 165-166 (1985); *Brandon v. Holt*, 469 U.S. 464, 471-472 (1985); *Hafer v. Melo*, 112 S.Ct. 358, 361 (1991); *McMillian v. Monroe Cnty., Ala.,* 520 U.S. 781, 784-85, (1997); *Burge v. St. Tammany Parish,* 187 F.3d 452, 466 (5th Cir. 1999).

---

[18] In Claim VI, Plaintiffs assert a claim that the DA's Office, through DA Marvin and ADA Holland and other policymakers and supervisors had policies and customs that violated Plaintiffs' rights under the Fourth, Fifth, and Fourteenth Amendments.  This claim is not addressed in the ruling because Claim VI does not pertain to the BSO Defendants.

The proper official to sue in his official capacity to impose liability upon a local governmental entity is the official with final policymaking authority for the entity under state or local law. *See Burge*, 187  F.3d at 468–70 ("The Supreme Court's cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are policymakers for the local government in a particular area, or on a particular issue, and that our inquiry is dependent on an analysis of state law.") (citing *St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion)).

Sheriff Whittington is a final policy maker for Bossier Parish.  *See Craig v. St. Martin Parish Sheriff*, 861 F.Supp.1290, 1300 (W.D. La. 1994) (citing LA. CONST. ART. 5, § 27 ("[The sheriff] shall be the chief law enforcement officer in the parish.").  However,  that status is not enough.  Plaintiffs must also show that a government policy or custom caused the alleged constitutional deprivation. *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 694 (1978); *Board of Cnty. Comm'nrs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *Turner v. Houma Mun. Fire & Police Civ. Serv. Bd.*, 229 F.3d 478, 483 n. 10 (5th Cir. 2000).  "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. . . .[A] municipality cannot be held liable *solely* because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Monell*, 436 U.S. at 691.

A policy may be a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the government's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority. *Burge*, 336 F.3d at 369.

> It is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the [governmental entity]. The plaintiff must also demonstrate that, through its deliberate conduct, the [governmental entity] was the "moving force" behind the injury alleged. That is, a plaintiff must show that the . . . action was

taken with the requisite degree of culpability and must demonstrate a direct causal link between the . . .  action and the deprivation of federal rights.

*Bryan Cnty.*, 520 U.S. at 404.

"Proof of [governmental] liability sufficient to satisfy *Monell* requires: (1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)); *see also Davis v. Tarrant Cnty., Tex.*, 565 F.3d 214, 227 (5th Cir. 2009) (There must be "proof of (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose 'moving force' is the policy or custom.").

> The "official policy" requirement may be met in at least three different ways: [*Bryan County,* 520 U.S. ] at 406–08. . .. (1) "[W]hen the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." *Id.* at 417 . . . (Souter, J., dissenting). . . ; (2) Where no "official policy" was announced or promulgated but the action of the policymaker itself violated a constitutional right.  *Bryan County*, 520 U.S. at 417–18, 117 S.Ct. 1382 (Souter, J., dissenting). . .; and (3) Even when the policymaker fails to act affirmatively at all, if the need to take some action to control the agents of the local governmental entity "is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymake[r] ... can reasonably be said to have been deliberately indifferent to the need." [*City of*] *Canton* [*v. Harris*], 489 U.S. [378, 390 1989] . . .  ("Only where a municipality's failure to train its employees ... evidences a 'deliberate indifference' to the rights of its inhabitants can ... a shortcoming be ... city 'policy or custom'... actionable under § 1983.").

*Burge v. Par. of St. Tammany*, 187 F.3d 452, 471 (5th Cir. 1999). "The 'moving force' inquiry requires a plaintiff to make two showings: causation and culpability."  *Mason*, 806 F.3d at 280 (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404, (1997)).  This inquiry imposes a causation standard higher than "but for" causation.  *Id.* (citing *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992)).

Plaintiffs' *Monell* claims fall into three categories: (1) a claim based on BSO's discovery policy, (2) claims of negligent hiring, training, and supervision, and (3) a claim based on BSO's alleged policy of failing to preserve evidence.

The BSO Defendants contend that Sheriff Whittington is entitled to summary judgment on these claims, foremost, because Plaintiffs' claim rests on Mr. Phillips' arrest without probable cause. As the Court has found that there is a genuine issue of material fact for trial on the false arrest claim, the BSO Defendants cannot prevail on this basis. However, the Court must also consider the other arguments applicable to these claims as well. The Court will consider each in turn.

### a. Claim Based on BSO Policy 09-1-2014

Even if Plaintiffs have raised a genuine issue of material fact for trial on the constitutional claim, the BSO Defendants argue that Plaintiffs can identify no policy that has been officially promulgated or adopted that is unconstitutional, nor can they identify any widespread practice. They contend that, throughout this litigation Plaintiffs have pointed to one policy provision, BSO Policy 09-1-2014 on Criminal Operations, which provides as follows:

I.     Policy

It shall be the policy of the Bossier Sheriff's Office to conduct thorough investigations of criminal activities with the objective in mind to arrest and prosecute offenders, to recover stolen property and to seize contraband. In order to facilities this initiative the Criminal Investigations Bureau (CIB) was created and is divided into three units, North, South and Crime Scene. . . The Detective Unit shall investigate all "<u>active</u>" reports of crime not assigned to the Patrol Unit.

II.    Procedure

A. Investigation

a. A detective shall be familiar with and have the ability to utilize the Louisiana Criminal Code, Parish Ordinances and BSO Policy and

Procedure, especially in the areas of suspect management, crime scene control, prisoner care, and the preservation and presentation of evidence for court.

b.  A detective shall be trained and prove to be proficient in interviewing victims, witnesses and suspects related to his assigned cases.
. . . .

d.  A detective shall, through investigative techniques, develop, locate and interview suspects relevant to his assigned cases.  He shall establish effective working relationships with co-workers, DA staff members as well as other law enforcement agencies.  He shall also develop and maintain effective contacts with the public and establish a pool of informants.

. . .

f.  A detective shall notify his superior of progress in their assigned investigations and request additional instruction, assistance or fresh perspectives when needed.

g.  It is important to make contact with the complainant or victim periodically to keep them apprised of progress being made on their case.

h.  A detective completing a case shall prepare the case file for the prosecution.  This shall include providing the DA's Office copies of all reports, warrants, subpoenas, photographs, and any other documentation related to the case **that would aid in a conviction**.
. . .

[Doc. No. 142-6, BSO Policy (emphasis added)].

Plaintiffs contend that the policy indicates that BSO had a practice of withholding exculpatory information in violation of *Brady v. Maryland*, and they argue that, based on Lt. Bletz's testimony, "BSO's interpretation of 'all evidence'" is limited to evidence "'that would aid in a conviction.'"  [Doc. No. 155, p. 59 (citation omitted)].  Because the policy does not state that exculpatory information must be turned over, they contend that the BSO had a policy or practice of failing to do so.  Plaintiffs then recount, again, its contentions with regard to the alleged misconduct of Lt. Bletz.

To the contrary, the BSO Defendants contend that it is the policy, practice, and custom to turn over the entire file to the district attorney's office. [Doc. No. 142-7, Huddleston Aff.; Doc. No. 142-8, Bletz Aff.].

Upon review, the Court finds that Plaintiffs have failed to raise a genuine issue of material fact for trial on this claim. Outside of their *Brady* allegation, which the Court addresses separately, the BSO's policy, on its face, does have the qualification "that would aid in a conviction." However, the BSO Defendants provided affidavits from now-Chief Deputy Huddleston and from Lt. Bletz that the entire file is turned over. Although Plaintiffs question Huddleston's qualifications to provide this affidavit, the fact that he was not Chief Deputy at the time does not render him unfamiliar with departmental policy. Further, there is no evidence, outside the facts of this particular case, that Sheriff Whittington and the BSO had a policy or practice of failing to provide the entire file to the district attorney (which has its own duties to provide exculpatory evidence to a defendant). Rather, the true focus, again, is on the actions of Lt. Bletz.

Moreover, in order to prevail on this claim, Plaintiffs must raise at least a genuine issue of material fact for trial that "the act complained of" is "an implementation of [the challenged] policy." *Burge*, 187 F.3d at 471. The act complained of is Mr. Phillips' false arrest, and the evidence which the Court has found supports that claim are Lt. Bletz's actions, particularly his false and misleading testimony and the failure to disclose exculpatory evidence *to the state court*. There is no evidence that Lt. Bletz took the actions he did, testified in the manner in which he did, or failed to disclose evidence as he allegedly did because of, or based on, his understanding of BSO Policy 09-1-2014. Thus, Plaintiffs have failed to raise a genuine issue of material fact for trial that Mr. Phillips' alleged false arrest was an implementation of BSO Policy 09-1-2014.

To this extent, the BSO Defendants' Motion for Summary Judgment is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### b.  Negligent Hiring, Training, and Supervision

The BSO Defendants also move for summary judgment on Plaintiffs' claims against Sheriff Whittington for negligent hiring, training, and supervision.   They contend that Plaintiffs make three allegations:  (1) that Sheriff Whittington employed deputies that he knew or should have known had propensities to abuse authority, (2) that he failed to supervise and train them, and (3) that he failed to supervise detectives within their investigations. The BSO Defendants contend that each of these allegations fail to raise a genuine issue of material fact for trial because Plaintiffs cannot prove any constitutional violations.  Furthermore, even if Plaintiffs can raise a genuine issue of material fact for trial on the alleged constitutional violations, the BSO Defendants argue that the  summary  judgment  evidence shows that Sheriff  Whittington thoroughly vetted all candidates before hiring them as deputies, and there is no evidence that any complaints were ever made against any of the BSO Defendants or that they ever exhibited any of the alleged propensities that Plaintiffs claim.

Plaintiffs do not raise specific arguments with regard to general hiring and training. Rather, they focus on Sheriff Whittington's alleged failure to supervise investigators and failure to train and supervise deputies as to the use of confidential informants.  They contend that, prior to Sheriff Whittington's tenure, the BSO had an established custom, policy, and practice for supervising the work of investigators:  supervisors reviewed cases, discussed the evidence with investigators, and approved every case prior to sending it to the DA's office.  Immediately upon taking office, Sheriff Whittington changed the chain of command, and, under the new practices,

Capt. Phillips was placed over investigations.  Based on his deposition testimony, they contend that he failed to supervise any investigation.  They argue that this failure resulted in Mr. Phillips' unlawful arrest and prosecution without probable cause.

Plaintiffs also contend that Sheriff Whittington is liable for failing to train Lt. Bletz on maintaining confidential informants.  Although Lt. Bletz spoke with Gary Wilson on a regular basis, gathered information from him, used him to pass information into the community, and visited previous crime scenes with him, none of this information was recorded  by  Lt.  Bletz  or approved by a supervisor.  They argue that the BSO's failure to train and supervise Lt. Bletz in the management of a confidential informant was a "moving force" behind the violations of Mr. Phillips' constitutional rights.

With regard to the supervision of investigators, the BSO Defendants respond that Capt. Phillips testified that, if faced with questions, and the lieutenants were unavailable, investigators could "directly ask [him]."  [Doc. No. 166-2, Exh. 2, Capt. Phillips Depo., p. 16, line 22].  He also stated that "new detectives would be looked at more often than an experienced detective as to making sure they're including facts into the report."  *Id.*, p. 18, line 21-23. He testified that a detective could come to him "when there's a problem or they're not sure or they just need, you know, some advice." *Id*. p. 22, lines 2-4.   They argue further that Capt. Phillips testified that his job began with "the overall day-to-day running of investigations."  *Id*, p. 16, lines 11-12 and 23. He also stated that he would have face-to-face meetings with the detectives every day to find out what they were working on, and they would give him facts and a current report of what they were doing that day.  *Id.,* p. 20, lines 1-6, lines 17-23. Indeed, as Plaintiffs admit, Capt. Phillips was personally present when the search warrant was executed on Plaintiffs' home, and was present for other investigations, such as when the tip was called into crime stoppers directing

BSO to Blake Barton's home.  [Doc. No. 142-8].  He even issued the misdemeanor citation to Mr. Phillips himself.  [Doc. No. 142-2, p. 53].

As to the use of confidential informants, the BSO Defendants do not specifically respond to Plaintiffs' argument.  They admit that there are inflammatory communications between Lt. Bletz and Gary Wilson, but point out that many of the communications occur after Lt. Bletz has been moved to Internal Affairs, and they prove only that he continued to serve as a communication point for Gary Wilson and tried to maintain a relationship with him, as a source of information and because he believed Gary Wilson to be a victim of several offenses by Mr. Phillips.  They contend that this is insufficient to show malice.

The Court finds that, with regard to the supervision of investigations, Plaintiffs have failed to raise a genuine issue of material fact for trial that the change in command was the moving force behind the alleged violation of Mr. Phillips' constitutional rights.  Additionally, Plaintiffs have failed to raise a genuine issue of material fact on Sheriff Whittington's alleged negligent hiring.  To this extent, the BSO Defendants' Motion for Summary Judgment is GRANTED, and these claims are DISMISSED WITH PREJUDICE.  With regard to the lack of policy on confidential informants, however,  Sheriff Whittington failed to act affirmatively at all, and Plaintiffs have raised a genuine issue of material fact for trial whether "the inadequacy [of existing practice]" was "so likely to result in the violation of constitutional rights, that the policymake[r] ... can reasonably be said to have been deliberately indifferent to the need." *Harris*, 489 U.S. at 390.  The BSO Defendants did not address this argument adequately, and, thus, are not entitled to summary judgment at this time.[19] To this extent, their Motion for

---

[19]At trial, it is possible that once Plaintiffs' evidence is presented or at the close of the case, the BSO Defendants may be entitled to judgment as a matter of law, but the Court cannot make that determination on the record before it.

Summary Judgment is DENIED, and Plaintiffs' claims based on failure to train and inadequate policy on the use of confidential informants remains pending for trial.

### c.  BSO's Alleged Policy of Failing to Preserve Evidence

Plaintiffs also claim that Sheriff Whittington is liable for an alleged policy of failing to preserve evidence.  They argue that, as part of BSO's policy of disclosing only evidence "that would aid in conviction," the BSO failed to preserve all evidence in an investigation.  They argue that there were no directives to employees; no written policies specifying the circumstances in which information must be recorded, the method of documentation, or the requirement of critical supervisory review and approval; and no widespread consistent practice of documenting non-arrest related activities.  In support of their claim, Plaintiffs point out that there was no documentation concerning  the  surveillance  of  Mr.  Phillips.  Although he was under surveillance at least twice, there was no documentation (including video, photograph, or other piece of evidence from BSO) indicating that such surveillance ever occurred.

Additionally, they contend that Lt. Bletz and Capt. Phillips failed to record interviews of witnesses or maintain notes from those interviews, even though the BSO agrees that the best practice is to record the interview of a witness or victim when it is feasible to do so and that detailed notes should be taken if the interview cannot be recorded.  Specifically, the BSO  either failed  to record  or  failed  to  maintain  the  recordings  of  the  interviews  of  the Phillips family conducted at their residence, as well as the interviews of Leslie Fletcher  and  Kelsey Phillips (the Phillips' estranged daughter).

Finally, they point to the BSO Defendants' "loss" of a letter involved in the investigation until it was later found in an evidence room.

From the Court's review of the evidence, it cannot be fairly said that the BSO Defendants moved for summary judgment or adequately responded to this claim. Unlike, their allegations based on the existing policy on turning over evidence the DA, the BSO Defendants have failed to identify deposition testimony or other evidence supporting summary judgment. Under these circumstances, the Court finds that this claim also remains pending for trial. To the extent that the BSO Defendants believe that they have moved for summary judgment on this claim, the motion is DENIED.

### 6. Failure to Disclose Exculpatory Evidence in Violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments (Claim XV)

Next, the BSO Defendants move for summary Judgment on Plaintiffs' Claim XV, that Defendants failed to disclose exculpatory evidence in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments. Plaintiffs oppose the motion, arguing that the BSO Defendants violated *Brady* obligations by failing to disclose exculpatory evidence prior to the 404(b) hearing.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. Nine years later, the Supreme Court extended this principle to include material evidence "affecting" the credibility of a witness. *Giglio v. United States*, 405 U.S. 150, 154 (1972). Under *Brady/Giglio*, the Government must give the defense impeachment evidence and exculpatory evidence. *See United States v. Johnson*, 872 F.2d 612, 619 (5th Cir. 1989).

The elements of a *Brady* claim include: (1) the prosecution suppressed evidence, (2) it was favorable to the defendant, and (3) it was material. *United States v. Brown*, 650 F.3d 581,

587–88 (5th Cir. 2011).  Evidence is material if there is a reasonable probability that, had

the evidence been disclosed to the defense, the result of the trial would have been different.  *Id.*

(citing *United States v. Bagley*,  473 U.S. 667, 682 (1985)).

> The Fifth Circuit has stated, "[ ]Brady is not a discovery rule, but a rule of
> fairness and minimum prosecutorial obligation." *United States v. Beasley*, 576
> F.2d 626, 630 (5th Cir.1978) (citing *United States v. Agurs*, 427 U.S. 97, 107, 96
> S.Ct. 2392 (1976)). Therefore, Brady "is not a pretrial remedy ." *See United
> States v. Garrett*, 238 F.3d 293, 303 (5th Cir.2000) (Fish, J., concurring) (quoting
> *United States v. Scott*, 524 F.2d 465, 467 (5th Cir.1975)). Rather, a Brady
> violation becomes a concern for courts only after trial, when courts are able to
> determine whether a nondisclosure deprived a defendant of a fair trial. *See id.* at
> 303–04 (citing cases). The Fifth Circuit has therefore held that "the prosecutor's
> compliance with the Jencks Act provided timely disclosures under Brady." *United
> States v. Campagnuolo,* 592 F.2d 852, 860 (5th Cir.1979) (citing cases). The Fifth
> Circuit has also held that there was no prejudice to the defendant when the
> government disclosed *Brady* information to the defendant during its case-in-chief.
> *See United States v. Neal*, 27 F.3d 1035, 1050 (5th Cir.1994). Lastly, the Fifth
> Circuit has held that there is no violation of *Giglio* as long as the evidence is
> disclosed to the defense before the end of trial.

*United States v. Davis*, No. CR.A. 01-282, 2003 WL 1825602, at *2 (E.D. La. Apr. 8, 2003).

The BSO Defendants argue, first, that no false arrest occurred, and, alternatively, they are

entitled to qualified immunity.  However, the Court has found that, as to Lt. Bletz, Plaintiffs can

proceed with their false arrest claim.

The BSO Defendants also argue further that there is no *Brady* obligation to disclose exculpatory

information or evidence prior to trial, and, thus, there can be no *Brady* violation for actions or

inaction before the 404(b) hearing.  The charges against Mr. Phillips were dismissed or nolle

prossed prior to the commencement of the criminal  trial against  Mr. Phillips.

The Court agrees.  While the Court has found that Plaintiffs have raised a genuine issue

of material fact for trial on Mr. Phillips' alleged false arrest, the BSO Defendants simply had no

duty under *Brady* to disclose exculpatory evidence prior to trial.  *Brady* is not a discovery rule,

and the 404(b) hearing was not a "trial."  Further, even if there were some type of *Brady*

obligation, the BSO Defendants would be entitled to qualified immunity because it certainly is not a clearly established right.  Thus, the BSO Defendants' Motion for Summary Judgment on this claim is GRANTED, and it is DISMISSED WITH PREJUDICE.

### C.  State Law Claims

The BSO Defendants also move for summary judgment on all pending state law claims. The Court considers each in turn.

### 1.  False Arrest (Claim VII)

False arrest claims under Louisiana law are analyzed with the same standard used to assess false arrest claims under § 1983.  *See Barnes v. McQueen*, Civil Action No. 14-2636, 2016 WL 872110, *11 (E.D. La. March 7, 2016) ("Under Louisiana law, '[f]alse arrest and imprisonment occur when one arrests and restrains another against his will without a warrant or other statutory authority.' . . . As under federal law, an officer who does not have a warrant for the arrest must have probable cause under Louisiana law.") (quoting *Deville v. Marcantel*, 567 F.3d 156, 172 (5th Cir. 2009) (other citations omitted).  Additionally, the defense of qualified immunity is applied to Louisiana state constitutional law claims based on "the same factors that compelled the United States Supreme Court to recognize a qualified good faith immunity for state officers under § 1983." *Roberts v. City of Shreveport*, 397 F.3d 287, 296 (5th Cir. 2005), (quoting *Moresi v. State*, 567 So.2d 1081, 1093 (La. 1990)).   Accordingly, for the reasons addressed previously, the BSO Defendants' Motion for Summary Judgment on Plaintiffs' state law claims of false arrest is GRANTED IN PART AND DENIED IN PART.  The motion is GRANTED as to all Defendants other than Lt. Bletz, and these claims are DISMISSED WITH PREJUDICE.  The motion is DENIED as to Lt. Bletz, and the state law false arrest claim remains pending against him.

### 2. Failure to Intervene (Claim VIII)

The BSO Defendants also move for summary judgment on Plaintiffs' state law claim for failure to intervene. This claim mirrors their federal claim under §1983, and there are no material differences in the applicable legal standards. *See Paternostro v. Crescent City Connection Police Dept.*, 2002 WL 34476319, *14 (E.D.La. April 2, 2002). Therefore, for the reasons previously stated, Defendants' Motion for Summary Judgment is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### 3. Malicious Prosecution (Claim IX)

The BSO Defendants also move for summary judgment on Plaintiffs' state law claim for malicious prosecution. Plaintiffs oppose dismissal of this claim as well.

A plaintiff must establish the following essential elements of a malicious-prosecution claim:

> (1) the commencement or continuance of an original criminal or civil judicial proceeding; (2) its legal causation by the present defendant[s] in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damage conforming to legal standards resulting to the plaintiff.

*Jones v. Soileau*, 448 So.2d 1268, 1271 (La. 1984). A "favorable termination" is a disposition where the court "passed on the merits of the charge in such circumstances as to suggest the innocence or non-liability of the malicious prosecution plaintiff." *Lemoine v. Wolfe,* 168 So.3d 362, 368 (La. 2015). Legal causation requires proof that "the defendants 'have caused the prosecution'" of the plaintiff. *James v. Woods*, 899 F.3d 404, 408–09 (5th Cir. 2018) (quoting *LeBlanc v. Pynes*, 46,393 (La. App. 2d Cir. 07/13/2011); 369 So.3d 1273, 1281). While "malice does not submit readily to definition," the Louisiana Supreme Court has held that "[a]ny feeling of hatred, animosity, or ill will toward the plaintiff . . . amounts to malice."

*Miller v. East Baton Rouge Parish Sheriff's Dept.*, 511 So.2d 446, 453 (La. 1987) "Malice may be inferred from the lack of probable cause or inferred from a finding that the defendant acted in reckless disregard of the other person's rights." *Id.* Because the determination of malice is a question of fact, summary judgment is inappropriate unless there is no evidence from which the trier of fact could reasonably infer malice. *See id.; Burrell v. Adkins*, Civil Action No. 3:01-2679, 2008 WL 130789, at *7 (W.D. La. Jan. 10, 2008).

It is undisputed that Plaintiffs can establish the first and the third elements: that a criminal proceeding was commenced against Mr. Phillips and that there was a bona fide termination in his favor. Further, while the BSO Defendants contend otherwise, the Court has found that there is a genuine issue of material fact for trial as to the absence of probable cause for the proceeding, establishing the fourth element. If Plaintiffs can prove the other elements, then they can also prove damages, the sixth element.

However, the BSO Defendants argue, summarily, that Plaintiffs cannot show the second element, legal causation, as to Lt. Bletz because he was no longer working as a detective when the decision was made to bring charges against Mr. Phillips. Further, the BSO Defendants contend that Plaintiffs have no evidence of malice, the fifth element, on behalf of any Defendant. Plaintiffs contend that Sheriff Whittington and Lt. Bletz are liable for both the 2015 misdemeanor citation and the 2017 felony arrest[20] because they "caused" Mr. Phillips' prosecution, and Lt. Bletz acted with malice. They further contend that Sheriff Whittington is liable under vicarious liability principles. In support, they rely on evidence of Lt. Bletz's "strikingly odd relationship or friendship" with Gary Wilson and Lt. Bletz's expressed ill will

---

[20] The statute of limitations on a malicious prosecution claim does not begin to run until the bona fide termination of a criminal proceeding in the plaintiff's favor. *See Murray v. Town of Mansura*, No. 06-355 (La. App. 3d Cir. 9/27/2006); 940 So.2d 832, 839.

toward Mr. Phillips.  [Doc. No. 155, p. 80].  Plaintiffs cite to a number of examples,  including

the following:

(1)      On September 21, 2016, at 12:01 a.m., while preparing for the 404(b)

hearing, Lt. Bletz wrote: ". . . The demise of Todd Phillips is rapidly approaching

and the first phase of the master plan will 100% go to trial in November . . . Gary

we have always been on the same page and I promise that we will undoubtedly

have the last laugh.  Once Todd Phillips is resting comfortably in Angola, you

have my word that I will personally work with you until we uncover the

truth  and answer every question surrounding your house and vehicle!!" [Doc. No.

155-76, Exh. 74, BSO-PRIV 0435].

(2)      On the morning of Wednesday, November 23,  2016,  less than one week

before the 404(b)  hearing,  after Gary Wilson sent Lt. Bletz six pictures of  his

deer camp being burned, Lt. Bletz responded less than thirty (30) minutes later,

without having been to the scene or performed any investigation, Lt. Bletz texted:

"GARY FYI I WOULD NOT TELL ANYBODY AT ALL ABOUT THIS

INCIDENT IF I WERE YOU, NOT EVEN JOHN GREER.  WE DO NOT

WANT TODD TO KNOW THAT U HAVE DISCOVERED EVERYTHING

BUNT [sic] DOWN AND STOLEN.  WE CAN HOPEFULLY CATCH HIM IN

A LITTLE TRAP, ILL EXPLAIN WHEN U  GET HERE BUT SOMETHING

HAPPENED YESTERDAY THAT CORRELATES TO THIS INCIDENT!!"

(8:54 a.m.)* * *OMG Gary, I'm so sorry!! Gary for what it's worth, from one

man to another I promise I'm about to make this friggen prick pray [sic] for ever

[sic] last thing he has done to you  and your family.   I'm about to change this

70

douchebags life forever and make sure he finishes his last years on this earth

being tortured and victimized by all of the other scumbags in Angola. (9:21

a.m.)  [Doc. No. 155-75, Exh. 73, pp. 12, 13].

(3)     In other texts between Lt. Bletz and Gary Wilson, Lt. Bletz described Mr.

Phillips as "a very disturbed individual" and a "crazy ass" and said that he would

"sure love to get my hands on that prick[.]"  [Doc. No. 155-75, Exh. 73, pp. 29-

30, 37].

In May 2017, long after he had been moved to Internal Affairs, Lt. Bletz criticized both other

officers and John Greer, who defended Mr. Phillips, as "blind" and "ignorant."  [Doc. No. 155-

75, Exh. 73, p. 44; Doc. No. 155-40, Exh. 38, Deposition of John D. Greer ("Greer Depo."), pp.

26, 134, 169].  He even stated:  "I'm still the case agent and things will be only be done the way

they should be!"  [Doc. No. 155-75, Exh. 73, p. 44].

In their Reply, the BSO Defendants argue that, while the language of the texts is

"inflammatory," Lt. Bletz's statements all indicate his belief that Mr. Phillips was guilty of the

crimes.  [Doc. No. 166, p. 23].  They further argue that any negative feelings he had towards Mr.

Phillips were based on his belief that Mr. Phillips was guilty and was victimizing the community,

and, later, his belief that Mr. Phillips had sent disturbing letters to members of the community

making vulgar allegations against Lt. Bletz.  They characterize Lt. Bletz as only a

"communication point  with  Gary Wilson," as an informant and victim.  *Id.*

First, to the extent that Plaintiffs assert a malicious prosecution claim against anyone

other than Lt. Bletz and Sheriff Whittington, the BSO Defendants' Motion for Summary

Judgment is GRANTED, and those claims are DISMISSED WITH PREJUDICE.  To the extent

that Plaintiffs assert a malicious prosecution claim against Lt. Bletz and against Sheriff

Whittington, under principles of vicarious liability, however, the Court finds that Plaintiffs have

raised a genuine issue of material fact for trial.  The evidence which has been detailed

extensively throughout this ruling is sufficient to show that Lt. Bletz and, through him, Sheriff

Whittington,[21] caused the prosecution of Mr. Phillips.  Further, regardless of the basis for Lt.

Bletz's feelings, the jury could reasonably infer that he and again, through him, Sheriff

Whittington, held malice towards Mr. Phillips.  Accordingly, the BSO Defendants' Motion for

Summary Judgment is DENIED on Plaintiffs' malicious prosecution claim against Defendants

Lt. Bletz and Sheriff Whittington.

### 4.  Abuse of Process (Claim X)

The BSO Defendants next move for summary judgment on Plaintiffs' abuse of process

contending that Plaintiffs have not even alleged, much less shown, that there was an improper or

irregular use of process.  Thus, they argue that there is no dispute of material fact regarding this

claim, and it must be dismissed.

In *Gonsouland v. Rosomano*, 176 F. 481 (5th Cir. 1910), the United States Court of

Appeals for the Fifth Circuit recognized that the common law action for abuse of process was

actionable under Louisiana law under LA. CIV. CODE ART. 2315.  Although the decision of a

federal court sitting in diversity on an issue of state law is not binding on the state courts,

Louisiana appellate courts have since continued to recognize this cause of action.  *See*

*Waguespack, Sego and Carmichael (A PLC) v. Lincoln*, 1999-2016 (La. App. 1 Cir. 9/22/00);

768 So.2d 287; *Goldstein v. Serio*, No. CA-5153 (La. App. 4 Cir. 10/9/1986); 496 So.2d 412

writs denied, 501 So.2d 208, 209 (La.1987); *Mini-Togs, Inc. v. Young*, No. 13455  (La. App. 2d

---

[21]The BSO Defendants made no argument that Sheriff Whittington is not properly held accountable under principles of vicarious liability as to this claim.  Thus, the Court can only assume for purposes of ruling on this motion that, if the claim against Lt. Bletz survives summary judgment, they concede that the claim against Sheriff Whittington does as well.

Cir. 1/16/1978); 354 So. 2d 1389; *Succession of Cutrer v. Curtis*, No. 11017 (La. App. 1

Cir.1976); 341 So.2d 1209, writ denied, 343 So.2d 201 (La. 1977).  To prove abuse of process, a

plaintiff must establish the following elements:  "(1) the existence of an ulterior purpose; and (2)

a willful act in the use of the process not proper in the regular prosecution of the proceeding."

*Waguespack*, 768 So.2d at 290-91 (citing *Cutrer*, 341 So.2d at 1213-14).  The first element, that

of ulterior purpose, is similar to malice, but is a much more demanding test which would not be

met by a showing of lack of knowledge or other technical types of malice, but which is only met

when the officer is acting for a specific purpose not authorized by law.  *Taylor v. State*, No. 92-

230 (La. App. 3d Cir. 3/31/93); 617 So.2d 1198,  1205, writ denied, 620 So.2d 875 (La. 1993).

Even if there is an improper purpose or ulterior purpose, a plaintiff must prove irregularity of the

process itself.  *See Mini–Togs, Inc.*, 354 So.2d at 1390 ("Regular use of process cannot constitute

abuse, even  though the user was actuated by a wrongful motive, purpose, or intent, or by

malice.").   This second criteria refers to a failure to comply with the proper procedures or rules

set out by law for conducting official actions.  *Taylor*, 617 So.23d at 1205-1206.

In their consolidated opposition to the pending motions, Plaintiffs respond with

allegations against ADA Holland and DA Marvin, but not against the BSO Defendants.  They

have, thus, apparently abandoned this claim against the BSO Defendants.  The BSO Defendants

have presented sufficient evidence to support their motion, and Plaintiffs have failed to oppose

that evidence.  Accordingly, the BSO Defendants' Motion for Summary Judgment on the abuse

of process claim is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### 5.   Intentional Infliction of Emotional Distress (Claim XI)

The BSO Defendants also move for summary judgment on Plaintiffs' claims for

intentional infliction of emotional distress.  Plaintiffs oppose dismissal of this claim as to BSO

Defendants Lt. Bletz, Capt. Phillips, and Sheriff Whittington.

To establish a cause of action for intentional infliction of emotional distress under

Louisiana law, a plaintiff must prove the following three elements: "(1) that the conduct of

defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff

was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that

severe emotional distress would be certain or substantially certain to result from his conduct."

*White v. Monsanto Co*. 585 So.2d 1205, 1209-10 (La. 1991).  "The conduct must be intended or

calculated to cause severe emotional distress and not just some lesser degree of fright,

humiliation, embarrassment, worry, or the like."  *Id.* at 1210 (citing Restatement (Second) of

Torts § 46 (1965) *see also Almerico v. Dale*, 05-749 (La. App. 5th 2006), 927 So.2d 586, 592–

593 (An employer's conduct must be "intended or calculated to cause severe emotional distress,

not just some lesser degree of fright, humiliation, embarrassment, or worry.").  Conduct which is

merely tortious or illegal does not rise to the level of being extreme and outrageous for purposes

of this cause of action.  *Schmidt v. Cal-Dive Int'l* 240 F. Supp. 3d 542 (W.D. La. 2017); *see also*

*White*, 585 So.2d at 1209.

First, the BSO Defendants contend that, as to Sheriff Whittington,  in his official and

individual capacities, and as to Capt. Phillips, Former Chief Deputy Charlie Owens, and the

other unknown BSO Deputies, Plaintiffs have not alleged and can present no evidence of any

conduct by any of the BSO Defendants that would even come close to meeting this exceedingly

high threshold  of "extreme and outrageous" as necessary for proving a claim for intentional

infliction of emotional distress. Therefore, they contend that the claims against these BSO

Defendants should be dismissed.

With regard to Lt. Bletz, the BSO Defendants predicted that Plaintiffs will rely on the text and email exchanges between him and Defendant Gary Wilson to meet the "extreme and outrageous" standard.  However, they contend that, even if Plaintiffs can meet the first two elements, they cannot establish the third element because the communications were only between Lt. Bletz and Gary Wilson and were "never intended or expected to be viewed by Plaintiffs at all." [Doc. No. 149-2, p. 33].  Plaintiffs only learned about the texts through discovery in this case.   Additionally, they argue that the text exchanges took place in 2016 after Lt. Bletz was transferred out of the detective's division and into internal affairs and before criminal charges were brought against Mr. Phillips.

Plaintiffs respond that the facts set forth in their memorandum are sufficient to show that the actions of Lt. Bletz, Capt. Phillips, and Sheriff Whittington constituted extreme and outrageous conduct.   They rely on undisputed evidence regarding the placement of three posters along Old Plain Dealing Road.  Plaintiffs note that all of  the criminal offenses at issue occurred in a small rural town in the "Bible belt."  The BSO Defendants  knew members of the community were "scared and concerned" and  that members of the community believed the dot writings were connected to the spikings and arsons.  Therefore, the BSO Defendants knew or should have known that by placing posters with no legitimate law enforcement purpose, including one of which was directly across the road from the Phillips home, they would cause community members, and, in particular, the Philips to be afraid.

The BSO Defendants do not make a specific reply to Plaintiffs' emotional distress arguments, but they do address the posters, alleging that they were not a violation of Plaintiffs' constitutional rights.  They point out that Plaintiffs' own expert agreed that there was a legitimate law enforcement purpose for placement of the posters and that they were written in "lettering

that could have been created by a cheerleader for a pep rally." [Doc. No. 166, p. 9]. They further contend that the posters were not meant to be threatening to "innocent persons" and note that no other residents complained about the posters.[22]

First, to the extent that Plaintiffs asserted a claim for intentional infliction of emotional distress against former Chief Deputy Owens and the unknown BSO employees, they have failed to raise a genuine issue of material fact for trial. The BSO Defendants' Motion for Summary Judgment on behalf of these Defendants is GRANTED, and the claims against them are DISMISSED WITH PREJUDICE.

With regard to the claims against Lt. Bletz, Capt. Phillips, and Sheriff Whittington, the Court finds that Plaintiffs have raised a genuine issue of material fact for trial. Lt. Bletz allegedly placed the posters with the assistance of Capt. Phillips and the approval of Sheriff Whittington. While the BSO Defendants have described the posters as innocuous, they were written in a style meant to emulate the actual criminal, not a spirit poster written by a cheerleader, regardless of the type of lettering used. Given the on-going investigation and the crimes that were taking place at the time, a jury could find the placement of the posters, especially near the Phillips home, to be outrageous. The fact that no other community members complained is unavailing when the posters were not placed directly in front of that community member's house, and no other community member had been targeted for investigation in the way the Phillips family had. These actions, along with others detailed throughout this ruling, are sufficient for the Court to find that Plaintiffs have also raised a genuine issue of material fact for trial whether these Defendants either intended to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from their actions.

---

[22] As these arguments and evidence have some applicability to Plaintiffs' emotional distress claims, the Court has considered them as well.

The Court reaches no conclusion as to whether Plaintiffs should prevail on this claim, but finds only that they are entitled to place the claim before the jury.  The BSO Defendants' Motion for Summary Judgment is DENIED as to Lt. Bletz, Capt. Phillips, and Sheriff Whittington.

### 6.  Civil Conspiracy (Claim XII)

The BSO Defendants next move for summary judgment on Plaintiffs' Claim XII, civil conspiracy.  Plaintiffs oppose the dismissal of this claim.

There is no general cause of action of civil conspiracy under Louisiana law.  Instead, Louisiana Civil Code article 2324  provides  in  pertinent  part: "He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act."  In order to prevail on a claim of civil conspiracy,  a plaintiff must establish a meeting of the minds or collusion between the parties for the purpose of committing a wrongdoing.  *Prime Ins. Co. v. Imperial Fire & Cas. Ins. Co.,* 2014-0323 ( La. App. 4 Cir 10/01/14), 151 So. 3d 670, 677 (citing *Guidry v. Bank of LaPlace*, 94-1758, p.9 (La. App. 4 Cir. 9/15/95), 661 So.2d 1052,1058).

The BSO Defendants argue that there is no evidence that they conspired to commit any wrongdoing against Mr. Phillips.

Plaintiffs respond that, at a minimum there is a genuine issue of material fact as to whether Lt. Bletz, Capt. Phillips, and Sheriff Whittington conspired with Gary Wilson to commit the wrongdoings against Mr. Phillips.  They concede that there is no evidence that these Defendants assisted Gary Wilson in the commission of the crimes for which Mr. Phillips was accused.  However, they contend there is evidence "that they knew of his criminal activity and attempted to cover up such activity."  [Doc. No. 166, pp. 90-91].

The Court finds that Plaintiffs have failed to raise a genuine issue of material fact for trial that these Defendants conspired with Gary Wilson to commit any wrongdoing against Mr. Phillips.  There is no evidence at all with regard to Sheriff Whittington or Capt. Phillips.  With regard to Lt. Bletz, there is evidence that he communicated with Gary Wilson in a way that the Court considers inappropriate and has found sufficient evidence to show malice for purposes of a malicous prosecution claim.  However, even viewing those communications in the light most favorable to Plaintiffs, the Court cannot say that they show that Lt. Bletz knew of and attempted to cover up Gary Wilson's wrongdoing.  Accordingly, Defendants' Motion for Summary Judgment on Plaintiffs' civil conspiracy claim is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### 7.   Negligent Hiring, Training and/or Supervision (Claim XIII Against Sheriff Whittington Only)[23]

The BSO Defendants next move for summary judgment on Plaintiffs' Claim XIII, asserting a Louisiana state law claim against Sheriff Julian Whittington in his official capacity for breach of his duty to properly "screen, hire, train, supervise and control" his agents and employees.  [Doc. No. 81, ¶¶ 210- 211].  They contend that the claim must be dismissed as Sheriff Whittington is entitled to discretionary immunity, pursuant to LA. REV. STAT. § 9:2798.1.

The elements of a negligent hiring, training, and/or supervision claim under Louisiana law, are the same as any negligence claim in Louisiana: "(1) the defendant had a duty to conform its conduct to a specific standard; (2) the defendant failed to conform its conduct to that standard; (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries; (4) the  defendant's substandard conduct was a legal cause of the plaintiff's injuries (in other words,

---

[23]In Claim XIV, Plaintiffs assert negligent, hiring, training, and supervision by DA Marvin.  Plaintiffs make no claims against the BSO Defendants.

the plaintiff and the plaintiff's injuries were within the scope of the defendant's duty); and (5) the plaintiff suffered damages." *Adams v. City of Shreveport*, 269 F. Supp. 3d 743, 771 (W.D. La. 2017); *see also Roberts v. Benoit*, 605 So.2d 1032, 1040–46 (La. 09/09/1991).

Further, Louisiana law provides for vicarious liability of employers for the actions of their employees under La. Civ. Code art. 2320 and does not have the same limitations of liability for governmental entities found under 42 U.S.C. § 1983.

However, Sheriff Whittington invokes immunity under § 9:2798.1, which provides: "[l]iability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties." *Id.* The Supreme Court of Louisiana has explained that the immunity conferred on state public officials by the discretionary function law is "essentially the same as the immunity conferred on the federal government by the exception to the Federal Tort Claims Act (FTCA)." *Roberts v. City of Shreveport*, 397 F.3d 287, 296 (5th Cir. 2005) (citing *Jackson v. State ex rel. the Dep't of Corrections*, 785 So.2d 803, 809 (La. 2001)).

"Louisiana courts have adopted a test analogous to the FTCA discretionary function test in determining whether an official is protected by the statute, namely, (1) whether a state law, regulation, or policy specifically prescribes the officer's course of action; and (2) whether the challenged action is grounded in political, economic, or social policy." *Roberts,* 397 F.3d at 296. As to the first part of the test, the exception does not apply if the official has no alternatives. *Id.* Under the second part of the test, the court must determine whether, if the action involves selection among alternatives, the choice was policy-based. *Id.* An officer's use of policy-based discretion protects him from state tort liability. *Id.*

"[D]iscretionary immunity 'protects the government from liability only at the policy-making or ministerial level, not at the operational level.'" *Thompson v. Hedrick*, No. 1:17-CV-00982, 2019 WL 3059808, at *9 (W.D. La. May 24, 2019), report and recommendation adopted, No. 1:17-CV-00982, 2019 WL 3059832 (W.D. La. July 10, 2019) (quoting *Lockett v. New Orleans City*, 639 F. Supp. 2d 710, 745 (E.D. La. 2009) (other citations omitted)).  Additionally, "acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct" are not subject to this provision. LA. REV. STAT. 9:2798.1(C)(2).

First, as to any hiring claim, the BSO Defendants point to evidence to show that deputies undergo an extensive background investigation, a psychological evaluation and a polygraph examination.   [Doc. No. 142-7, Huddleston Aff.].  They argue that this screening and hiring process is discretionary and thus falls within the discretionary function exception.  Alternatively, they argue that Plaintiffs can identify no evidence that they suffered damages as a result of any failure to properly screen or hire the BSO Defendants.

Second, as to any training claim, the BSO Defendants also point out that Sheriff Whittington had a wide variety of options for training officers under his command, and no state law, regulation, or policy explicitly directs his course of action.  Rather, such decisions are based in policy considerations according to the needs of the community, "the types of situations his officers  would  face,  and" with the department budget in mind.  Therefore, they argue that Sheriff Whittington is also immune from suit on this claim under the discretionary function exception.  Alternatively, they argue that there is no evidence that Sheriff Whittington breached any duty with regard to training.

Finally, with regard to supervision, the BSO Defendants contend that Plaintiffs have not identified particular actions by BSO Defendants that caused Plaintiffs any damages that resulted from a failure to supervise.

Plaintiffs respond that, generally, state law claims of negligent hiring, training, and supervision are analyzed similarly to their federal claim.  *See  e.g., Christmas v. City of Shreveport*, 2017 U.S. Dist. LEXIS 165885, *6, 2017 WL 4453340 (W.D. La. Oct. 5, 2017) (applying same analysis to plaintiff's state law claim for negligent supervision as plaintiff's federal claim).  Therefore, they rely on their earlier arguments to support their state law claim as well.

First, the Court finds that Sheriff Whittington is immune from liability on the hiring/screening and training claims raised by Plaintiffs under the discretionary function exception.  These are policy decisions, not decisions on the operational level.  Therefore, the BSO Defendants' Motion for Summary Judgment is GRANTED on Plaintiffs' hiring/screening and training claims, and they are DISMISSED WITH PREJUDICE.

The specific allegations against Sheriff Whittington for failure to supervise, however, evoke at least some considerations on the operational level.  For the reasons stated, in the analysis of Plaintiffs' § 1983 claim,  Plaintiffs have failed to raise a genuine issue of material fact for trial that the actual supervision claim—that Sheriff Whittington instituted a change in command—caused the alleged violation of Mr. Phillips' constitutional rights.  To this extent, the BSO Defendants' Motion for Summary Judgment is GRANTED, and this claim is DISMISSED WITH PREJUDICE.  Sheriff Whittington's lack of policy on confidential informants was also challenged, and Plaintiffs have raised a genuine issue of material fact for trial whether this lack of policy, and the resulting lack of supervision over Lt. Bletz's relationship with Gary Wilson,

was a breach of his duty to the public and caused damages to Plaintiffs.  To this extent, the BSO

Defendants' Motion for Summary Judgment is DENIED as to this part of the claim.

### 8.   Negligence and Negligent Infliction of Emotional Distress (Claim XVI)

The BSO Defendants also move for summary judgment on Plaintiffs' claims of

negligence and negligent infliction of emotional distress.  Plaintiffs oppose dismissal of this

claim.

When plaintiffs seek to recover on the basis "that defendants' ordinary negligence caused

them only mental disturbance[,]" the "general rule followed by the great majority of

jurisdictions" is that, "without accompanying physical injury, illness or other physical

consequences, the defendant is not liable for such emotional disturbance."  *Moresi v. State*

*Through Dep't of Wildlife & Fisheries*, No. 90-C-0205 (La. 1990); 567 So. 2d 1081, 1095

(citations omitted).  The Louisiana Supreme Court has recognized that in its jurisprudence there

have been "deviations from the general rule[,]" but in all cases where the plaintiff has been

allowed to proceed there have been "the special likelihood of genuine and serious mental

distress, arising from the special circumstances, which serves as a guarantee that the claim is not

spurious."  *Id.* (collecting cases) (citations omitted).

"Recovery for mental anguish or emotional distress is based on La. C.C. art. 2315, which

provides in part that every act whatever of man that causes damage to another obliges him by

whose fault it happened to repair it."  *Brown v. City of Monroe*, 48,764 (La. App. 2 Cir. 2/26/14);

135 So. 3d 792, 796.  In order to prevail on a claim of negligent infliction of emotional distress, a

plaintiff "must prove that the conduct in question was the cause-in-fact of the resulting harm or

damages, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by

the defendant, and the risk of harm was within the scope of a protection afforded by the duty breached."   *Id*. at 796.

The BSO Defendants move for summary judgment on the basis that there is no genuine issue as to any material fact regarding whether any of their acts breached a duty owed to Plaintiffs and whether such breach was the cause in fact of their alleged  emotional  injuries. They argue that they had probable cause to arrest Mr. Phillips, lawfully arrested him, and the charges were dismissed prior to trial.   They argue that they did not have a duty to protect Plaintiffs from the consequences of his having been suspected of a crime where probable cause existed for the suspicion, from emotional damages resulting from local gossip caused by charges, or ostracization by the community due to his status as a suspect.  In addition, they contend that this case is not one where Plaintiffs can show "special circumstances" giving rise to the "special likelihood" of real and serious mental distress.

Plaintiffs respond that, as a result of the Defendants' intentional actions and gross neglect, false accusations were lobbied against Mr. Phillips for more than  five (5) years, Plaintiffs  suffered,  and  are  continuing  to  suffer, severe  emotional  distress.  They argue that Defendants acted with such gross neglect that they must be held liable for the damages caused to Plaintiffs.

The Court finds that Plaintiffs have raised a genuine issue of material fact for trial on their claims against Defendants Lt. Bletz, Capt. Phillips, and Sheriff Whittington.  These Defendants owed a duty to Plaintiffs to conduct an investigation in an appropriate manner.  For the reasons previously stated, the Court has found that there is a genuine issue of material fact for trial as to whether there was probable cause for Mr. Phillips' arrest, thereby breaching their duty to him.  Such actions resulted in damages to Plaintiffs.  Further, Lt. Bletz's actions, as detailed

fully in this Ruling, which were under the supervision of and with the approval, in some cases, of Sheriff Whittington.  Finally, the Court finds that this is the kind of "special circumstances" envisioned by the Louisiana Supreme Court for the type of action asserted. Accordingly, the BSO's Motion for Summary Judgment as to these Defendants is DENIED.  As to the remaining BSO Defendants, however, Plaintiffs have not asserted evidence sufficient to raise a genuine issue of material fact for trial, and the Motion for Summary Judgment is GRANTED as to Chief Deputy Owens and the unnamed BSO Employees.  The claims against these Defendants are DISMISSED WITH PREJUDICE.

### 9.  Defamation Claim

The BSO Defendants did not originally move for summary judgment on any defamation claim asserted by Plaintiffs.  This is presumably because, despite three amendments to their Complaint, there is no heading in which a defamation claim is asserted, in contrast to all of their other claims.  Nonetheless, Plaintiffs contend that they asserted a defamation claim in paragraphs 1, 98, 100, 111, 118, 118-A, 119, 225-227 of their Fourth Amended Complaint.  [Doc. No. 81]. In the alternative, if such claim "was not expressly stated under Article 2314, Plaintiffs request leave to amend the Complaint to include a defamation claim under Louisiana state law."  [Doc. No. 155, p. 81, p. 81 n. 391].  To this extent they rely on Fifth Circuit precedent for the proposition that when a claim is raised for the first time in response to a motion for summary judgment, the court should review that as a motion to amend under Federal Rule of Civil Procedure 15(a).  *See Riley v. School Bd. Union Parish*, 379 Fed. App'x. 335, 341 (5th Cir. 2010); *see also Sherman v. Hallbauer*, 455 F.2d 1236, 1242 (5th Cir. 1972) ("[F] air treatment for the [plaintiffs] requires that they not be deprived of their day in court" despite the "frantically revised theory of the case.").

The only factual allegations against the BSO Defendants appear in paragraphs 98 and 100.  In paragraph 98, Plaintiffs allege:

> Despite finding no evidence at the Phillips residence connecting any member of the Phillips family to the above-described offenses, and without identifying any opportunity or motive, Sheriff  Whittington, Lt. Bletz,  Capt. Phillips, Chief Owens, and  other  [BSO] detectives were unable to withstand the public's scrutiny  for  their  failure  to  identify  a suspect and began reporting to members of the community that Todd Phillips was a suspect.
>
> For nearly three years after, they reported to members of the community on a regular basis that Todd Phillips was guilty and that an arrest was imminent.  Most of the victims of the above-described  offenses  had never met or even heard of Todd  Phillips but  became outraged and began making threatening remarks in public and on social media towards Mr. Phillips and his family based on the accusations of Sheriff Whittington, Lt. Bletz, and other [BSO] deputies.

[Doc. No. 81, ¶ 98].  In paragraph 100, they further allege that "[t]he statements of Sheriff Whittington,  Lt. Bletz, Capt. Phillips, and other [BSO] deputies to members of the community identifying Mr. Phillips as a suspect caused Mr. Phillips, his wife, Jodi, and daughters,  Brooke and Abby, to suffer extreme emotional distress, fear, and humiliation."

In their memorandum, Plaintiffs point to additional alleged facts obtained in discovery. Specifically, that Capt. Phillips and Sheriff Whittington also made statements of Mr. Phillips' alleged guilt to members of the community, bringing Sonny Bickham and Breck Bickham into their office, not for investigative purposes but to "convince" them of Mr.  Phillips'  guilt.  [Doc. No. 155-33, Exh. 31, Deposition of James "Sonny" Bickham ("Sonny Bickham Depo."), pp. 25, 43-44; Doc. No. 155-34, Exh. 32, Deposition of A. Breck Bickham ("Breck Bickham Depo."), pp. 62, 123, 248].  Plaintiffs contend that these statements "were not official  reports of a crime but statements made to friends and neighbors with reckless disregard for the  truth."  [Doc. No. 155, p. 83].  They finally contend that such statements continued for two years until the issuance of the citation to Mr. Phillips.

To prevail a claim of defamation under Louisiana Civil Code article 2315, Plaintiffs must prove four elements:"(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury." *Trentacosta v. Beck*, 96-2388  (La. 10/21/97); 703 So.2d 552, 559 (citing *Restatement (Second) of Torts*, § 558 (1977)).  "Thus a plaintiff, in order to prevail in a defamation action, must prove 'that the defendant, with actual malice or other fault, published a false statement with defamatory words which caused plaintiff damages.'" *Id.* (quoting *Sassone v. Elder*, 92-C-1856 (La. 1993); 626 So.2d 345, 350).

Words which expressly or implicitly accuse another of criminal conduct are considered defamatory *per se*, and the elements of falsity and fault are presumed, and the element  of  injury may  be  presumed.  *Costello v. Hardy*, 2003-1146  (La. 1/21/04);  864 So.2d 129, 140 (citing *Kosmitis v. Bailey*, 28,585 (La. App. 2d Cir. 1996); 685 So.2d 1177, 1180).

There is a qualified privilege for law enforcement officers, however.  The Louisiana Supreme Court has instructed:

> While we agree that law enforcement officers, whose duty includes charging persons with crimes, should be allowed to report the fact of a criminal investigation and an arrest without fear of a defamation action if the person is cleared of the charges, an officer cannot add additional injurious statements that the officer had no reason to believe were true. Such a restriction of the privilege should not have a chilling effect on the free reporting of criminal investigations and arrests, but should prevent occurrences such as in the present case where the officer not only reported the investigation and arrest, but also reported facts pertaining to guilt that were not developed in the investigation.

*Trentecosta*, 703 So. 2d at 564.

Despite filing a reply, the BSO Defendants do not address Plaintiffs' alleged defamation claim.  Thus, there is no pending motion for summary judgment on this claim or an opposition to Plaintiffs' position that they asserted this claim in their Fourth Amended Complaint.  The Court

finds that Plaintiffs appear to have sufficiently alleged a defamation claim pursuant to article 2315 in the Fourth Amended Complaint, and, without a motion or opposition to its pursuit, this claim remains pending for trial.

### D.  All Claims Against BSO Unknown Employees

The BSO Defendants also move for summary judgment on all claims against "Unknown Bossier Parish Sheriff Deputies, John and Jane Does 1-100" as Plaintiffs have clearly not identified cognizable claims against these "unknown" Defendants.

The Court agrees.  To the extent not already addressed in the ruling on the individual claims, the Court finds that, after three amendments to their original Complaint and extensive discovery, Plaintiffs have failed to identify and present evidence to support any claims against these so-called unknown employees.  Accordingly, the BSO Defendants' Motion for Summary Judgment on all claims against BSO Unknown Employees is GRANTED, and all such claims are DISMISSED WITH PREJUDICE.

## III.    CONCLUSION

For the foregoing reasons, the BSO Defendants' Motion for Summary Judgment [Doc. No. 142] is GRANTED IN PART AND DENIED IN PART.  The motion is GRANTED as to the following claims:

(1) All Plaintiffs' claims against the unnamed employees of the BSO;

(2) Plaintiffs' claims against BSO Defendants under § 1983 and state law for failure to intervene (Claims II & VIII);

(3) Plaintiffs' claims against BSO Defendants under § 1983 for violations of the Due Process Clause and for excessive pre-accusation delay (Claim III);

(4) Plaintiffs' claims against BSO Defendants under § 1983 for violations of the Due Process and Equal Protection Clauses (Claim IV);

(5) Plaintiffs' claims against BSO Defendants under state law for abuse of process (Claim X);

(6) Plaintiffs' claims against BSO Defendants under state law for civil conspiracy (Claim XII); and

(7)  Plaintiffs' claims against BSO Defendants under § 1983 for failure to disclose exculpatory evidence/for a violation of *Brady* (Claim XV).

These claims are DISMISSED WITH PREJUDICE.

The motion is GRANTED IN PART and DENIED IN PART as to the following Claims and/or Defendants and to the following extent:

(1) The motion on Plaintiffs' claims against BSO Defendants for false arrest under § 1983 and state law is DENIED as to Lt. Bletz based on Mr. Phillips' 2017 arrest, but otherwise GRANTED (Claims I & VII);

(2) The motion on Plaintiffs' claims against BSO Defendants for policy and custom violations under § 1983 is DENIED as to Sheriff Whittington for a lack of policy and supervision on the use of  confidential informants and lack of policy for the preservation of evidence, but otherwise GRANTED (Claim V);

(3) The motion on Plaintiffs' claims against BSO Defendants for malicious prosecution under state law is DENIED as to Sheriff Whittington and Lt. Bletz, but otherwise GRANTED (Claim IX);

(4) The motion on Plaintiffs' claims against BSO Defendants for intentional infliction of emotional distress under state law is DENIED as to Sheriff Whittington, Lt. Bletz, and Capt. Phillips, but otherwise GRANTED;

(5) The motion on Plaintiffs' claims against BSO Defendants for negligent hiring, training, and/or supervision under state law is DENIED as to Sheriff Whittington for a lack of policy and supervision on the use of  confidential informants, but otherwise GRANTED (Claim XIII); and

(6) The motion on Plaintiffs' claims against BSO Defendants for negligence and negligent infliction of emotional distress under state law is DENIED as to Sheriff Whittington, Lt. Bletz, and Capt. Phillips, but otherwise GRANTED.

Plaintiffs' defamation claim also remains pending for trial.

MONROE, LOUISIANA, this 28th day of October, 2020.

TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE