# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### SHREVEPORT DIVISION

| | |
|---|---|
| **TODD PHILLIPS, ET AL.** | **CIVIL ACTION NO. 17-cv-1524** |
| **VERSUS** | **JUDGE DOUGHTY** |
| **JULIAN C WHITTINGTON, ET AL.** | **MAGISTRATE JUDGE HORNSBY** |

### RULING

The case arises from the investigation of a series of tire spikings, arsons, and vandalism of deer camps in Bossier Parish beginning in 2010.  Plaintiff Todd Phillips ("Phillips") was investigated and charged, but it was later determined that another person committed the crimes. Phillips; his wife, Jodi Phillips ("Mrs. Phillips"); and his daughters, Brooke Phillips Lottinger ("Brooke") and Abby Phillips ("Abby"), brought suit against Defendants Julian Whittington ("Sheriff Whittington"), the Sheriff of Bossier Parish, in his individual and official capacities; Lieutenant Bruce Bletz ("Lt. Bletz"), in his individual capacity; Captain Shawn Phillips ("Capt. Phillips"), the supervisor of the investigation division, in his individual capacity;   former Chief Deputy Charlie Owens ("Chief Deputy Owens"), supervisor of day-to-day operations and adviser to Sheriff Whittington, in his individual capacity; unknown Bossier Sheriff's Office employees (collectively "BSO Defendants"); J. Schuyler Marvin ("DA Marvin"), individually and in his official capacity as District Attorney for the 26th Judicial District; and Hugo Holland ("ADA Holland"), individually and in his official capacity as an Assistant District Attorney (collectively DA Defendants); Gary Wilson, the alleged perpetrator of the crimes; and Carrie Lee Winford,

Administratrix of the Estate of Coty Wilson, Gary Wilson's son and additional alleged perpetrator of the crimes.[1]  [Doc. No. 81, Fourth Amended and Supplemental Complaint].

Pending before the Court are a Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim upon Which Relief Can be Granted ("Motion to Dismiss") [Doc. No. 139] and a Motion for Partial Summary Judgment [Doc. No. 141] filed by the DA Defendants.  They move to dismiss the remaining claims against them on the basis of absolute, qualified, and/or sovereign immunity and, alternatively, move for summary judgment on all claims.

For the following reasons, the Motion to Dismiss is GRANTED IN PART AND DENIED IN PART, and the Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART.

## I.      FACTS AND PROCEDURAL HISTORY

The Phillips family moved to Benton, Bossier Parish, Louisiana, in 2004 when Mr. Phillips accepted a position as Vice-President of Finance for Frymaster, a worldwide supplier of commercial fryers and other equipment.   Mr. Phillips continues to be employed by Frymaster, after having later been promoted to Chief Executive Officer.

The Phillips purchased 28 acres on Old Plain Dealing Road, which were heavily wooded and had a barn and pasture area for their horses.  Their daughters, Brooke and Abby, were involved in barrel racing, and the family regularly attended rodeo events.  Mr. Phillips also traveled frequently, both in and out of the country, for his job.  As a result, the Phillips, who are not from Louisiana originally, did not know many people in Benton, other than their closest neighbors and persons they met through their daughters' activities.

---

[1]While out on bond, Coty Wilson and his mother, Jennifer Wilson, drove to a bridge and purportedly jumped into the Red River, where their bodies were later found.

Around 2010, approximately six years after the Phillips moved to the area, there were a series of property crimes along Old Plain Dealing Road and Cottage Grove Road in Benton, particularly involving hunting leases.  A number of items were stolen, and homemade metal spikes were placed on roads and trails to and from the leases, causing flat tires to trucks and ATV's.  The crime escalated to vandalisms, arsons, and damage to property by gun fire.  A number of strange letters were mailed to individuals in the area, as well as to law enforcement.

Between 2010 and 2017, there were over sixty (60) documented crimes that occurred. However, there were no witnesses who observed the perpetrators in the acts, and there were no fingerprints or DNA obtained from the scenes.  From 2010 to 2012, the actual perpetrator also planted evidence at the crime scenes to mislead detectives and implicate other persons.  *See* [Doc. No. 155-4, Exh. 1; Doc. No. 155-45, Exh. 43,  BSO Report No. 10-4483; Doc. No. 155-46, Exh. 44, BSO Report No. 10-5374; Doc. No. 155-47, Exh. 45, BSO Report No. 11-2586; Doc. No. 155-53, Exh. 51, BSO Report No. 12-5816].

On October 2, 2010, Nicholas Osentoski ("Mr. Osentoski") reported to the BSO that several items were stolen from his deer lease on Cottage Grove Road.  Mr. Osentoski found a hammer on his property with the initials "LC" written on the handle, and he believed the hammer might belong to Larry Coker, although no evidence was ever developed placing that person at or near the property.

On October 18, 2010, Jimmy Hope [2] ("Mr. Hope") reported finding a welded spike on a private gravel roadway and that it was believed to have caused flat tires.

On November 26, 2010, homemade metal spikes were found in the dirt driveway leading into the Burnt Pine Hunting Club. The spikes caused flat tires to three vehicles.

---

[2]Plaintiffs identify Mr. Hope as the father-in-law of Gary Wilson at times and as his uncle at others. Regardless, there appears to be some familial relationship between Mr. Hope and Gary Wilson.

A few weeks later, on December 18, 2010, BSO deputies were again dispatched to the Burnt Pine Hunting Club when Kathy Naron reported finding two more homemade spikes. A red plaid men's shirt was found lying on the ground beside the access road approximately five feet from where the spikes were located, and deputies discovered a small walkie-talkie radio inside the pocket of the shirt. The name "L. Burns" was written in black marker on the radio, and Landon Burns, who lived in the area and hunted a nearby lease, was identified as a suspect. However, it was determined that the shirt was way too small for him, and no DNA evidence was found on the radio.

On June 3, 2011, Tammy Brunson ("Mrs. Brunson") reported to BSO that she received an anonymous telephone call from a female who stated that she needed to "clear her conscience" and that she was with Gregory Bickham when he vandalized the Brunsons' camp house on Highway 160. The caller also stated that Gregory Bickham was responsible for all the recent thefts at the camp and that he hides the property under his mobile home until a friend picks up the property or he is able to pawn the property.   Mrs. Brunson's husband, Johnnie, reported that they had repeated run-ins with Gregory Bickham and believed he was responsible for placing spikes on his hunting lease. BSO deputies followed the Brunsons to Highway 160 where they discovered their camp house in disarray. Items were removed from the camp and thrown along the roadway, the A/C unit was pulled from the house, threatening messages were carved into the front door, threatening messages were written on the television and other places inside the home, Bible verses were written on a chip bag and a piece of paper, and a bottle of lighter fluid was left upside down on a roll of toilet paper in a manner believed to  be an  attempt  to burn down the camp house, although no form of ignition was found nearby.

4

A search warrant was obtained and executed at Gregory Bickham's residence based on the anonymous call.  However, no stolen items were located at his residence, nor was there any evidence that the items had ever been located there.  BSO deputies then spoke with Gregory Bickham who advised that he had been in East Texas for the last couple of weeks working, and cell phone records subpoenaed from AT&T confirmed his statement.  As a result, he was cleared as a suspect, and the case was marked inactive on July 15, 2011.

In July 2011, Sheriff Whittington was elected to serve his first term as sheriff of Bossier Parish.

On September 11, 2011, Stephan Adams ("Mr. Adams") reported that he was at the "Four-N's" Hunting Club where he found a cell phone box suspended approximately 10-12 feet in the air.  Mr. Adams opened the box and discovered a plastic baby-doll with the words "cry baby" and "kiss my ass" written on it.  "Mark 13:35"[3] was written on the box.  Records from AT&T identified the cell phone box with an account registered to Billy Joe Fletcher.  The Fletchers were contacted, and Leslie Fletcher, Billy Joe's wife, reported that their middle daughter, Kendra, had the same type of cell phone as shown on the box.  Kendra was interviewed by Deputy Brandon Masters, but no suspects were identified.

In  September 2011, Lt. Bletz was appointed as the lead investigator in connection with the various property crimes.  He began reviewing reports of prior offenses and concluded that the real perpetrator had intentionally placed false information or evidence at various crime scenes to mislead investigators.  He also determined that the real culprit appeared to know or have knowledge of Gregory Bickham and Landon Burns and that they had been named by victims as

---

[3]" Therefore keep watch because you do not know when the owner of the house will come back—whether in the evening, or at midnight, or when the rooster crows, or at dawn."  *Mark* 13:35 (New International Version).

potential suspects.  In connection with his investigation, Lt. Bletz  spoke to some of the prior

victims, particularly Defendant Gary Wilson.  Mr. Wilson claimed that he was a victim of

multiple property crimes.   Lt. Bletz began using Gary Wilson as an informant; as a result, they

developed a friendly relationship and began to communicate regularly.  [Doc. No. 155-10,  Exh.

7, Deposition of Lt. Bruce Bletz ("Bletz Depo."), pp. 16-17; Doc. No. 155-27, Exh. 25,

Deposition of Gary Wilson ("Wilson Depo.), pp. 16, 20; Doc. No. 155-, Exhs. 73 & 74].

During this time, Mr. Phillips was traveling significant distances fairly often for work.  In

late summer and fall 2012, he traveled to Tampa, Florida, on August 24-29, to Seoul, South

Korea, on October 6-11, and to Chicago, Illinois, on October 16-18.[4]

In the middle of October 2012, Gary Wilson's deer camp burned down.

On October 24, 2012, Chad Johnson ("Mr. Johnson") reported two of his deer stands

were burned down.  A small Coleman fuel bottle with the name "Todd Phillips" written on the

side was located at the scene.  The offense occurred in the Highway 3 and Highway 160 area of

Benton, which is near the home of Gary Wilson and several miles from the Phillips' home on

Old Plain Dealing Road.

On November 12, 2012, BSO received a report of an arson at a deer stand owned by Matt

Caston ("Mr. Caston").  Mr. Caston reported that his GPS device had also been stolen.  In a

nearby deer stand owned by Otis Smalley, deputies located an alleged "delayed action incendiary

device" made from a grape Powerade Zero bottle, which had been filled halfway with red diesel

fuel, and a veterinary bute syringe that had been placed into a cardboard toilet paper roll and

attached to the top of the Powerade bottle.  The name "Phillips" was written on the label of the

---

[4]Mr. Phillips avers that copies of expense reports and work calendars confirming these dates were provided to the DA's Office and were introduced at the 404(b) hearing discussed *infra*.  He does not state when the documentation was first provided to the DA's Office or if it was provided to the BSO. [Doc. No. 155-29, Todd Phillips Affidavit, ¶ 2].

bute syringe.  That deer stand had not burned, and officers theorized that rain had gotten into the deer stand and extinguished the incendiary device.  A blue plastic bag filled with trash was also found next to the bottle inside the deer stand.  It contained several soda cans and a styrofoam cup with the name "Karen" written on it.  The syringe was traced to a local veterinarian who reported to BSO that it had been sold to Todd and Jodi Phillips.

State Court Judge Parker Self issued a search warrant for the Phillips' home.  The search warrant was executed on the evening of November 15, 2012.  When deputies arrived, Mr. Phillips was still in his office in Shreveport.  Lt. Bletz, in the presence of Capt. Phillips, interviewed Mrs. Phillips for approximately one hour until Mr. Phillips arrived home.  He then interviewed Mr. Phillips and the Phillips' daughters, Abby and Brooke.  BSO Detectives informed Mr. Phillips that the syringe and propane bottle implicating him had been found at crime scenes.  The Phillips told Lt. Bletz that the syringe had been used for Abby's horse, and Abby believed that it had been thrown in the trash at the rodeo the previous weekend, but she really could not remember.  The Phillips also reported that the cup with the name "Karen" written on it had been used by a family friend who was visiting and had been thrown away.  The trash was placed for pick up along Old Plain Dealing Road, approximately 0.3 miles from their house.  Although approximately eight (8) deputies were present for the search, they found nothing of evidentiary value at the house.

The following day, Friday, November 16, 2012, the entire Phillips family voluntarily provided fingerprints to the BSO.  Mr. Phillips also provided DNA and a handwriting exemplar.

A few days later, according to Mrs. Phillips, a neighbor, Dale Russell ("Mr. Russell"), flagged her down as she pulled into her driveway.  He had found a device in the bed of his truck which was parked along the fence line of the Phillips' property.  He thought the device had fallen

out of the Phillips' truck and then had been picked up and thrown in his truck by kids.  Mrs. Phillips, who believed the device to be a walkie talkie, told Mr. Russell about the search warrant executed at her home.  Mr. Russell allegedly did not want to contact BSO deputies because he had previously had legal trouble, so Mrs. Phillips offered to contact the BSO.  She then pulled up to her house, and Mr. Phillips and their neighbor, Sonny Bickham, were in the carport.  Sonny Bickham said that it appeared to be a GPS tracker for a dog.  Mrs. Phillips called the BSO, but no one returned her call.

On December 14, 2012, an anonymous call was made from a pay phone in Bossier City to a crime stoppers hotline.  The following day, BSO received information that the caller accused local resident Blake Barton ("Mr. Barton") of the crimes, claimed that he had been framing a neighbor, and reported that evidence could be found under a tree behind his home.  The caller also reported that the hole was covered by leaves, and that inside the hole were spikes used to blow out tires.  Mr. Barton lived near the Phillips and Defendant Gary Wilson.

Later the same day, Mr. Hope reported to the BSO that he had run over spikes which caused a flat tire.  BSO retrieved the spikes from the scene, along with other items of evidence.

Lt. Bletz and Capt. Shawn Phillips contacted Mr. Barton, who consented to a search of his home.  Upon searching under the tree as indicated in the crime stoppers tip, they located a bag  containing tire spikes and a trash bag containing trash, including a magazine with a subscription label for "Jodi Phillips."  Mr. Barton  denied  any involvement in the ongoing crimes, and no other evidence was discovered at his residence.

On December 24, 2012, another call was made from the same pay phone in Bossier City to Charles Everett, Mr. Barton's step-father, stating that Mr. Barton needed to leave town immediately or his trailer would be burned down.

On or about December 27, 2012, Lt. Bletz learned from Gary Wilson that Mr. Russell had located a GPS tracker in his truck and given it to Mrs. Phillips.[5]  Lt. Bletz contacted her and then picked up the tracker from the Phillips residence.  The tracker was later determined to be the device stolen from Mr. Caston's deer stand on or about November 12, 2012.

In January 2013, Lt. Bletz obtained a warrant allowing for the placement of a GPS tracker on Mr. Phillips' vehicle.  The GPS tracker was placed on his vehicle on January 14, 2013, and remained there until April 19, 2013, but the device never showed him to be at or near any of the deer camps or other areas where the property crimes were occurring.  Lt. Bletz also subpoenaed the AT&T records for the cellular devices registered to Todd and Jodi Phillips for the dates of December 14 and 24, 2012.  Those records did not show Todd Phillips to be in Bossier City at or near the time the phone calls were made from the pay phone, but they did show that Jodi Phillips (or the cell phone used by her) was in the general area on December 24, 2012.  The general area where the pay phone is located and within the range shown includes a local mall and shopping areas.  Jodi Phillips has stated that she was shopping on Christmas Eve.

Additionally, although it is unclear exactly when, BSO deputies also conducted nighttime surveillance of the Phillips home on at least two occasions.  [Doc. No. 155-13, Exh. 11, Deposition of Lt. Shannon Mack ("Mack Depo."), pp. 34-38].  No report was prepared.

Lt. Bletz continued to suspect Mr. Phillips was responsible for the crimes, despite having found no further evidence.  So in March 2013, on a Friday evening, Lt. Bletz, with the assistance of Capt. Phillips and the approval of Sheriff Whittington, placed three white posters with writings in black marker along Old Plain Dealing Road, one of which was placed across from the

---

[5]It is unclear how Gary Wilson obtained this information.

Phillips' residence.  Bible verses were written on the posters in dot-style lettering like the writings of the perpetrator of the property crimes being investigated.

Mrs. Phillips and Abby saw the posters on their way home from a local rodeo.  They assert that they were fearful because they were aware that Bible verses had been found written at the deer camps.  Mr. Phillips was in China on business, so Mrs. Phillips called their friend, John Greer, who came over and called the BSO.  Although a deputy was dispatched, he did not admit that the signs had been placed by the BSO,[6] nor did he pick up the signs or search the property.  Jodi and Abby Phillips spent the night with John and Lisa Greer, so that Mr. Greer could search the property during the daylight.

When he returned home, Mr. Phillips went to see Lt. Bletz, stating multiple times, according to Lt. Bletz's report, that the situation was becoming dangerous.  Lt. Bletz still did not admit that the BSO had placed the signs.  Lt. Bletz's notes indicate that he perceived Mr. Phillips' statements as a threat.

In June 2013,  Lt. Bletz met with DA Marvin, Lt. Shannon Mack ("Lt. Mack"), Capt. Phillips, and perhaps others.  While DA Marvin has testified he did not advise Lt. Bletz on whether to proceed, he admits that he did not believe there was "proof beyond all reasonable doubt to formally charge Todd Phillips" at that time.  [Doc. No. 155-25, Exh. 23, Deposition of J. Schuyler Marvin ("Marvin Depo."), pp.  30-34, 48-49].

Meanwhile, crimes in the area continued.  During 2013 and continuing into 2014 and 2015, threatening letters with dot-style lettering were sent in the mail, with some referring to Lt. Bletz as "Detective Clouseau"[7]; dogs were shot and killed;  truck windows and houses were shot

---

[6]It is unclear whether the deputy was aware BSO had placed the posters.

[7]Inspector Clouseau is a fictional character in *The Pink Panther* movie series.  "Clouseau is an inept and incompetent police detective in the French Sûreté, whose investigations quickly turn to chaos. His absent-

up; spikes continued to cause vehicle damage; plastic bottles with salt and flagging tape were left in people's yards; a toilet was used as a makeshift headstone for Lt. Bletz; and beer cans with nails were left in the driveway of a Shreveport policeman who lived across the street from the Phillips.  Thefts, vandalisms, and other incidents occurred on a regular basis.

On July 15, 2014, Sonny Bickham, the Phillips' neighbor and friend, received a threatening letter in the mail which purportedly read:  "We know your son is helping Phillips and you know it[,] two[sic][;] chief no hair will not get off his ass to do anything[,] so I will[.] I have always hated you anyway[.]   [Y]ou and son are going to hell[,] and I am going to send yall there." [Doc. No. 155-59] (all caps deleted). [8]

According to the Phillips, members of  the community had been reporting to them that the BSO suspected Mr. Phillips of the crimes and his arrest was imminent.  The family asserts that they became increasingly concerned for their safety and feared that they would not receive any protection from the BSO.  In September 2014, even though it was Abby's senior year in high school, the Phillips purchased a new home in Marshal, Texas, approximately sixty (60) miles away, and moved in the middle of the night.  Yet the crimes continued.

In March and June of 2015, BSO Detective Mike Lombardino was assigned to investigate two cases involving the vandalism of a skid loader and the burglary of a tractor trailer on Cottage Grove Road.  Detective Lombardino identified Gary Wilson as the primary suspect in both cases and advised Lt. Bletz of his suspicions.  [Doc. No. 155-19, Exh. 17, Deposition of Michael D. Lombardino, Jr., ("Lombardino Depo."), pp. 8, 11-14, 19-24].  Lt. Bletz was not personally involved in the investigations of these two cases,  but he was Detective Lombardino's supervisor.

---

mindedness almost always leads to destruction of property . . . "
https://en.wikipedia.org/wiki/Inspector_Clouseau (last visited 08/17/2020).
    [8] The statement was provided in a police report in all caps with no punctuation.  For ease of reading, the Court has deleted the capitalization and added punctuation in brackets.

He advised Detective Lombardino that "Gary Wilson was a weird guy but he had cleared him." *Id.* at p. 15.  Lt. Bletz  instructed Detective Lombardino to "inactivate" the cases.  *Id.* at p. 18. Detective Lombardino disagreed with that decision.  *Id.*  Detective Lombardino also advised Capt. Phillips that he believed Gary Wilson was a suspect and expressed his concerns that the investigation had been marked inactive.  *Id.* at pp. 17, 30-31.  These offenses were never disclosed by Lt. Bletz or anyone else with the BSO to the DA's office.  Nor were Mr. Phillips and his attorney notified of  these crimes or the fact that evidence had been developed identifying another potential suspect.

Between Friday, March 13, and Saturday, March 21, 2015, Mr. and Mrs. Phillips were in Illinois visiting family.  [Doc. No. 155-29, Phillips Aff., ¶ 4].

In the spring of 2015, Lt. Bletz learned that he would be promoted and transferred to lead the Internal Affairs division of the BSO.  Prior to his transfer, Lt. Bletz and Capt. Phillips consulted with ADA Holland, a special prosecutor brought into the case at the request of Sheriff Whittington.

From Monday, June 8, 2015, through Sunday, June 14, 2015, Mr. and Mrs. Phillips and Abby were in Abilene, Texas, for the Texas state rodeo finals.  [Doc. No. 155-29, Phillips Aff., ¶ 5].

Even after his promotion in July 2015, Lt. Bletz was responsible for preparing the narrative supplement accusing Mr. Phillips of committing the offense for which a misdemeanor summons later issued.  He continued to include in his narrative report offenses which occurred after July 2015, and his primary narrative supplement was not entered until December 9, 2015.

After July of 2015, Gary Wilson continued to contact Lt. Bletz via phone, email, and text messages regarding the crimes that were occurring in the area.  Lt. Bletz would obtain the

information from Gary Wilson and convey the information to the detectives working in the Detectives division.  Lt. Bletz's responses to these messages indicate that he believed Mr. Phillips to be the perpetrator of any new crime, although he was no longer the investigator, and the detectives who were assigned to the case had not yet had a chance to conduct their own investigation.

On August 3, 2015, ADA Holland sent a plea offer to Mr. Phillips' attorney requesting that he plead guilty to simple damage to property and pay restitution in the sum of $59,578.00. Mr. Phillips rejected that offer.

On September 14, 2015, Mr. Phillips appeared at the BSO detectives' office pursuant to arrangements made between ADA Holland and Mr. Phillips' attorney, Marty Stroud ("Mr. Stroud").  At that time, Capt. Shawn Phillips formally served him with a summons for the misdemeanor charge of simple criminal property damage under LA. REV. STAT. § 14:56.  A formal Bill of Information followed, charging Mr. Phillips with simple criminal damage to property in connection with a single spiking incident in March 2014.

ADA Holland filed a 404(b) Notice of the State's intent to introduce evidence of more than sixty (60) other crimes, and a 404(b) hearing was scheduled to begin on November 28, 2016, in the 26th Judicial District Court, Bossier Parish, Louisiana.

In the fall of 2016, just prior to the hearing, Mr. Stroud received an envelope at his office. On the back of the envelope was written "U R asking 2 many ?" and inside was flagging tape which read "We R Untouchable Better Make Phillips C The Light" and "Elephant Foot on a Mouse Tail."  [Doc. No. 155-71].

On November 28, 2016, the hearing was conducted under Louisiana Code of Evidence article 404(b) to determine if evidence of other crimes could be used in Mr. Phillips'

misdemeanor criminal trial on the charge of simple criminal damage to property.[9]  A five-day hearing was held.  Lt. Bletz testified as one of the witnesses, but, according to Plaintiffs, he mischaracterized witness statements and evidence and testified falsely.  Additionally, Plaintiffs contend that they were not provided with exculpatory evidence and, thus, had no opportunity to cross-examine or call witnesses to testify as to those facts, nor was the exculpatory evidence disclosed to the state court.

In January 2017, approximately one month after the 404(b) hearing concluded and well prior to the state court ruling, BSO deputies were directed to a fake "grave site" of DA Marvin where a booby trap was set.  BSO deputies were tasked with determining whether this incident was connected to the arsons and spikes and identified a suspect, John Greer, based on information provided by Gary Wilson to Lt. Bletz.  [Doc. No. 155-13, Exh. 11, Mack Depo., pp. 44-46].  Lt. Mack reported their suspicions that John Greer was the culprit to Deputy Chief Owens.  *Id.* at p. 49.  However, the task force was disbanded.  *Id.* at p. 48.  Neither Plaintiffs nor their counsel was informed of this offense, that the task force was formed to investigate, that a suspect other than Mr. Phillips was identified, or that the task force was then disbanded.  Likewise, this information was not furnished to the state court judge.

In May 2017, Lt. Bletz  continued to exchange texts and calls with Gary Wilson regarding additional criminal activity in the area. [Doc. No. 155-75, p. 44].

---

[9]Louisiana Code of Evidence article 404(b) provides, in pertinent part:

B.  Other crimes, wrongs, or acts. Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. . .

Also in May 2017, Judge Jeff R. Thompson issued an Opinion [Doc. No. 142-4] that the state had proven by clear and convincing evidence that Mr. Phillips was responsible for five of the related camp vandalism and arson cases.

In August 2017, ADA Holland prepared a Bill of Information and a Motion and Order for Issuance of Warrant for the arrest of Mr. Phillips for felony arson.  No affidavit accompanied the motion.  Instead, ADA Holland incorporated by reference "the entirety of the evidence adduced at the previous 404([b]) hearing."  [Doc. No. 155-87, Exh. 85].  Judge Thompson issued the warrant without requesting or considering additional information.  After the charges against Mr. Phillips were amended to a felony, his jury trial was set for January 22, 2018 (although it was later continued to May 29, 2018).

In October 2017, Chief Deputy Owens assigned Deputy Duane Huddleston to go back and look at the harassing letters that had been sent to individuals and businesses in the area over several years with "a fresh set of eyes."  [Doc. No. 155-15, Exh. 13, Duane Huddleston Deposition ("Huddleston Depo."), pp. 29-32, 40-42; Doc. No. 142-7, Affidavit of Duane Huddleston ("Huddleston Aff.")].  Lt. Mack, Lt. Dave Falk, Sergeant Tim Wynn, and Detective Tab Cahn[10] were also part of this task force.  [Doc. No. 155-13, Exh. 11, Mack Depo., p. 56; Doc. No. 155-15, Exh. 13, Huddleston Depo., p. 42].  Once Deputy Huddleston began investigating, he and other members of the task force focused on Gary Wilson as the person who was sending the letters.  [Doc. No. 155-15, Huddleston Depo., pp. 52-53].  Deputy Huddleston stated in his later report that it "seems the recent letters are connected to a series of spikes, vandalisms, arsons, property damage by gunfire and strange letters that have been occurring in a

---

[10]In the Mack deposition, "Cahn" is spelled "Kahn," and "Wynn" is spelled "Nguyen."

small area south of Hwy 160 and between Old Plain Dealing Road and Hwy 3." [Doc. No. 155-54, Exh. 52, BSO Report No. 12-5866].

On November 20, 2017, Plaintiffs filed their original Complaint [Doc. No. 1].  The Complaint was amended prior to the filing of answers or motions by Defendants.  [Doc. No. 3].

In December 2017, a handwriting analysis of the letters was performed that revealed that Gary Wilson could have been the one who wrote the letters.  [Doc. No. 142-7, Huddleston Aff.].

On December 27, 2017, the DA Defendants filed a Motion to Dismiss [Doc. No. 10]. Defendants Sheriff Whittington, Lt. Bletz, and the BSO Jane & John Does also filed a Motion to Dismiss [Doc. No. 12].  While those motions were pending, Plaintiffs obtained leave of Court to file a Second Amended Complaint [Doc. No. 23] and, later, a Third Amended Complaint [Doc. No. 35].  The Third Amended Complaint asserted claims against Gary Wilson and Coty Wilson, in addition to the other Defendants.

In  February 2018, Gary Wilson was arrested and charged with crimes, including the one which Mr.  Phillips had been accused of and those crimes which the State sought to introduce as "other crimes" evidence at the 404(b) hearing.  The June 2011 burglaries of the Brunson residence and Naron residence,  the March 2012 arsons of the hunting camps of Johnnie Brunson, Stephen  Adams,  Morris  Naron, and Curtis Southern, the October 2012 arson of Chad Johnson's deer camp and theft of his deer camera,  the  October/November 2012  arson of Matthew Caston's deer stand, the December 2012 threats to Charles Everett, the August 2013 theft of Dustin Williams'  deer  stand, and the September 2013 theft of a hunting camera are all included in the Amended Bill of  Information filed against Gary Wilson.

On March 13, 2018, DA Marvin nolle prossed[11] the charges against Mr. Phillips.

_____

[11]"Nolle pros" is an abbreviation of the Latin term, "nolle prosequi," which is defined as follows:

Based on Plaintiffs' amendments to their Complaint, on March 26, 2018, the Court denied the BSO Defendants' Motion to Dismiss as moot.  [Doc. No. 38].

On March 29, 2018, the DA Defendants filed a Second Motion to Dismiss [Doc. No. 39]. After conferring with counsel, Magistrate Judge Hornsby denied the DA Defendants' first Motion to Dismiss as moot.  [Doc. No. 41].

On May 16, 2018, Magistrate Judge Hornsby issued a Report and Recommendation [Doc. No. 47] recommending that the Court grant in part and deny in part the DA Defendants' Second Motion to Dismiss.  After the objection period passed, on May 31, 2018, the Court adopted the Report and Recommendation of  Magistrate Judge Hornsby and granted the motion to dismiss the claims against ADA Holland under Claim II (Failure to Intervene), Claim III (Due Process and Excessive Pre-Accusation Delay), and Claims V and VI (Policy and Custom). Those claims were dismissed with prejudice.  The motion was otherwise denied.

On March 11, 2019, Magistrate Judge Hornsby held a status conference [Doc. No. 80] in which he granted Plaintiffs leave of Court to file a Fourth Amended Complaint.  He cautioned, however, that no further amendments would be permitted.  *Id.*  The Fourth Amended Complaint [Doc. No. 81] was filed, and it amended and supplanted any previous filings.

After discovery and motion practice, on April 8, 2020, the DA Defendants filed the instant Motion to Dismiss.  [Doc. No. 139].  On May 6, 2020, Plaintiffs filed a Memorandum in

---

an entry on the record of a legal action denoting that the prosecutor or plaintiff will proceed no further in an action or suit either as a whole or as to some count or as to one or more of several defendants.

https://www.merriam-webster.com/dictionary/nolle%20prosequi (last visited 08/19/2020).   In essence, the prosecutor drops the charges.  *See id.*

Opposition to the Motion to Dismiss [Doc. No. 154].  On May 20, 2020, the DA Defendants filed a Reply Memorandum [Doc. No. 165].

On April  9, 2020, the DA Defendants also filed the instant Motion for Partial Summary Judgment.  [Doc. No. 141].  On May 6, 2020, Plaintiffs filed a Memorandum in Opposition, opposing both the DA Defendants' Motion for Partial Summary Judgment and the BSO Defendants' separately filed Motion for Summary Judgment.  [Doc. No. 155].  On May 20, 2020, the DA Defendants filed a Reply in Support of their Motion for Partial Summary Judgment. [Doc. No. 164].

The motions are fully briefed, and the Court is prepared to rule.

## II.    LAW AND ANALYSIS

### A.  Standards of Review

#### 1.  Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's claims are subject to dismissal if they fail "to state a claim upon which relief can be granted."   A pleading states a claim for relief when it contains a "short and plain statement . . . showing that the pleader is entitled to relief . . ." FED. R. CIV .P. 8(a)(2).

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when it contains sufficient factual content for the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.(citing *Twombly*, 550 U.S. at 556).  Plausibility does not require probability, but "asks for more than a sheer possibility"; in other words, it lies somewhere in between. *See Id.*  Plausibility simply calls for enough factual

allegations to raise a reasonable expectation that discovery will reveal evidence to support the elements of the claim.  *See Twombly*, 550 U.S. at 556.

Assessing whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679 (citation omitted).  A well-pleaded complaint may proceed even if it strikes the court that actual proof of the asserted facts is improbable, and that recovery is unlikely.  *Twombly, supra*.  Furthermore, "[t]he notice pleading requirements of Federal Rule of Civil Procedure 8 and case law do not require an inordinate amount of detail or precision." *Gilbert v. Outback Steakhouse of Florida Inc.*, No. 07-40982, 295 Fed. App'x. 710, 713 (5th Cir. Oct. 10, 2008) (citations and internal quotation marks omitted).  "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (quoting *Bell Atl.*, 127 S. Ct. at 1958).  The complaint need not even "correctly specify the legal theory" giving rise to the claim for relief.  *Gilbert, supra*.[12]

Although the court must accept as true all factual allegations set forth in the complaint, the same presumption does not extend to legal conclusions.  *See Iqbal,* 550 U.S. at 554, 564-65. A pleading comprised of  "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" does not satisfy Rule 8.  *Id*. at 554 (citation and internal quotation marks omitted).  In addition, a court is compelled to dismiss an otherwise well-pleaded claim if it is premised upon an invalid legal theory.  *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (". . . if as a matter of law it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations, . . . a claim must be dismissed, without regard to whether

---

[12] "Courts must focus on the substance of the relief sought and the allegations pleaded, not on the label used." *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013) (citations omitted).

it is based on an outlandish legal theory or on a close but ultimately unavailing one.") (citation and internal quotation marks omitted).

When considering a motion to dismiss, courts generally are limited to the complaint and its proper attachments. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (citation omitted).  However, courts may "rely on 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice'"– including public records. *Id.*(quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007)); *see also Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) (citation omitted) (proper to take judicial notice of matters of public record).  Furthermore, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-499 (5th Cir. 2000) (citations and internal quotation marks omitted).

## 2.  Motion for Reconsideration

The Federal Rules of Civil Procedure do not recognize a motion for reconsideration *per se*.  Instead, a motion challenging a judgment or order may be filed under Rules 54, 59, or 60. Rules 59 and 60 apply only to final judgments.  Rule 54(b) provides that any order "that adjudicates fewer than all the claims... [among] all the parties... may be revised at any time before the entry of a [final] judgment." FED. R. CIV. P. 54(b).  "Under Rule 54[(b)], a district court has the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *Iturralde v. Shaw Grp., Inc.*, 512 F. App'x 430, 432 (5th Cir. 2013) (quoting *Melancon v. Texaco, Inc.*, 659 F2.d 551, 553 (5th Cir. 1981)) (citations omitted); *see generally Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 12 n. 14 (1983) (holding that "virtually all interlocutory orders may be altered or amended before final judgment if sufficient cause is shown").  An "order granting partial summary judgment [is]

interlocutory," and, therefore, the Court must "analyze[] the motion for reconsideration under Rule 54(b) . . . instead of Rule 59(e), which applies to final judgments." *Cabral v. Brennan*, 853 F.3d 763, 766 (5th Cir. 2017).  Courts evaluate motions to reconsider interlocutory orders under a "less exacting" standard than Rule 59(e), but, nevertheless, look to similar considerations for guidance.  *See HBM Interests, LLC v. Chesapeake Louisiana, LP*, No. 12-1048, 2013 WL 3893989 (W.D. La. July 26, 2013) (quoting *Livingston Downs Racing Ass'n, Inc. v. Jefferson Downs Corp.*, 259 F. Supp. 2d 471, 475 (M.D. La. 2002)); *Sw. Louisiana Hosp. Ass'n v. BASF Const. Chemicals*, LLC, No. 2:10-CV-902, 2013 WL 1858610 (W.D. La. Apr. 29, 2013) (quoting *Livingston Downs*, 259 F. Supp. 2d at 475).  Therefore, in determining whether to grant the motion, the Court evaluates whether there are "manifest errors of law or fact upon which judgment is based[,]" whether "new evidence" is available, whether there is a need "to prevent manifest injustice," or whether there has been "an intervening change in controlling law."  *HBM Interests,* 2013 WL 3893989, at *1 (internal quotation marks and citations omitted).

### 3.  Motion for Summary Judgment

Summary judgment is appropriate when the evidence before a court shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party.  *Id.*

 "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247).  "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim."  *Stahl v. Novartis Pharm. Corp.,* 283 F.3d 254, 263 (5th Cir. 2002).  Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate.  *Id.*  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).1

 In evaluating a motion for summary judgment, courts "may not make credibility determinations or weigh the evidence" and "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party."  *Total E & P USA Inc. v. Kerr–McGee Oil and Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013) (citations omitted).  While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts."  *Little v. Liquid Air. Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).  To rebut a properly supported motion for summary judgment, the opposing party must show, with "significant probative evidence," that a genuine issue of material fact exists.  *Hamilton v. Segue Software, Inc*., 232 F.3d 473, 477 (5th Cir. 2000) (emphasis added).  "'If the evidence is merely colorable, or is not significantly probative,' summary judgment is appropriate."  *Cutting Underwater Tech. USA, Inc. v. Eni U.S. Operating Co*., 671 F.3d 512, 517 (5th Cir. 2012) (quoting *Anderson,* 477 U.S. at 248).

Relatedly, there can be no genuine dispute as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.,* 477 U.S. at 322-

23.  This is true "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id*. at 323.

### B.  Analysis of Motion to Dismiss

The DA Defendants, individually and in their official capacity, move the Court for dismissal of Plaintiffs' Fourth Amended Complaint for failure to state a claim upon which relief can be granted.  They move for dismissal on four grounds:  (1) immunity from suit in their individual capacities on the basis of absolute and qualified immunity, (2) immunity from suit in their official capacities on the basis of Eleventh Amendment sovereign immunity, (3) Plaintiffs' inability to recover damages for the alleged placement of signs and for statements allegedly made by ADA Holland, and (4) insufficiency of the factual allegations to support Claims I, II, III, V, VI, VII, XIII, and XIV as a matter of law.

### 1.  Absolute and Qualified Immunity

First, the DA Defendants move for dismissal on the basis that they cannot be sued in their individual capacities "for any acts they performed in initiating prosecution, presenting a case, or preparing for either of these."  [Doc. No. 139-1, p.1].[13]   "[E]ven for other acts," the DA Defendants argue that they cannot be sued in their individual capacities unless those acts were "objectively unreasonable, given clearly established law and the information they possessed, to believe that their acts were lawful."  *Id.* For these alleged acts, they contend that they are entitled to qualified immunity.

Plaintiffs respond that the DA Defendants previously filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on immunity grounds, and that motion was denied. They assert, therefore, that the DA Defendants move the Court for reconsideration, citing to

---

[13]The Court refers to the page numbers used by the parties on their documents, not the CM/ECF page numbers.

Federal Rule of Civil Procedure 59(e).  As to the DA Defendants' qualified immunity argument, Plaintiffs respond that dismissal is inappropriate because there are issues of fact.

### a.  Absolute Immunity

A prosecutor sued in his individual capacity is immune from civil suit for damages under Section 1983 for his actions in initiating and pursuing a criminal prosecution through the judicial process.  *See Imbler v. Pachtman*, 424 U.S. 409, 431 (1976) ("[A] state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution" was not subject to suit under Section 1983"); *see also Brooks v. George Cty.*, 84 F.3d 157, 168 (5th Cir.), *cert. denied*, 519 U.S. 948 (1996) ("Actions which are related to the judicial process fulfill the prosecutor's advocatory function and are considered absolutely immune from suit"). The immunity afforded prosecutors is absolute, not qualified, and protects a prosecutor from being sued in connection with his duties altogether, regardless of the merits of the claim. *See Lucas v. Parish of Jefferson*, 999 F. Supp. 839, 942 (E.D. La. 1998). Absolute immunity protects prosecutors from all liability even when they act "maliciously, wantonly, or negligently." *Morrison v. City of Baton Rouge,* 761 F.2d 242, 248 (5th Cir. 1985). "[A]cts which are investigative or administrative do not carry absolute immunity," but are subject only to qualified immunity.  *Brooks*, 84 F.3d at 168.

ADA Holland raised these same arguments in a Motion to Dismiss Plaintiffs' Third Amended Complaint, seeking dismissal of the federal claims against him.  [Doc. No. 39]. With respect to the state-law claims, the DA Defendants moved the Court to decline to exercise supplemental jurisdiction if the federal claims were dismissed.

After briefing was complete, as required by precedent, Magistrate Judge Hornsby issued a Report and Recommendation in which he reviewed the nature of the claims asserted and

assessed "'the nature of the conduct on which the claim is based.'"  [Doc. No. 47-1, p. 15 (quoting *Cousin v. Small*, 325 F.3d 627, 632 (5thCir. 2003)).  Magistrate Judge Hornsby recommended, based on that assessment, that the Court dismiss Plaintiffs' Section 1983 claims against ADA Holland for Failure to Intervene (Claim II), Due Process and Excessive Pre-Accusation Delay (Claim III), and Policy and Custom (Claims V and VI).  Magistrate Judge Hornsby further recommended that the Motion to Dismiss otherwise be denied.  The Court adopted the Report and Recommendation and dismissed the recommended claims.  [Doc. No. 49].

Since that time, however, Plaintiffs, with leave of Court, have filed a Fourth Amended Complaint.  In that amended and final version, Plaintiffs assert the following claims against one or both DA Defendants:

- Claim I against DA Defendants for false arrest under § 1983;

- Claim II against DA Defendants for failure to intervene under § 1983;

- Claim III against DA Defendants for due process and excessive pre-accusation delay under § 1983;

- Claim IV against DA Defendants for due process and equal protection violations under § 1983;

- Claim VI against DA Defendants for policy and custom violations under § 1983;

- Claim VII against DA Defendants for false arrest under state law;

- Claim VIII against DA  Defendants for failure to intervene under state law;

- Claim IX against DA Defendants for malicious prosecution under state law;

- Claim X against DA Defendants for abuse of process under state law;

- Claim XI against DA Defendants for intentional infliction of emotional distress under state law;

- Claim XII against DA Defendants for civil conspiracy under state law;

- Claim XIV against DA Marvin only for negligent hiring, training and/or supervision under state law; and

- Claim XV against DA Defendants for failure to disclose exculpatory evidence and/or a *Brady* violation.

[Doc. No. 81].   The DA Defendants acknowledge that Plaintiffs' claims I-VI and XV are federal claims and argue that they are entitled to "dismissal of Claim I insofar as it is supported by the misdemeanor citation, and they are entitled to the dismissal of Claims II,  III, and V."  [Doc. No. 139, p. 9].  They argue further that they "re entitled to the dismissal of Claim VI insofar as it is supported by the previous claims on which they are entitled to dismissal."  *Id.*  They do not move for dismissal of Claim XV.

### (1) Previously Dismissed Section 1983 Claims Against ADA Holland

First, to the extent that Plaintiffs have re-asserted claims against ADA Holland which were previously dismissed and to the further extent that they concede that these claims have been dismissed, the DA Defendants' Motion to Dismiss is GRANTED, and Plaintiffs' Section 1983 claims against ADA Holland for Failure to Intervene (Claim II) and  Due Process and Excessive Pre-Accusation Delay (Claim III) are DISMISSED WITH PREJUDICE.  Plaintiffs do not specifically concede that their Policy and Custom (Claim VI) against ADA Holland should be dismissed, but it, too, was addressed by Magistrate Judge Hornsby's Report and Recommendation which was adopted by the Court, and it, too, should be dismissed. Accordingly, the DA Defendants' Motion to Dismiss Plaintiffs' Claim VI against ADA Holland is also GRANTED, and this claim is DISMISSED WITH PREJUDICE.

**(2) Previously Considered Section 1983 Claims Against ADA Holland**

Second, it appears that the DA Defendants move for dismissal of the false arrest claim only to the extent that Plaintiffs assert the claim based on the misdemeanor citation.  However, that argument is not one based on immunity, but timeliness, so the Court will address it elsewhere.  To the extent that the DA Defendants move for dismissal of the claim for false arrest on the basis of the felony arrest of Mr. Phillips and for dismissal of the due process and equal protection claim (Claims I and IV) against ADA Holland, they are, in essence, asking the Court to reconsider its previous judgment.  As set forth above, a motion to reconsider prior to entry of final judgment is considered under Federal Rule of Civil Procedure 54, not Rule 59(e).  While the Rule 54 standard is less exacting, the Court finds no basis to set aside its previous judgment or to decline to adopt Magistrate Judge Hornsby's original analysis.  Thus, the DA Defendants' Motion to Dismiss the claims for false arrest and due process and equal protection (Claims I and IV) against ADA Holland is DENIED.  The Court will consider these claims further on review of the DA Defendants' Motion for Partial Summary Judgment.

**(3) Section 1983 Claims Against DA Marvin**

Third, unlike ADA Holland, DA Marvin did not previously move for dismissal of the claims against him on the basis of absolute immunity.  At the time, Plaintiffs had not asserted any claims against DA Marvin in his individual capacity, so there was no basis to raise the absolute immunity defense (which does not apply to official capacity claims).  In the Fourth Amended Complaint, however, Plaintiffs assert claims against DA Marvin, individually and in his official capacity.  [Doc. No. 81, ¶ 5].  Therefore, the Court must consider these newly raised arguments.

The Court previously adopted the Report and Recommendation of Magistrate Judge Hornsby, including his analysis of the Section 1983 claims against ADA Holland in his individual capacity.  Magistrate Judge Hornsby properly stated the law and the Court's duty thereunder as follows:

> The absolute immunity of prosecutors was addressed in *Imbler v. Pachtman*, 96 S.Ct.984 (1976), which held that a former prisoner whose conviction had been set aside could not maintain a Section 1983 action against the prosecutor who had litigated the charges against him.  The Court stated that "a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution" was not subject to suit under Section 1983.  *Id.* . . . The holding in *Imbler* has been applied in a number of settings to determine whether absolute immunity was or was not available to a prosecutor.  The determination relies on a "functional approach" and is not grounded in any special esteem for those who perform the functions.  In determining immunity, the court examines "the nature of the function performed, not the identity of the actor who performed it."  *Forrester v. White*, 108 S. Ct. 538, 545 (1988).  As an example, *Forrester* held that a judge did not have judicial immunity for actions taken in an administrative capacity when he demoted and fired a probation officer.  The mere fact that a person holds the title judge or prosecutor does not afford him immunity for all actions taken in connection with his job.
>
> It has developed that a prosecutor is absolutely immune for initiating and pursuing a criminal prosecution, for actions taken in his role as "advocate for the state" in the courts, or when his conduct is intimately associated with the judicial phase of the criminal process.  *Loupe,* 824 F.3d at 539.  On the other hand, a  prosecutor is afforded only qualified immunity for acts performed in the course of administrative duties and investigatory functions that do not relate to his preparation for the initiation of a prosecution or for judicial proceedings.  *Id.*

[Doc. No. 47-1, pp. 14-15].

Plaintiffs assert five Section 1983 claims against DA Marvin:  false arrest (Claim I), failure to intervene (Claim II), due process and excessive pre- accusation delay (Claim III), due process and equal protection violations (Claim IV), and policy and customs violations (Claim VI).

As to Claim I, Plaintiffs allege that Mr. Phillips was subjected to false arrest for the

felony charge against him.  Plaintiffs allege that in January 2017, a letter was mailed to Lt. Bletz

containing GPS coordinates.  [Doc. No. 81, ¶ 129-A].   "Deputies reported that 'it was assumed

the letter was related to the cases involving spikings and arsons in the Hwy. 60 and Cottage

Grove Road area due to writing and markings on the front of the envelope.  *Id.*     Plaintiffs

further allege as follows:

> ADA  Holland and DA Marvin learned of the  new investigation and became
> concerned that the new investigation could create reasonable doubt as to the
> pending charges against Mr. Phillips.  ADA Holland or DA Marvin or their
> designee called Sheriff Whittington and requested that the investigation be shut
> down, and Sheriff  Whittington agreed.  The task force members were instructed
> to return to their regular duties, and no other investigation was done.

[Doc. No. 81, ¶ 129-E].  At least to this extent, Plaintiffs alleged actions by DA Marvin that were

investigatory, or, in this case, interfered with the investigation.  Such actions, if proven, would

not be entitled to prosecutorial immunity.  As previously stated, to the extent that the DA

Defendants move for dismissal of this claim on the basis of the misdemeanor citation, that

argument is based on the timeliness of the claim, not prosecutorial immunity, and will be

considered elsewhere in this Ruling.  Accordingly, the Motion to Dismiss Claim I is DENIED.

As to Claims II and III, failure to intervene and due process and excessive pre-

accusation delay, Plaintiffs concede their dismissal.  Therefore, the Motion to Dismiss Claims II

and III against DA Marvin is GRANTED, and these claims are DISMISSED WITH

PREJUDICE.

As to Claim IV, the due process and equal protection violations, Plaintiffs assert that DA

Marvin and the other Defendants failed "to treat Mr. Phillips equally as to all other citizens

and/or 'suspects' identified throughout the course of their investigation."  [Doc. No. 81, ¶ 164].

This claim, thus, is based on investigatory practices and actions, not prosecutorial functions.  The

Motion to Dismiss is DENIED to the extent that DA Marvin asserts absolute immunity to this claim.

As to Claim VI, the policy and customs violations,  the allegations appear to be directed towards DA Marvin in his official capacity, not his individual capacity.  The Supreme Court has explained the difference between the two types of claims:

> In *Kentucky v. Graham*, 473 U.S. 159, 105 S. Ct. 3099, 87 L.Ed.2d 114 (1985), the Court sought to eliminate lingering confusion about the distinction between personal- and official-capacity suits. We emphasized that official-capacity suits "'generally represent only another way of pleading an action against an entity of which an officer is an agent.' " *Id.*, at 165, 105 S. Ct., at 3104 (quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55, 98 S. Ct. 2018, 2035, n. 55, 56 L.Ed.2d 611 (1978)). Suits against state officials in their official capacity therefore should be treated as suits against the State. 473 U.S., at 166, 105 S. Ct., at 3105. Indeed, when officials sued in this capacity in federal court die or leave office, their successors automatically assume their roles in the litigation. *See* FED. RULE CIV. PROC. 25(d)(1); FED. RULE APP. PROC. 43(c)(1); this Court's Rule 35.3. Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, "the entity's 'policy or custom' must have played a part in the violation of federal law." *Graham, supra,* at 166, 105 S.Ct., at 3105 (quoting *Monell, supra*, 436 U.S., at 694, 98 S.Ct., at 2037). For the same reason, the only immunities available to the defendant in an official-capacity action are those that the governmental entity possesses. 473 U.S., at 167, 105 S. Ct., at 3105.
>
>  Personal-capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law. Thus, "[o]n the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Id.,* at 166, 105 S. Ct., at 3105. While the plaintiff in a personal-capacity suit need not establish a connection to governmental "policy or custom," officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law. *Id.,* at 166–167, 105 S. Ct., at 3105–3106.

*Hafer v. Melo*, 502 U.S. 21, 25 (1991).

In this case, Plaintiffs' allegations on Claim VI are that the Bossier Parish District Attorney's Office, through its agents and employees, and through . . . DA Marvin  . . .

30

maintained . . . [certain identified] unconstitutional customs, practices, and/or policies." [Doc. No. 81, ¶ 177]. Such allegations do not support an individual capacity claim, and it is for this reason alone that the DA Defendants' Motion to Dismiss Claim VI against DA Marvin in his individual capacity is GRANTED, and the claim, if any, is DISMISSED WITH PREJUDICE.[14]

### (4) State Law Claims against DA Marvin and ADA Holland

Finally, the DA Defendants have not previously moved for dismissal of the state law claims against them on the basis of absolute prosecutorial immunity. They do so in the pending motion. The DA Defendants note that Plaintiffs' Claims VII-XIV and XVI are state claims. They move for dismissal of the state law claim of false arrest (Claim VII), "insofar as it is supported by the misdemeanor citation," and argue that "they are entitled to the dismissal of Claims VIII and XIII." [Doc. No. 139, p. 14]. They further argue that they "are entitled to the dismissal of Claim XIV "insofar as it is supported by the previous claims on which they are entitled to dismissal." *Id.* at pp. 14-15.

Plaintiffs do not specifically respond to these arguments, but, given the extensive briefing in this case, the Court can address the Motion to Dismiss without further briefing.

As to Claim VII against DA Defendants for false arrest under state law, the Motion to Dismiss is DENIED for the reasons previously stated. *See Knapper v.* Connick, 96-0434 (La. 10/15/96); 681 So.2d 944 (applying the functional analysis to state law claims). The Court will address the argument with regard to the misdemeanor citation elsewhere.

As to Claim VIII against DA  Defendants for failure to intervene under state law, that claim is analyzed the same as the federal claim. Therefore, the Motion to Dismiss is GRANTED for the reasons previously stated, and this claim is DISMISSED WITH PREJUDICE.

---

[14]To be clear, the Court does not address absolute immunity to this claim, but finds there is no individual capacity claim asserted under the factual allegations.

The DA Defendants next move for dismissal of Claim XIII against the DA Defendants, but that claim is asserted against the BSO Defendants only, which the DA Defendants acknowledge in their motion.  Therefore, the Motion to Dismiss is DENIED AS MOOT as to this non-existent claim against the DA Defendants.

As to Claim XIV against DA Marvin only for negligent hiring, training and/or supervision under state law, the DA Defendants argue that ADA Holland is the only employee or agent of the DA's Office against whom claims are asserted.  They argue, therefore, that, for any claims for which ADA Holland has been entitled to immunity, DA Marvin is also entitled to dismissal of the claims against him.

However, the Court is required to analyze this portion of the Motion to Dismiss with regard to the "function" of the claims against DA Marvin.  The DA Defendants offer no argument on that analysis.  Further, it appears that the allegations against DA Marvin, found in paragraphs 213-216, are related to his administrative duties and his involvement in the investigatory phase of this case.  Accordingly, he is not entitled to absolute immunity, and the Motion to Dismiss Claim XIV on this basis is DENIED.

Finally, the DA Defendants provide no argument that the state law claims against the DA Defendants for malicious prosecution (Claim IX), abuse of process (Claim X), intentional infliction of emotional distress (Claim XI), civil conspiracy (Claim XII), and negligence and negligent infliction of emotional distress (Claim XVI) should be dismissed on the basis of absolute immunity.  To the extent that they believe they have moved for dismissal of these claims, the Motion to Dismiss is DENIED.

### b.  Qualified Immunity

To the extent that the DA Defendants argue that they are entitled to qualified immunity,

the Court agrees with Plaintiffs that such arguments raise factual issues that are more appropriately considered in ruling on the DA Defendants' Motion for Partial Summary Judgment.  Thus, the Court will deny the DA Defendants' Motion to Dismiss on the basis of qualified immunity, but will consider these arguments in ruling on the pending Motion for Partial Summary Judgment (along with the arguments and evidence in support of that motion).  Thus, to this extent, the Motion to Dismiss is also DENIED.

## 2.  Sovereign Immunity

The DA Defendants also move for dismissal of the claims against them in their official capacities, contending that they are entitled to sovereign immunity under the Eleventh Amendment.[15]  Plaintiffs oppose the motion.

"Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'"  *Kentucky v. Graham,* 473 U.S. 159, 165 (1985) (quoting *Monell v. New York City Dep't. of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). "As long as the government entity receives notice and an opportunity to respond, an official capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *Id.* at 166.

In this case, DA Marvin and ADA Holland acted as agents of the District Attorney's Office for the 26th Judicial District of the State of Louisiana.  They contend that the DA's Office for the 26th Judicial District is an arm of the State and thus immune from suit under the Eleventh Amendment.  Although federal law "controls the scope" of the Eleventh Amendment analysis, the DA Defendants argue that there is no general rule applicable to district attorneys in

---

[15]The Eleventh Amendment does apply to personal or individual capacity lawsuits.  *See Flowers v. Phelps*, 964 F.2d 400, 401 n.2 (5th Cir. 1992) (per curiam).

Louisiana; rather, federal courts "look to the state's view of the entity in question" and apply a six-factor test.  *See Hudson v. City of New Orleans*, 174 F.3d 677, 685 (5th Cir. 1999).

Plaintiffs oppose the motion and respond, first, that any consideration of DA Marvin's affidavit in support of their arguments converts this Motion to Dismiss to one for summary judgment.  Second, they disagree with the DA Defendants, and contend that there *is* a "general rule" in the Fifth Circuit that district attorney offices are local.  Regardless, Plaintiffs argue that Eleventh Amendment immunity will not apply here under the six-factor *Hudson* test.

First, the Court notes that DA Marvin previously raised this argument to Magistrate Judge Hornsby in the previously filed Motion to Dismiss.  [Doc. No. 47, p. 23].  Relying on a previous Fifth Circuit decision, *Spikes v. Phelps*, 2005 WL 984224, 131 Fed. App'x 47, 49 (5th Cir. 2005),  Magistrate Judge Hornsby found that DA Marvin was not protected by sovereign immunity.  *Id.*  He explained that "[a] Louisiana district attorney is akin to a municipality, which is not considered an arm of the state and not entitled to assert Eleventh Amendment immunity." *Id.*   Thus, to the extent that the DA Defendants again raise this argument on behalf of DA Marvin, their motion is properly construed as a motion for reconsideration.

However, as this Court has explained, there is no final judgment in this matter, and, at any rate, ADA Holland has not previously raised this defense.  Therefore, the Court will consider the substantive arguments as to whether the DA Defendants are protected by sovereign immunity.

In *Mairena v. Foti,* 816 F.2d 1061 (5th Cir. 1987), *cert. denied*, 484 U.S. 1005 (1988)), Harry Connick, then District Attorney for Orleans Parish, argued that he was entitled to sovereign immunity from a civil rights lawsuit based on the Eleventh Amendment because he

acted as an arm of the State.  The Fifth Circuit, sitting *en banc*, held that this argument lacked

"merit."  *Id.* at 1064 n. 1.  The *Mairena* Court explained:

> This court addressed that contention in *Crane v. State of Texas,* 766 F.2d 193 (5th Cir.1985), and held that for purposes of section 1983 liability, a Texas district attorney was a local government official. We can see no basis to distinguish this Louisiana case from Crane.

*Id.*  The Court then went on to analyze the claims against Mr. Connick.

In *Hudson v. City of New Orleans*, 174 F.3d 677 (5th Cir. 1999), a Fifth Circuit panel

returned to the issue of whether the Orleans Parish District Attorney's Office is an arm of the

state of Louisiana and therefore immune from suit in federal court under the Eleventh

Amendment.  The plaintiff, Hudson, argued that the Fifth Circuit panel was bound by the

precedent of *Mairena*, which could only be overruled by an en banc court.  The Fifth Circuit

panel noted:

> Several district courts, including the one below, have argued that Mairena's precedential value is questionable, however, because there we had not applied the six-factor *Clark* test. Additionally, we have held that "analogies between like entities cannot replace consideration of the six relevant factors." *Flores v. Cameron County, Texas*, 92 F.3d 258, 268 (5th Cir.1996); *see also McDonald v. Board of Mississippi Levee Commissione*rs, 832 F.2d 901, 908 (5th Cir. 1987).

174 F.3d at 680-81.  Because the panel found "the *Mairena* decision was correct, [the Court did]

not address Hudson's contention."  *Id.* at 680.   Nevertheless, the *Hudson* Court took the

opportunity to "clarify why the Eleventh Amendment does not immunize the Orleans Parish

District Attorney's Office."  *Id.* at 681.  The *Hudson* then enunciated and applied the six factors

that are to be considered when determining whether an entity is an arm of the state, so that

Eleventh Amendment immunity will attach:  (1) whether the state statutes and case law view the

agency as an arm of the state; (2) the source of the entity's funding; (3) the entity's degree of

local autonomy; (4) whether the entity is concerned primarily with local as opposed to statewide

problems;  (5)  whether the entity has the authority to sue and be sued in its own name; and (6)

whether the entity has the right to hold and use property.  *Id.* at 681.

In a decision following *Hudson*, another panel of the Fifth Circuit held in a published

opinion:  "[t]he rule in this circuit is that a Louisiana District Attorney, sued in his or her official

capacity, is a local government official who is not entitled to 11th Amendment immunity. . . It is

a firm rule of this circuit that in the absence of an intervening contrary or superseding decision

by this court sitting en banc or by the United States Supreme Court, a panel cannot overrule a

prior panel's decision."  *Burge v. Par. of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999) (citing

*Mairena,* 816 F.2d at 1064 n. 1).  That lawsuit was against the District Attorney of St. Tammany

Parish, not Orleans Parish, and the panel found no need to engage in an analysis of the six

factors.  The *Burge* panel was unequivocal that it was bound by the Fifth Circuit's  previous en

banc decision in *Mairena.  See also DeCorte v. Jordan*, No. CV 03-1239, 2005 WL 8173799, at

*6 (E.D. La. Feb. 22, 2005) ("The United States Court of Appeals for the Fifth Circuit found

unambiguously examining Louisiana state law that a Louisiana district attorney is a local

government official not entitled to Eleventh Amendment immunity."); *O'Reilly v. Louisiana

Dep't of Educ.*, No. CIV.A. 11-1454, 2013 WL 3270443, at *5 (E.D. La. June 26, 2013)

("*Hudson* does not  . . . suggest that the Orleans Parish District Attorney's Office can be an arm

of the state for some purposes but not for others."); *see generally Crane v. Tex.*, 766 F.2d 193

(5th Cir. 1985) (Texas district attorneys were not afforded Eleventh Amendment immunity

because the office was funded by county, the powers of the district attorney were limited to the

county, and the district attorneys are elected by voters of the county).

While not a published decision, another panel of the Fifth Circuit ruled consistently with

*Burge* that a Louisiana district attorney is not protected by sovereign immunity.  *See Spikes*, 31

F. App'x at 48-49.  In *Spikes*, the case relied upon by Magistrate Judge Hornsby, Terry Reeves was then the District Attorney for Winn Parish and asserted that he "acted on behalf of the state, rather than the parish[.]"  *Id.*  He raised an Eleventh Amendment state sovereign immunity defense in reliance on footnote 8 in *Esteves v. Brock,* 106 F.3d 674 (5th Cir.1997).  *Id.*  In *Esteves*, the Fifth Circuit "noted that a Texas prosecutor acting in her official capacity to prosecute crime is a state actor protected by the Eleventh Amendment from § 1983 damages." *Id.* at 49.  Judge Edith Jones, writing for the panel, explained that "*Esteves* should be viewed as an interpretation of Texas law concerning the role of a district attorney within the framework of state government. . . But this court has held, contrary to *Esteves*, and based on Louisiana law, that a parish district attorney is not entitled to Eleventh Amendment immunity." *Id.* (citing *Hudson*, 174 F.3d at 677 n. 1; *Burge*, 187 F.3d at 466–67).  Therefore, the *Spikes* panel ruled that "Reeves's Eleventh Amendment immunity claim . . . fails."  *Id.*

The DA Defendants have made sound arguments that application of the six factors would support their contention that they are entitled to sovereign immunity as state actors.  However, this Court is bound to apply precedent, and, in this case, both the precedential and persuasive authority compel the result that the DA Defendants are not entitled to the protection of sovereign immunity under the Eleventh Amendment.   That precedential and persuasive authority is not limited to the Orleans Parish District Attorney's Office, but has been applied to other parish offices which would, presumably, be  more akin to DA in this matter.  Although the DA Defendants argue that later panels "misapprehended *Hudson*," *Hudson*, too, was a panel decision.  The Court finds, as it must, that a parish district attorney is not a state actor, and the DA Defendants' Motion to Dismiss the official capacity claims against them is DENIED on this basis.

### 3.   Damages

The DA Defendants next raise arguments related to damages sought by Plaintiffs for the placement of the signs near their residence and for statements made by ADA Holland during a 404(b) hearing.  With regard to both of these arguments, the Court is required to look beyond the face of the Fourth Amended Complaint, attachments thereto, and any documents which might properly be incorporated.  Accordingly, the Motion to  Dismiss is DENIED on damages, but the Court will consider these arguments in its ruling on the Motion for Partial Summary Judgment, *infra*.

### 4.   Sufficiency of Claims

Finally, the DA Defendants argue that Plaintiffs' allegations in support of their claims are insufficient on the fact of the Fourth Amended Complaint to state a claim as a matter of law, but they merely re-hash earlier arguments.  Moreover, given the stage of litigation in this case and the plethora of discovery that has taken place, the Court has considered matters outside the Fourth Amended Complaint.  Accordingly, as is appropriate under Federal Rule of Civil Procedure 12(c), these arguments are appropriately considered in support of the DA Defendants' separately filed Motion for Partial Summary Judgment.  The DA Defendants' Motion to Dismiss is DENIED on these grounds, but the Court will consider all arguments and evidence in ruling on the pending Motion for Partial Summary Judgment.

### C.   Analysis of Motion for Partial Summary Judgment

In addition to their assertions of absolute prosecutorial immunity, the DA Defendants also  move the Court for summary judgment on the claims against them.  They argue that Plaintiffs have failed to raise a genuine issue of material fact for trial on the claims against them, and, alternatively, that they are entitled to qualified immunity.

"Qualified immunity . . . 'is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Sorey v. Kellett*, 849 F.2d 960, 961 (5th Cir. 1988) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 105 S. Ct. 2806, 2816 (1985)).  When an officer argues that he is entitled to qualified immunity from suit, we first view the evidence "in the light most favorable to the party asserting the injury" and decide if "the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L.Ed.2d 272 (2001). If that view reveals no constitutional violation, there is no claim. "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* This second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* For immunity to apply, the "actions of the officer must be objectively reasonable under the circumstances, such that a reasonably competent officer would not have known his actions violated then-existing clearly established law." *Evett v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 330 F.3d 681, 688 (5th Cir. 2003).

"When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." *Atteberry v. Nocona General Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005) (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam).

The Court will consider each of Plaintiffs' claims against the DA Defendants and then, if applicable, will consider qualified immunity.

### 1.  Federal Claims

#### a.  False Arrest in Violation of the Fourth and Fourteenth Amendments (Claim I)

First, the DA Defendants move for summary judgment on Plaintiffs' claims that Mr. Phillips was subjected to false arrest in violation of the Fourth and Fourteenth Amendments.  The DA Defendants argue that Plaintiffs have made no allegations specifically against DA Marvin. With regard to the allegations against ADA Holland, they argue that the arrest warrant he obtained for Mr. Phillips was supported by probable cause and that, even if it were technically or legally deficient, he is insulated from liability because of Judge Thompson's action in issuing the warrant.

Plaintiffs have apparently abandoned any claims based on the 2015 citation, and, therefore, the DA Defendants' Motion for Summary Judgment as it relates to the 2015 citation is GRANTED.

However, the Court must still concern itself with Mr. Phillips' 2017 arrest on the felony charge.  It is further undisputed that Judge Thompson's issuance of a warrant for Mr. Phillips' arrest on that charge was based solely on the evidence presented prior to and at the 404(b) hearing while the misdemeanor charge against Mr. Phillips was pending.

"By virtue of its 'incorporation' into the Fourteenth Amendment, the Fourth Amendment requires the States to provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty. "  *Baker v. McCollan*, 443 U.S. 137, 142–43 (1979) (citing *Gerstein v. Pugh*, 420 U.S. 103 (1975)).  "The initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection—the Fourth Amendment if the accused is seized and arrested, for example, or other constitutionally secured rights if a case is further pursued. Such claims of lost constitutional

rights are for violation of rights locatable in constitutional text, and some such claims may be made under 42 U.S.C. § 1983." *Castellano v. Fragozo*, 352 F.3d 939, 953–54 (5th Cir. 2003); *see also Blackwell v. Barton*, 34 F.3d 298, 302 (5th Cir. 1994) ("We hold that Blackwell's section 1983 claim against Barton for illegal arrest and detention is properly considered under the Fourth Amendment, the more specific constitutional right implicated by her allegations."); *Estep v. Dallas County, Te*x. 310 F.3d 353, 358 (5th Cir. 2002) (Fourth Amendment guarantees citizens the right to be free from illegal searches and seizures).

To prevail on a Fourth Amendment claim of false arrest, a plaintiff must show that he was arrested without probable cause. U.S. CONST. AMEND. IV; *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir.), *cert. denied*, 122 S .Ct. 46 (2001).   The determination of probable cause is an objective inquiry and requires an examination of the facts honestly and reasonably believed by an officer at the time criminal proceedings were instituted.  *Gordy v. Burns*, 294 F.3d 722, 728 (5th Cir. 2002).  An officer must rely on the totality of facts available to him, but "'may not disregard facts tending to dissipate probable cause.'"  *Evett*, 330 F.3d at 688 (quoting *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988)).

> In general, "[i]t is well settled that if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party." [*McLin v. Ard*, 866 F.3d 682, 689 (5th Cir. 2017)]. There is a qualification: the initiating party may still be liable for false arrest "if the plaintiff shows that the 'deliberations of the intermediary were in some way tainted by the actions of the defendant.'" [*Id.* (quoting *Deville v. Marcantel*, 567 F.3d 156, 170 (5th Cir. 2009)].  Chiefly relevant here, thirty-five years before Gabbert obtained his warrant, *Franks v. Delaware* established that even if an independent magistrate approves a warrant application, "a defendant's Fourth Amendment rights are violated if (1) the affiant, in support of the warrant, includes 'a false statement knowingly and intentionally, or with reckless disregard for the truth,' and (2) the allegedly false statement is necessary to the finding of probable cause." *Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018), *on petition for rehearing* (quoting *Franks v. Delaware*, 438 U.S. 154, 155–56, 165, 98 S. Ct. 2674, 57 L.Ed.2d 667

(1978); *see Hale v. Fish,* 899 F.2d 390, 400–02 (5th Cir. 1990) (applying *Franks* to a § 1983 claim for arrest without probable cause)].

*Arizmendi v. Gabbert*, 919 F.3d 891, 897 (5th Cir.), *cert. denied*, 140 S. Ct. 220, 205 (2019); *see also Davis v. Strain*, 676 Fed. App'x 285, 287 (5th Cir. 2017) (A Fourth Amendment violation occurs, even if the arrest and prosecution were achieved through legal process, if "a false statement [is] made knowingly and intentionally, or with reckless disregard for the truth."). Likewise, an officer may not omit "exculpatory information from the warrant affidavit, thereby precluding review by a neutral magistrate of all the facts material to the existence of probable cause." *Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006); *see also Burrell v. Adkins*, Civil Action No. 01-2679-M, 2007 WL 4699166 at *10 (W.D. La. Oct. 22, 2007) (citing cases), adopted as modified by *Burrell v. Adkins*, Civil Action No. 01-2679-M, 2008 WL 130789 (W.D. La. Jan. 10, 2008).

First, Plaintiffs limit their arguments, assertions of wrongdoing, and recitation of the evidence against Defendants Lt. Bletz and ADA Holland. Further, DA Marvin has no vicarious liability under Section 1983. For these reasons and those argued by the DA Defendants, Plaintiffs have failed to raise a genuine issue of material fact for trial on the false arrest claim against DA Marvin, the DA Defendants' Motion for Partial Summary Judgment is GRANTED to this extent, and the claim against DA Marvin is DISMISED WITH PREJUDICE.

Plaintiffs do dispute, however, that ADA Holland is entitled to qualified immunity from the false arrest claim. Plaintiffs argue that "'[t]he evidence adduced at the previous 404(b) hearing' was insufficient to establish probable cause because much of the testimony by Lt. Bletz at the hearing was false or grossly misrepresented, and ADA Holland either knew such testimony was erroneous based on his own review of the evidence or he acted with reckless disregard for the truth. Additionally, both Lt. Bletz and ADA Holland withheld patently exculpatory evidence

42

from Mr. Phillips, his counsel, and Judge Thompson, [sic] thus neither Lt. Bletz nor ADA

Holland [is] entitled to qualified immunity."  [Doc. No. 155, pp. 21-22].

> They further assert as follows:

> Holland admitted that he learned of the January 2017 task force and there is sufficient testimony from which a reasonable jury could infer that ADA Holland personally advised BSO to shut down the investigation, despite knowing that such incident was likely committed by the same person responsible for the spikings  and  vandalisms. . . Such interference in an investigation is not an activity "intimately associated with the judicial phase of the criminal process,". . . thus ADA Holland is not entitled to absolute immunity for those actions. Additionally, Plaintiffs submit that ADA Holland acted beyond the scope of his role as  an  advocate  when  he  obtained  the  arrest  warrant  for  Mr. Phillips.

[Doc. No. 155, p. 51].  ADA Holland filed the Bill of Information and the Motion and Order for

Issuance of Warrant of Arrest pursuant to La. C. Cr. P. art. 496(B), but Plaintiffs contend that he

did not comply with the statute by attaching an affidavit and instead referring to the 404(b)

hearing transcript.  He further signed the motion, thus "verifying the statements contained

therein," according to Plaintiffs.  *Id.* at p. 52.

In their original motion and their reply, the DA Defendants argue that there is no

statutory requirement that an affidavit be attached to a bill of information and that Judge

Thompson was properly referred to the 404(b) hearing, which he had just conducted,  for the

probable cause to support the issuance of an  arrest warrant for Mr. Phillips.

The DA Defendants argue further that "evidence exculpatory of [Mr.] Phillips was fully

present at the hearing" and that Plaintiffs have failed to identify exculpatory information that was

withheld by ADA Holland (rather than Lt. Bletz).  [Doc. No. 164, p. 2; Doc. No. 141-2, ¶¶ 9-11].

Plaintiffs allege ADA Holland knew or recklessly disregarded the truth that Lt. Bletz with regard

to expert evidence at the 404(b) hearing.  Lt.  Bletz testified that the State's handwriting expert,

Robert Foley, noted a "very obvious anomaly in Mr. Phillips' handwriting exemplar which was

the fact that in his professional opinion there was a very obvious attempt to deceive throughout Mr. Phillips' handwriting exemplar meaning he intentionally attempted to deceive and change his ordinary handwriting." [Doc. No. 155-5, Exh. 2, 404(b) Hearing Transcript, Vol. I, p. 139]. Yet, Mr. Foley actually opined that it appeared as though Mr. Phillips had put forth his best effort in the exemplars and that the attempt to deceive was only noted in the writings found at the various crime scenes.  [Doc. No. 155-6, Exh. 3, 404(b) Hearing Transcript, Vol. II, p. 305; Doc. No. 155-75, Exh. 72, Foley Report].  However,  Lt. Bletz testified on November 28, 2016, one day prior to Mr. Foley.  [Docs. No. 166-4 & 166-6].  Even if it could be shown that Lt. Bletz intentionally testified falsely, the transcript shows that ADA Holland mistakenly interpreted the report because Mr. Foley referred to the writings in his analysis by number rather than name. *See* [Doc. No. 166-6, 404(b) Hearing Transcript, Vol. II, p. 305].  Prior to his ruling, Judge Thompson was aware of Mr. Foley's clarified opinion and testimony.

Lt. Bletz also stated in his narrative that cell phone records placed "Todd Phillips' cellular device at the Circle K gas station on the same date/time" the threatening phone calls were made in December 2012.  [Doc. No. 155-4, Exh. 1, p. 177].  At the 404(b) hearing, he testified that the cell phone records showed "Mr. Phillips leave his residence . . . , drive straight to the location of the Circle K, . . . and then turn around and drive straight home," claiming the records "placed him at that payphone."  [Doc. No. 155-7, Exh. 2, 404(b) Hearing Transcript, vol. I, pp. 144, 154; Doc. No. 155-6, Exh. 3, 404(b) Hearing Transcript, Vol. II, p. 259].  However, Plaintiffs point to no evidence that ADA Holland disbelieved Lt. Bletz or mislead the Court himself.  Rather, the State's expert, Lt. Shannon Mack, testified that the records only demonstrated Mrs. Phillips' cell phone was in the same "pie shape" area as the Circle K and that the exact location of the cell phone could not be determined.  [Doc. No. 155-8, Exh. 5, 404(b)

Hearing Transcript, Vol. IV, pp. 681, 687; Doc. No. 155-9, Exh. 6, 404(b) Hearing Transcript, Vol. V, pp. 1081, 1083].

Finally, the DA Defendants argue that Plaintiffs' latest arguments are an attempt to amend their Fourth Amended Complaint by virtue of pleading facts for the first time in an opposition memorandum and that such tactics should not be allowed.

First, to the extent that Plaintiffs contend that ADA Holland's alleged failure to comply with the state statute and his signature on the motion to obtain an arrest warrant are sufficient to raise a genuine issue of material fact for trial on the false arrest claim, the Court rejects those arguments.  The DA Defendants have not argued that ADA Holland is entitled to absolute immunity for this claim, and, thus, Plaintiffs contention that a prosecutor steps outside his role as advocate when he submits a motion for issuance of a warrant is irrelevant.

On the other hand, to the extent that the DA Defendants urge the Court to deny consideration of Plaintiffs' factual assertions as an attempt to amend their Complaint again, the Court also rejects that argument.  Plaintiffs are not required to place every single fact in their complaint that they may later rely upon in opposition to a motion for summary judgment. Extensive discovery has taken place in this case, and that discovery has expanded upon and illuminated earlier factual allegations, but the Court cannot say that these are entirely new facts, and certainly there was no undue surprise here.

However, after considering the facts alleged against ADA Holland, even viewed in the light most favorable to Defendants, the Court finds that there is not a genuine issue of material fact for trial on the false arrest claim against him.  In a separate ruling, the Court has denied summary judgment for Lt. Bletz.  The Court did so after consideration of the entire record against Lt. Bletz, not merely these three allegations against ADA Holland.  If it were merely the

handwriting and cell phone testimony offered against Lt. Bletz, the Court might well have reached another decision with regard to him as well.  On those two issues, the Court cannot say that Plaintiffs have raised a genuine issue of material fact for trial that ADA Holland knew or recklessly disregarded the truth of the evidence and that his actions brought about the harm suffered by Mr. Phillips, the issuance of a felony arrest warrant.

The Court is more troubled by the fact that it is undisputed that ADA Holland was aware of the January 2017 task force and that Sheriff Whittington testified that the task force was disbanded after reassurances from the DA's Office.  In this regard, the Court has carefully reviewed the relevant testimony.  It is clear that the task force was disbanded after the members identified John Greer as a suspect based on information from Gary Wilson, that Sheriff Whittington was the one with the authority to disband the task force, and that Sheriff Whittington cannot dispute testimony from BSO deputies that he ordered that the task force be disbanded. [Doc. No. 156, Sheriff Whittington Depo., pp. 87-89, 92; Doc. No. 155-12, Exh. 9, Owens Depo., pp. 40-43; Doc. No. 155-13, Exh. 11, Mack Depo., pp. 44-49].  DA Marvin also testified that ADA Holland was the only one involved in this case from the DA's Office, and he never advised Sheriff Whittington to discontinue the task force.  [Doc. No. 155-25, Exh. 23, Marvin Depo., pp. 57-58, 63-64].  ADA Holland did not specifically deny giving Sheriff Whittington this advice because he refused to answer questions on any advice he gave to Sheriff Whittington as privileged.  [Doc. No. 155-26, Exh. 24, pp. 28, 47-50].  Plaintiffs urge the Court to find that the jury can infer from the testimony that it was ADA Holland who told Sheriff Whittington that the DA's Office had an "ample, solid case" against Mr. Phillips and that they did not "need any more evidence" against Mr. Phillips, that they had a "good case." [Doc. No. 156, Sheriff Whittington Depo., p. 89].  Even if the jury were permitted to make this inference, there is no

evidence from which the jury can infer that ADA Holland knew the task force had identified a

suspect other than Mr. Phillips.  The evidence, at best shows, that Sheriff Whittington advised

someone from the DA's Office, presumably ADA Holland, that there was a task force looking

into the grave site incident and that someone, again presumably ADA Holland, said the DA's

Office had a good case, and no additional evidence was necessary.  There is no evidence that

Chief Deputy Owens spoke to ADA Holland or knew exactly what he said.  Even if the jury

might be permitted to make the first inference, it cannot speculate as to ADA Holland's

knowledge when he allegedly made that statement.  Such speculation goes far afield of the

admissible evidence.

While the Court has found a genuine issue of material fact for trial as to Lt. Bletz's

liability for false arrest based on all the evidence presented, the same is not true of ADA

Holland.  The Court finds that Plaintiffs have failed to raise a genuine issue of material fact for

trial whether he knowingly withheld or recklessly disregarded evidence that should have been

presented to Judge Thompson.  Accordingly, the DA Defendants' Motion for Partial Summary

Judgment is also GRANTED as to ADA Holland, and this claim is DISMISSED WITH

PREJUDICE.

### b. Due Process and Excessive Pre-Accusation Delay in Violation of the Fifth and Fourteenth Amendments (Claim III)

The DA Defendants next move for summary judgment on Plaintiffs' Claim III that Mr.

Phillips was subjected to due process and excessive pre-accusation delay in violation of the Fifth

and Fourteenth Amendments.  "Plaintiffs concede there is no evidence in the record at this time

to prove an actual loss of evidence that would have aided Mr. Phillips and his counsel in the

criminal proceeding as required by Fifth Circuit precedent."  [Doc. No. 155, p. 19 (citing

*Quinn v. Roach,* 326 Fed. App'x. 280, 291 (5th Cir. 2009))].

The DA Defendants' Motion for Summary Judgment is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### c. Due Process and Equal Protection in Violation of the Fourteenth Amendment (Claim IV)

The DA Defendants next move for summary judgment on Plaintiffs' Claim IV that Mr. Phillips was subjected to due process and equal protection violations of the Fourteenth Amendments.  "Plaintiffs concede that, in this particular case based on the facts and circumstances, this claim is duplicative of other claims asserted herein for violations of the Fourth Amendment."  [Doc. No. 155, p. 19].

The DA Defendants' Motion for Summary Judgment is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### d. Failure to Disclose Exculpatory Evidence in Violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments (Claim XV)

Next, the DA Defendants move for summary Judgment on Plaintiffs' Claim XV, that Defendants failed to disclose exculpatory evidence in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments.  Plaintiffs oppose the motion, arguing that the DA Defendants violated *Brady* obligations by failing to disclose exculpatory evidence prior to the 404(b) hearing.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  *Id.* at 87.  Nine years later, the Supreme Court extended this principle to include material evidence "affecting" the credibility of a witness.  *Giglio v. United States*, 405 U.S. 150, 154 (1972).  Under *Brady/Giglio*, the Government must give the

defense impeachment evidence and exculpatory evidence.  *See United States v. Johnson*, 872 F.2d 612, 619 (5th Cir. 1989).

The elements of a *Brady* claim include: (1) the prosecution suppressed evidence, (2) it was favorable to the defendant, and (3) it was material. *United States v. Brown*, 650 F.3d 581, 587–88 (5th Cir. 2011).  Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the trial would have been different. *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

> The Fifth Circuit has stated, "[ ]Brady is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation." *United States v. Beasley*, 576 F.2d 626, 630 (5th Cir.1978) (citing *United States v. Agurs*, 427 U.S. 97, 107, 96 S. Ct. 2392 (1976)). Therefore, Brady "is not a pretrial remedy ." *See United States v. Garrett*, 238 F.3d 293, 303 (5th Cir.2000) (Fish, J., concurring) (quoting *United States v. Scott*, 524 F.2d 465, 467 (5th Cir.1975)). Rather, a Brady violation becomes a concern for courts only after trial, when courts are able to determine whether a nondisclosure deprived a defendant of a fair trial. *See id.* at 303–04 (citing cases). The Fifth Circuit has therefore held that "the prosecutor's compliance with the Jencks Act provided timely disclosures under Brady." *United States v. Campagnuolo,* 592 F.2d 852, 860 (5th Cir.1979) (citing cases). The Fifth Circuit has also held that there was no prejudice to the defendant when the government disclosed *Brady* information to the defendant during its case-in-chief. *See United States v. Neal*, 27 F.3d 1035, 1050 (5th Cir.1994). Lastly, the Fifth Circuit has held that there is no violation of *Giglio* as long as the evidence is disclosed to the defense before the end of trial.

*United States v. Davis*, No. CR.A. 01-282, 2003 WL 1825602, at *2 (E.D. La. Apr. 8, 2003).

The DA Defendants argue, first, that no false arrest occurred, and, alternatively, they are entitled to qualified immunity.  However, the Court has found that, as to Lt. Bletz, Plaintiffs can proceed with their false arrest claim.

The DA Defendants also argue further that there is no *Brady* obligation to disclose exculpatory information or evidence prior to trial, and, thus, there can be no *Brady* violation for actions or inaction before the 404(b) hearing.  The charges against Mr. Phillips were dismissed or nolle prossed prior to the commencement of the criminal trial against Mr. Phillips.

The Court agrees.  The DA Defendants simply had no duty under *Brady* to disclose exculpatory evidence prior to trial.  *Brady* is not a discovery rule, and the 404(b) hearing was not a "trial."  Further, even if there were some type of *Brady* obligation, the DA Defendants would be entitled to qualified immunity because it certainly is not a clearly established right.  Thus, the DA Defendants' Motion for Summary Judgment on this claim is GRANTED, and it is DISMISSED WITH PREJUDICE.

### e.   Policy and Custom Claim under § 1983 (Claim VI)

The DA Defendants next move for summary judgment on Plaintiffs' claims that policies and customs at the DA's Office were the moving force behind the deprivation of Mr. Phillips' constitutional rights.

An official capacity suit is the equivalent of a suit against the entity of which the officer is an agent. *Kentucky v. Graham*, 473 U.S. 159, 165-166 (1985); *Brandon v. Holt*, 469 U.S. 464, 471-472 (1985); *Hafer v. Melo*, 112 S.Ct. 358, 361 (1991); *McMillian v. Monroe Cnty., Ala.,* 520 U.S. 781, 784-85, (1997); *Burge v. St. Tammany Parish,* 187 F.3d 452, 466 (5th Cir. 1999).

The proper official to sue in his official capacity to impose liability upon a local governmental entity is the official with final policymaking authority for the entity under state or local law. *See Burge*, 187  F.3d at 468–70 ("The Supreme Court's cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are policymakers for the local government in a particular area, or on a particular issue, and that our inquiry is dependent on an analysis of state law.") (citing *St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion)).

Plaintiffs must show that a government policy or custom caused the alleged constitutional deprivation. *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 694 (1978); *Board of Cnty. Comm'nrs*

*of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *Turner v. Houma Mun. Fire & Police Civ. Serv. Bd.*, 229 F.3d 478, 483 n. 10 (5th Cir. 2000).  "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. . . .[A] municipality cannot be held liable *solely* because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Monell*, 436 U.S. at 691.

A policy may be a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the government's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority. *Burge*, 336 F.3d at 369.

> It is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the [governmental entity]. The plaintiff must also demonstrate that, through its deliberate conduct, the [governmental entity] was the "moving force" behind the injury alleged. That is, a plaintiff must show that the . . . action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the . . . action and the deprivation of federal rights.

*Bryan Cnty.*, 520 U.S. at 404.

"Proof of [governmental] liability sufficient to satisfy *Monell* requires: (1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)); *see also Davis v. Tarrant Cnty., Tex.*, 565 F.3d 214, 227 (5th Cir. 2009) (There must be "proof of (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose 'moving force' is the policy or custom.").

> The "official policy" requirement may be met in at least three different ways: [*Bryan County*, 520 U.S. ] at 406–08. . .. (1) "[W]hen the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." *Id.* at 417 . . . (Souter, J., dissenting). . . ; (2) Where no "official policy" was announced or

promulgated but the action of the policymaker itself violated a constitutional right. *Bryan County*, 520 U.S. at 417–18, 117 S.Ct. 1382 (Souter, J., dissenting). . .; and (3) Even when the policymaker fails to act affirmatively at all, if the need to take some action to control the agents of the local governmental entity "is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymake[r] ... can reasonably be said to have been deliberately indifferent to the need." [*City of*] *Canton* [*v. Harris*], 489 U.S. [378, 390 1989] . . .  ("Only where a municipality's failure to train its employees ... evidences a 'deliberate indifference' to the rights of its inhabitants can ... a shortcoming be ... city 'policy or custom'... actionable under § 1983.").

*Burge*, 187 F.3d at 471. "The 'moving force' inquiry requires a plaintiff to make two showings: causation and culpability." *Mason*, 806 F.3d at 280 (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404, (1997)). This inquiry imposes a causation standard higher than "but for" causation. *Id.* (citing *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992)).

First, to the extent that Plaintiffs assert this claim against ADA Holland, the Court has found that the allegations are in the nature of official capacity claims. As such, they must be asserted against the official policy maker, and, for the DA's Office, that person is DA Marvin, not a special prosecutor brought in by him. *Burge*, 187  F.3d  at  468 (Louisiana District Attorneys are "final policymakers" for purposes of official capacity claims under §1983. The DA Defendants' Motion for Partial Summary Judgment as to ADA Holland is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

Plaintiffs do properly assert a claim against the Bossier Parish District Attorney's Office, acting through DA Marvin. The DA Defendants move for summary judgment on this claim, arguing that Plaintiffs' claim against DA Marvin does not actually "stand alone," but is based on their assertions in support of their Section 1983 claims for false arrest, due process violations, and *Brady* violation (Claims I, III, IV, and XV). They argue that they are entitled to summary judgment on this claim because it is derivative of their other claims, and those underlying claims fail.

Plaintiffs respond that they have raised a genuine issue of material fact for trial on this claim because DA Marvin "maintained a custom, policy, and practice of initiating prosecutions without probable cause, interfering in criminal investigations, and failing to preserve exculpatory evidence." [Doc. No. 155, p. 74].  Additionally, Plaintiffs argue that DA Marvin failed to supervise ADA Holland.  *Id.*

In support of these claims, Plaintiffs assert that the DA's Office "twice initiated charges against Mr. Phillips without probable cause" and DA Marvin brought in ADA Holland, "who was already" in charge of the DA Office in Webster Parish.  [Doc. No. 155, p. 74].  Plaintiffs contend that he did so because he "knew ADA Holland would have no qualms about intimidating Mr. Phillips and threatening to bring multiple charges in an effort to coerce a plea[.]"  *Id.*  They also argue that DA Marvin is liable because there "are no written policies whatsoever directing the duties of assistant district attorneys[,]" and "[t]he lack of any clear directives has resulted in a widespread custom, policy, and practice of the Bossier Parish District Attorney's Office of failing to preserve exculpatory evidence."  *Id.* at 74-75.  Because of this lack of policy, Plaintiffs argue that ADA Holland "not only failed to comply with his duty to learn of the investigation's full results, which would have revealed patently exculpatory evidence and revealed evidence against one of the State's primary witnesses, but he also advised BSO to stop the January 2017 investigation, an investigation which undoubtedly would have led to the discovery of patently exculpatory evidence."  *Id.* at 75.  Further, if DA Marvin had supervised ADA Holland, Plaintiffs contend that he would have questioned the theory of the case, would have found it "odd" as he later admitted, and "it's likely Mr. Phillips would have never been unlawfully and maliciously prosecuted."  [Doc. No. 155, p. 76].  As a result, Plaintiffs argue that the unlawful custom, policy, and practices of the Bossier Parish District Attorney's Office

were a "moving force" behind the constitutional violations, and DA Marvin is liable for them.
*Id.*

In their reply, the DA Defendants again argue that Plaintiffs' policy claim is derivative
and fails for that reason alone.  The DA Defendants observe that, "[i]n general, Plaintiffs make
no attempt to tie particular alleged failures of policy, training, or  supervision  to  particular
alleged  constitutional  violations—they  simply  allege  the  derivative  claims  and say that these
were the 'moving force' behind the primary claims."  [Doc. No. 164, p. 7].  The only
"connection" they attempt to make is the argument that the DA's office had a custom, policy, or
practice of reviewing "'only . . . what the police bring.'"  *Id*. (quoting Doc. No. 155, p.76].
However, the DA Defendants argue that the resulting "violation" from that allegation could only
be a *Brady* violation, and there was no *Brady* violation in this case where the charges against Mr.
Phillips were dismissed prior to trial.

The Court has already dismissed Plaintiffs' Claims I, III, IV, and XV for the reasons
stated, *supra.*  To the extent that Plaintiffs' policy and custom claim against DA Marvin is
derivative of these dismissed claims, they have also failed to raise a genuine issue of material
fact for trial.  Furthermore, the Court finds that Plaintiffs have failed to raise a genuine issue of
material fact for trial that DA Marvin's failure to act affirmatively, as alleged, constituted
deliberate indifference to Mr. Phillips' rights.  Although Plaintiffs attach some nefarious purpose
behind DA Marvin's decision to bring in ADA Holland from Webster Parish, the Court cannot
say his decision to bring in an outside, experienced prosecutor made it "obvious" that the Bossier
Parish DA's Office needed a policy on the supervision of ADAs or that he would "need to take
some action to control the [ADAs]" in his office and under his supervision.  *See Burge*, 187 F.3d
at 471 (citations omitted).  Likewise, ADA Holland's reliance on review of "what the police

bring" as long as "everything necessary. . .to evaluate the case is there" also fails to raise a genuine issue of material fact for trial.  Even assuming that this "policy" is attributable to DA Marvin, the Court cannot say this policy or practice rises to the level of deliberate indifference.[16] Plaintiffs' reliance on DA Marvin's after-the-fact admission that he thought it odd Mr. Phillips would have committed these crimes is not sufficient to meet the standard required, but, at best, mere speculation.  Therefore, the DA Defendants' Motion for Partial Summary Judgment on the customs and policy claim against DA Marvin is also GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### 2.  State Law Claims

The DA Defendants also move for summary judgment on the state law claims against them.

### a.  False Arrest (Claim VIII)

Plaintiffs concede that the state law false arrest claim is analyzed the same as that under Section 1983.  Accordingly, for the reasons set forth previously, the Motion for Partial Summary Judgment is GRANTED, and the claims against the DA Defendants for false arrest in violation of state law are DISMISSED WITH PREJUDICE.

### b.  Malicious Prosecution (Claim IX)

The DA Defendants also move for summary judgment on Plaintiffs' state law claim for malicious prosecution.  Plaintiffs oppose dismissal of this claim as well.

A plaintiff must establish the following essential elements of a malicious-prosecution claim:

> (1) the commencement or continuance of an original criminal or civil judicial proceeding; (2) its legal causation by the present defendant[s] in the original

---

[16]Given the issues of fact with regard to Lt. Bletz's actions in this case, the Court is skeptical that ADA Holland would have received a "full" file, even if he had requested additional information.

> proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the
> absence of probable cause for such proceeding; (5) the presence of malice therein;
> and  (6) damage conforming to legal standards resulting to the plaintiff.

*Jones v. Soileau*, 448 So.2d 1268, 1271 (La. 1984).  A "favorable termination" is a disposition

where the court "passed on the merits of the charge in such circumstances as to suggest the

innocence or non-liability of the malicious prosecution plaintiff." *Lemoine v. Wolfe,* 168 So.3d

362, 368 (La. 2015). Legal causation requires proof that "the defendants 'have caused the

prosecution'" of the plaintiff.  *James v. Woods*, 899 F.3d 404, 408–09 (5th Cir. 2018) (quoting

*LeBlanc v. Pynes*, 46,393  (La. App. 2d Cir. 07/13/2011); 369 So.3d 1273, 1281).  While

"malice does not submit readily to definition,"  the  Louisiana Supreme Court has held that

"[a]ny feeling of hatred, animosity,  or ill will toward the plaintiff . . . amounts to malice." *Miller

v. East Baton Rouge Parish Sheriff's Dept.*, 511 So.2d 446, 453 (La. 1987) "Malice may be

inferred from the lack of probable cause or  inferred  from  a  finding  that  the  defendant  acted

in reckless disregard  of  the  other person's rights." *Id.*  Because  the  determination  of  malice

is  a  question of fact, summary judgment  is  inappropriate unless there is no evidence  from

which the trier of fact could reasonably infer malice.  *See id.; Burrell v. Adkins*, Civil Action No.

3:01-2679, 2008 WL 130789, at *7 (W.D. La. Jan. 10, 2008).

It is undisputed that Plaintiffs can establish the first and the third elements:  that a

criminal proceeding was commenced against Mr. Phillips and that there was a bona fide

termination in his favor.

However, the DA Defendants argue that Plaintiffs cannot raise a genuine issue of

material fact for trial on the fourth element—lack of probable cause.[17]  They argue that there was

sufficient evidence presented to Judge Thompson for him to determine that the charges against

---

[17]The Court notes, again, that the DA Defendants did not raise an absolute immunity defense to this claim.

Mr. Phillips were "'not capricious and [were] sufficiently supported to justify bringing into play the further steps of the criminal justice system.'"  [Doc. No. 141-2, ¶ 61 (quoting *Elkhayyat v. City of Memphis*, No. 2:16-cv-02154-JTF-dkv, 2018 U.S. Dist. LEXIS 201370, at *74 (W.D. Tenn. Sept. 21, 2018) (quoting *Flaskamp v. Dearborn Pub. Sch.*, 385 F.3d 935, 943 (6th Cir. 2004) (other citations and quotations omitted))].

Plaintiffs respond there was a lack of probable cause and point to the malice shown by Lt. Bletz.  Specific to the claims against the DA Defendants, Plaintiffs allege that ADA Holland acted with malice and that he and DA Marvin, as his employer, are liable for malicious prosecution.  Specific to ADA Holland, Plaintiffs argue:

> While ADA Holland did not explicitly express his hatred, animosity, and ill will, for the reasons set forth above, malice can be inferred from the absence of probable cause for the prosecution and ADA Holland's interference in the investigation which likely would have resulted in exculpatory evidence. . . ADA Holland  acted  with  reckless disregard to the truth and Mr. Phillips' constitutional rights, having doubts about the investigation . . . but arrogantly assuming he could simply coerce Mr. Phillips to plead guilty and pay restitution so he could obtain a "win." . . . ADA Holland's callousness is evidenced by his trial preparation efforts which include "sip[ping] a beer and smok[ing] a cigar". . . .during  lunch  with  Lt.  Bletz,  and claiming he has a "constitutional right to prosecute whomever [he] want[s] when [he] want[s]."3

[Doc. No. 155, p. 81 (citing Doc. No. 155-89, Exh. 87, ¶18; Doc. No. 155-26, Exh. 24, Holland Depo., p. 50[18]; Doc. No. 155-94. Exh. 92(a); Doc. No. 155-83, Exh. 81; Doc. No. 155-84, Exh. 82)].

While the Court has found that there is a genuine issue of material fact for trial that there was a lack of probable cause for Mr. Phillips' felony arrest, the Court has also found that the lack of probable cause is attributable to the actions (and inactions) of Lt. Bletz and not to ADA

---

[18]ADA Holland testified that once Chief Huddleston took over, he "had no doubt whatsoever that all [they] were going to find was the truth" and that before Chief Huddleston was involved "there was someone involved in the investigation, and [he] had some questions about whether they were the right person for the job."

Holland or DA Marvin.  Therefore, the jury cannot be permitted to "infer" malice from the lack

of probable cause for the arrest against ADA Holland and DA Marvin.  The other facts alleged in

support of the claim against ADA Holland, which are also attributable to DA Marvin, may not

paint him in the best light, but "callousness" towards criminal defendants generally falls short of

evidence of hatred, animosity, or ill will towards Mr. Phillips.  The DA Defendants' Motion for

Partial Summary Judgment on the malicious prosecution claim under state law is GRANTED,

and this claim is DISMISSED WITH PREJUDICE.

### c.   Abuse of Process (Claim X)

The DA Defendants next move for summary judgment on Plaintiffs' claims against them

for abuse of process under state law.  Plaintiffs oppose dismissal of this claim.

In *Gonsouland v. Rosomano*, 176 F. 481 (5th Cir. 1910), the United States Court of

Appeals for the Fifth Circuit recognized that the common law action for abuse of process was

actionable under Louisiana law under LA. CIV. CODE ART. 2315.  Although the decision of a

federal court sitting in diversity on an issue of state law is not binding on the state courts,

Louisiana appellate courts have since continued to recognize this cause of action.  *See*

*Waguespack, Sego and Carmichael (A PLC) v. Lincoln*, 1999-2016 (La. App. 1 Cir. 9/22/00);

768 So.2d 287; *Goldstein v. Serio*, No. CA-5153 (La. App. 4 Cir. 10/9/1986); 496 So.2d 412

writs denied, 501 So.2d 208, 209 (La.1987); *Mini-Togs, Inc. v. Young*, No. 13455  (La. App. 2d

Cir. 1/16/1978); 354 So. 2d 1389; *Succession of Cutrer v. Curtis*, No. 11017 (La. App. 1

Cir.1976); 341 So.2d 1209, writ denied, 343 So.2d 201 (La. 1977).  To prove abuse of process, a

plaintiff must establish the following elements:  "(1) the existence of an ulterior purpose; and (2)

a willful act in the use of the process not proper in the regular prosecution of the proceeding."

*Waguespack*, 768 So.2d at 290-91 (citing *Cutrer*, 341 So.2d at 1213-14).  The first element, that

of ulterior purpose, is similar to malice, but is a much more demanding test which would not be met by a showing of lack of knowledge or other technical types of malice, but which is only met when the officer is acting for a specific purpose not authorized by law.  *Taylor v. State*, No. 92-230 (La. App. 3d Cir. 3/31/93); 617 So.2d 1198,  1205, writ denied, 620 So.2d 875 (La. 1993). Even if there is an improper purpose or ulterior purpose, a plaintiff must prove irregularity of the process itself.  *See Mini–Togs, Inc.*, 354 So.2d at 1390 ("Regular use of process cannot constitute abuse, even  though the user was actuated by a wrongful motive, purpose, or intent, or by malice.").   This second criteria refers to a failure to comply with the proper procedures or rules set out by law for conducting official actions.  *Taylor*, 617 So.23d at 1205-1206.

In their consolidated opposition to the pending motions, Plaintiffs respond with allegations against ADA Holland and DA Marvin in "two respects":

> First, ADA Holland attempted to coerce Mr. Phillips into pleading guilty and paying restitution for an offense ADA Holland and DA Marvin knew there was insufficient evidence to support. . . . ADA Holland even acknowledged to the state  court that, "quite frankly, if [the 404(b) evidence is] not admissible there's no way you can find [Mr. Phillips] guilty.  There's just not." . . . He also threatened to file more charges against Mr. Phillips if he did not plead guilty.

> Second, . . . ADA Holland filed a "Motion and Order for Issuance of Warrant of Arrest, but failed to comply with the requirements of La. C. Cr. P. Art. 496(B), which requires "one or more affidavits which establish probable cause.

 [Doc. No. 155, p. 89 (citing Doc. No. 155-25, Exh. 23, Marvin Depo., p. 56; Doc. No. 155-6, Exh. 3, 404(b) Vol. II, p. 350; Doc. No. 155-26, Exh. 24, Holland Depo., p. 39)].

The DA Defendants respond that Plaintiffs' allegations do not show that there was "an act not proper in the regular prosecution of the proceeding," rather than an improperly motivated use of legal process.  [Doc. No. 164, pp. 11-12 (quoting *Weldon v. Republic Bank*, 414 So. 2d 1361, 1365 (La. App. 2 Cir. 1982)) (other citations and quotations omitted)].

59

The Court finds that Plaintiffs have failed to raise a genuine issue of material fact for trial.  As the DA Defendants argue, the process was not improper in this matter.  Even if the statute identifies an affidavit as the type of evidentiary support normally required for an arrest warrant, ADA Holland's incorporation by reference to the extended 404(b) hearing before the same judge considering the arrest warrant and who had the opportunity to hear and consider the evidence, could hardly be considered "abuse" of  process.   Further, even if there were abuse of process, the first element requires a showing that "much more demanding" than malice, and the Court has already found that Plaintiffs have failed to raise a genuine issue of material fact for trial that the DA Defendants acted with malice.  Generalized allegations of a win-at-any-cost attitude of ADA Holland does not meet the required showing.  The DA Defendant's Motion for Partial Summary Judgment on this claim is GRANTED, and the claim is also DISMISSED WITH PREJUDICE.

### d.  Intentional Infliction of Emotional Distress (Claim XI)

The DA Defendants also move for summary judgment on Plaintiffs' claim of intentional infliction of emotional distress against them.  Plaintiffs oppose dismissal of this claim.

To establish a cause of action for intentional infliction of emotional distress under Louisiana law, a plaintiff must prove the following three elements: "(1) that the conduct of defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." *White v. Monsanto Co*. 585 So.2d 1205, 1209-10 (La. 1991).  "The conduct must be intended or calculated to cause severe emotional distress and not just some lesser degree of fright, humiliation, embarrassment, worry, or the like."  *Id.* at 1210 (citing Restatement (Second) of

Torts § 46 (1965) *see also Almerico v. Dale*, 05-749 (La. App. 5th 2006), 927 So.2d 586, 592–

593 (An employer's conduct must be "intended or calculated to cause severe emotional distress,

not just some lesser degree of fright, humiliation, embarrassment, or worry.").  Conduct which is

merely tortious or illegal does not rise to the level of being extreme and outrageous for purposes

of this cause of action.  *Schmidt v. Cal-Dive Int'l* 240 F. Supp. 3d 542 (W.D. La. 2017); *see also*

*White*, 585 So.2d at 1209.

The DA Defendants argue that Plaintiffs just alleged generically that "Defendants"

engaged in "extreme and outrageous conduct" and "caused Todd Phillips, Jodi Phillips, Brooke

Phillips, and Abby Phillips to suffer severe emotional distress."  [Doc. No. 81, ¶¶ 202-203].

Even if these allegations were sufficient for pleading the first two elements of this claim, the DA

Defendants argue that Plaintiffs failed to plead the remaining element of this tort--that the DA

Defendants desired to inflict severe emotional distress or knew that severe emotional distress

would be certain or substantially certain to result from his conduct.

Plaintiffs respond that the facts set forth in their memorandum are sufficient to show that

the actions of ADA Holland constituted extreme and outrageous conduct.   However, they point

solely to the undisputed evidence regarding the placement of three posters along Old Plain

Dealing Road.  They note that all of  the criminal offenses at issue occurred in a small rural town

in the "Bible belt."  The remainder of their argument is devoted to the knowledge of the "BSO

Defendants" and their actions.  Plaintiffs contend that Defendants either desired Plaintiffs to

suffer or knew severe emotional distress would be substantially certain to occur.

The Court finds that Plaintiffs have failed to raise a genuine issue of material fact for

trial.  Even if the third element is a fact issue for the jury to decide generally, they rely on

evidence supporting a claim against the BSO Defendants, not the DA Defendants.  While the

Court has extensively reviewed the allegations and the evidence in this case, when the opposing party moves for summary judgment and points to a lack of evidentiary support (or even purported allegations), it is incumbent on the non-movant to point the Court to the evidence it believes supports its claim.  Here, the only specific evidence relied upon by Plaintiffs points to liability of the BSO Defendants, not the DA Defendants.  The Court cannot say, based on its review of the record, that the other actions or inactions of the DA Defendants rise to the level of outrageous conduct.  Accordingly, the DA Defendants' Motion for Partial Summary Judgment on Plaintiffs' intentional infliction of emotional distress claim is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### e.  Civil Conspiracy (Claim XII)

The DA Defendants next move for summary judgment on Plaintiffs' civil conspiracy claim under state law.  Plaintiffs raise allegations against certain BSO Defendants, but not against any DA Defendants.

There is no general cause of action of civil conspiracy under Louisiana law.  Instead, Louisiana Civil Code article 2324  provides  in  pertinent  part: "He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act."  In order to prevail on a claim of civil conspiracy,  a plaintiff must establish a meeting of the minds or collusion between the parties for the purpose of committing a wrongdoing.  *Prime Ins. Co. v. Imperial Fire & Cas. Ins. Co.,* 2014-0323 ( La. App. 4 Cir 10/01/14), 151 So. 3d 670, 677 (citing *Guidry v. Bank of LaPlace*, 94-1758, p.9 (La. App. 4 Cir. 9/15/95), 661 So.2d 1052,1058).

As Plaintiffs have failed to point to any evidence to support this claim against the DA Defendants, their Motion for Partial Summary Judgment is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### f.   Negligence and Negligent Infliction of Emotional Distress (Claim XVI)

The DA Defendants also move for summary judgment on Plaintiffs' claim of negligence and negligent infliction of emotional distress against them.  Plaintiffs oppose dismissal of this claim.

When plaintiffs seek to recover on the basis "that defendants' ordinary negligence caused them only mental disturbance[,]" the "general rule followed by the great majority of jurisdictions" is that, "without accompanying physical injury, illness or other physical consequences, the defendant is not liable for such emotional disturbance." *Moresi v. State Through Dep't of Wildlife & Fisheries*, No. 90-C-0205 (La. 1990); 567 So. 2d 1081, 1095 (citations omitted).  The Louisiana Supreme Court has recognized that in its jurisprudence there have been "deviations from the general rule[,]" but in all cases where the plaintiff has been allowed to proceed there have been "the special likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious." *Id.* (collecting cases) (citations omitted).

"Recovery for mental anguish or emotional distress is based on La. C.C. art. 2315, which provides in part that every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." *Brown v. City of Monroe*, 48,764 (La. App. 2 Cir. 2/26/14); 135 So. 3d 792, 796.  In order to prevail on a claim of negligent infliction of emotional distress, a plaintiff "must prove that the conduct in question was the cause-in-fact of the resulting harm or damages, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by

the defendant, and the risk of harm was within the scope of a protection afforded by the duty breached."   *Id*. at 796.

The DA Defendants argue that negligent infliction of emotional distress is a disfavored tort that requires special circumstances.  They contend that "distress over a mistaken arrest and prosecution is not a special but a ubiquitous circumstance."  [Doc. No. 164, p. 11].  They also contend that Plaintiffs have not specifically pleaded any of the elements of negligent infliction of emotional distress.

Plaintiffs respond that, as a result of the intentional actions and gross neglect of Defendants, including ADA Holland, "false accusations were lobbied against Mr. Phillips for more than  five (5) years," and "Plaintiffs  suffered,  and  are  continuing  to  suffer, severe emotional  distress.   They argue that Defendants acted with such gross neglect that they must be held liable for the damages caused to Plaintiffs."  [Doc. No. 155, p. 88].

In contrast to their arguments with regard to the BSO Defendants, Plaintiffs have again failed to point to specific evidence supporting this cause of action against the DA Defendants.  In fact, they rely on the same arguments for both the intentional and negligent infliction of emotional distress claims.  Under these circumstances, the Court finds that Plaintiffs have failed to raise a genuine issue of material fact for trial on their claims against the DA Defendants.  The DA Defendants' Motion for Partial Summary Judgment on this claim is GRANTED, and it is DISMISSED WITH PREJUDICE.

### g.   Negligent Hiring, Training, and Supervision (Claim XIV)

The elements of a negligent hiring, training, and/or supervision claim under Louisiana law, are the same as any negligence claim in Louisiana: "(1) the defendant had a duty to conform its conduct to a specific standard; (2) the defendant failed to conform its conduct to that standard;

(3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (in other words, the plaintiff and the plaintiff's injuries were within the scope of the defendant's duty); and (5) the plaintiff suffered damages." *Adams v. City of Shreveport*, 269 F. Supp. 3d 743, 771 (W.D. La. 2017); *see also Roberts v. Benoit*, 605 So.2d 1032, 1040–46 (La. 09/09/1991).

Further, Louisiana law provides for vicarious liability of employers for the actions of their employees under La. Civ. Code art. 2320 and does not have the same limitations of liability for governmental entities found under 42 U.S.C. § 1983.

The DA Defendants argue that DA Marvin's only liability on this cause of action is for the training, hiring, and supervision of ADA Holland.  For the same reasons the Court found there was no liability under Section 1983, there is also no cause of action under state law.  The DA Defendants' Motion for Partial Summary Judgment on this claim is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### h.  Defamation

In their Motion to Dismiss, the DA Defendants argued that Plaintiffs could not recover damages for allegedly defamatory statements made by ADA Holland.  The Court deferred ruling on that argument, indicating that it would be more properly considered in ruling on the instant Motion for Partial Summary Judgment.

In contrast, the DA Defendants did not originally move for summary judgment on any defamation claim asserted by Plaintiffs.  This is presumably because, despite three amendments to their Complaint, there is no heading in which a defamation claim is asserted, in contrast to all of their other claims.

Nonetheless, Plaintiffs contend that they asserted a defamation claim in paragraphs 1, 98, 100, 111, 118, 118-A, 119, 225-227 of their Fourth Amended Complaint.  [Doc. No. 81].  In the alternative, if such claim "was not expressly stated under Article 2314, Plaintiffs request leave to amend the Complaint to include a defamation claim under Louisiana state law."  [Doc. No. 155, p. 81, p. 81 n. 391].  To this extent they rely on Fifth Circuit precedent for the proposition that when a claim is raised for the first time in response to a motion for summary judgment, the court should review that as a motion to amend under Federal Rule of Civil Procedure 15(a).  *See Riley v. School Bd. Union Parish*, 379 Fed. App'x. 335, 341 (5th Cir. 2010); *see also Sherman v. Hallbauer*, 455 F.2d 1236, 1242 (5th Cir. 1972) ("[F] air treatment for the [plaintiffs] requires that they not be deprived of their day in court" despite the "frantically revised theory of the case.").

The only factual allegations against the DA Defendants appear in paragraphs 118, 118-A, and 119:

118.

On or about November 26, 2016, KTBS 3 News reported on the story and aired for the first time a recorded statement of ADA Holland wherein he stated: "Not a single person is gonna tie Todd Phillips to the property damage." ADA Holland also stated his intent to file more charges against Mr. Phillips if he did not accept the plea offer.

118-A.

During this same news segment, KTBS 3 News also reported that threatening letters had been sent to Mr. Phillips' counsel stating "You're asking too many questions" and "we can redirect blame."  Despite the absence of any evidence whatsoever that Mr. Phillips had written any letters, ADA Holland stated: "Todd Phillips is trying to deflect attention.  I'm convinced he is the one sending this stuff."

119.

In subsequent news segments,  ADA Holland intentionally and/or with reckless disregard for the truth made false representations to the media and to the public

that Mr. Phillips was responsible for all acts of property damage at issue and that
he was responsible for sending threatening letters to witnesses and others.

[Doc. No. 81, ¶¶ 118, 118-A, & 119].

To prevail a claim of defamation under Louisiana Civil Code article 2315, Plaintiffs must

prove four elements:"(1) a false and defamatory statement concerning another; (2) an

unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the

publisher; and (4) resulting injury." *Trentacosta v. Beck*, 96-2388 (La. 10/21/97); 703 So.2d

552, 559 (citing *Restatement (Second) of Torts*, § 558 (1977)). "Thus a plaintiff, in order to

prevail in a defamation action, must prove 'that the defendant, with actual malice or other fault,

published a false statement with defamatory words which caused plaintiff damages.'" *Id.*

(quoting *Sassone v. Elder*, 92-C-1856 (La. 1993); 626 So.2d 345, 350).

Words which expressly or implicitly accuse another of criminal conduct are considered

defamatory *per se*, and the elements of falsity and fault are presumed, and the element of injury

may be presumed. *Costello v. Hardy*, 2003-1146 (La. 1/21/04); 864 So.2d 129, 140 (citing

*Kosmitis v. Bailey*, 28,585 (La. App. 2d Cir. 1996); 685 So.2d 1177, 1180).

The Louisiana Supreme Court has recognized that a prosecutor may be entitled to

absolute or qualified immunity depending on the function of the role he is fulfilling. *See*

*Knapper v. Connick*, 96-0434 (La. 10/15/96); 681 So.2d 944, ( "A determination that prosecutors

are entitled to absolute immunity for conduct within the course and scope of their prosecutorial

functions does not mean that a prosecutor will be immune from suit in all cases. Immunity is

granted only in those instances where the function being served is advanced by the extension of

immunity. . . . We agree that a functional analysis of the role a prosecutor is fulfilling when the

alleged misconduct occurs is the touchstone to determining the type of immunity available

[either absolute or qualified].").   The Louisiana Supreme Court has further instructed:

> While we agree that law enforcement officers, whose duty includes charging persons with crimes, should be allowed to report the fact of a criminal investigation and an arrest without fear of a defamation action if the person is cleared of the charges, an officer cannot add additional injurious statements that the officer had no reason to believe were true. Such a restriction of the privilege should not have a chilling effect on the free reporting of criminal investigations and arrests, but should prevent occurrences such as in the present case where the officer not only reported the investigation and arrest, but also reported facts pertaining to guilt that were not developed in the investigation.

*Trentecosta*, 703 So. 2d at 564.

First, the Court finds that Plaintiffs appear to have sufficiently alleged a defamation claim against ADA Holland, pursuant to article 2315 in the Fourth Amended Complaint. In their reply, the DA Defendants find that Plaintiffs never asserted a defamation claim, and, therefore, they need not address such claim.  Without a motion or opposition to its pursuit, this claim would normally remain pending for trial.

However, the Court cannot ignore the DA Defendants' earlier argument in their Motion to Dismiss that Plaintiffs cannot not recover damages for any alleged defamatory statements made by ADA Holland because they rely on statements made in the 404(b) hearing or made to the Court and pertaining to that hearing.  For any such statements, the DA Defendants argue that ADA Marvin is entitled to absolute immunity because those statements were part of the judicial phase of the criminal process.

In fact, Plaintiffs admit that the statements of ADA Holland that were aired on KTBS News and appeared on ktbs.com on May 25, 2017, were quotes from the State's Post-Hearing Memorandum filed by ADA Holland.  To the extent that Plaintiffs seek to base a defamation claim on these statements, the Court finds that they were made as part of the judicial process, and, thus, ADA Holland is entitled to absolute immunity from liability for these statements.

In contrast, Plaintiffs have presented evidence that in November 2016,  knowing that KTBS was reporting on the investigation  and prosecution of Mr.  Phillips, ADA Holland stated to  reporters:  "Todd Phillips is trying to deflect attention.  I'm convinced he is the one sending this stuff."  [Doc. No. 155-94, Exh. 92, Affidavit of Gary Hines and KTBS news articles].  That statement then appeared on air and on ktbs.com.  *Id.*  Later, after Plaintiffs commenced this  suit seeking injunctive relief from the federal court  but  while  ADA  Holland  was continuing to prosecute Mr. Phillips, ADA Holland told reporters:  "It's interesting the sort of things criminals will do to try to escape responsibility."  "When they have money, like this  defendant,  they  and their  attorneys –who  are  equally  as  complicit  i[n]  abusing  the system –can be very creative." *Id.*

With regard to these remaining statements, only a qualified immunity would apply, and the Court has no argument from the DA Defendants.  Accordingly, Plaintiffs have a defamation action against ADA Holland only on the basis of such statements.

## III.    CONCLUSION

For the reasons set forth in this Ruling, the Motion to Dismiss is GRANTED IN PART AND DENIED IN PART.  To the extent that the DA Defendants move for dismissal of Plaintiffs' Section 1983 claims against them in their individual capacities for Failure to Intervene (Claim II), Due Process and Excessive Pre-Accusation Delay (Claim III), and Policy and Custom (Claim VI), the motion is GRANTED, and these claims are DISMISSED WITH PREJUDICE. To the extent that the DA Defendants move for dismissal of the state law claim of Failure to Intervene (Claim VIII), the motion is also GRANTED, and this claim is DISMISSED WITH PREJUDICE.  To the extent that the DA Defendants move for dismissal of Claim XIII, the Motion to Dismiss is DENIED AS MOOT.  The Motion to Dismiss is otherwise DENIED.

The Motion for Partial Summary Judgment [Doc. No. 141] filed by the DA Defendants is also GRANTED IN PART AND DENIED IN PART.  The motion is GRANTED IN PART AND DENIED IN PART as to Plaintiffs' state law defamation claim against ADA Holland, and the defamation claim remains pending based on the identified statements.  The motion is otherwise GRANTED, and all other claims against the DA Defendants are DISMISSED WITH PREJUDICE.  The only remaining claim for trial is Plaintiffs' defamation claim against ADA Holland.

MONROE, LOUISIANA, this 28th day of October, 2020.

_____
TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE